IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG VAN ARSDEL, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-2579 |
| | : | |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE | : | |
| COMPANY OF BOSTON, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                March 29, 2016

This action stems from the defendant's alleged wrongful denial of the plaintiff's claim for long-term disability benefits.  The plaintiff has asserted two state-law causes of action and a cause of action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. §§ 1001-1191c.  The parties have both moved for summary judgment on the issue of whether ERISA preempts the state-law causes of action or whether the long-term disability insurance policy at issue is exempt from ERISA preemption because it falls into the "safe harbor" regulation, 29 C.F.R. § 2510.3-1(j).  As discussed below, the court finds that ERISA preempts the state-law causes of action and the policy does not fall into the safe harbor provision.  Accordingly, the court will deny the plaintiff's motion for summary judgment, grant the defendant's motion for summary judgment, and enter partial summary judgment in the defendant's favor on the state-law causes of action in the amended complaint.

## I.    PROCEDURAL HISTORY

The plaintiff, Craig Van Arsdel, filed a complaint against Liberty Life Assurance Company of Boston ("Liberty Life") in the Court of Common Pleas of Philadelphia County on

April 3, 2014.  Notice of Removal ("Notice"), at Ex. 1, Complaint, Doc. No. 1.[1]  In the complaint, the plaintiff alleges that while working as a plant controller for Pratt Industries he developed severe arthritis in his right hip along with a multitude of other ailments.  Complaint at ¶¶ 3, 8.  By January 4, 2013, the plaintiff could not continue working at his job, and he applied for short-term disability ("STD") benefits under a group disability insurance policy that he purchased from Liberty Life in 2011.[2]  *Id.* at ¶¶ 4, 9.  Although Liberty Life initially denied the claim, it provided him with STD benefits from February 1, 2013, until April 7, 2013, after he successfully appealed from the denial.  *Id.* at ¶¶ 9, 10.  On March 28, 2013, the plaintiff applied for long-term disability ("LTD") benefits.  *Id.* at ¶ 11.  Liberty Life denied the LTD benefits claim on or about May 2, 2013, and although the plaintiff appealed from the denial, Liberty Life affirmed its prior denial on August 23, 2013.  *Id.* at ¶¶ 19-20.

Based upon Liberty Life's denial of his claim for LTD benefits, the plaintiff asserted state-law causes of action for breach of contract and statutory bad faith in the complaint.  *Id.* at 8-9.  On May 2, 2014, Liberty Life filed a notice of removal claiming that removal was proper because the plaintiff was actually seeking to enforce an ERISA claim.  *See* Notice at ¶ 10 (referencing 28 U.S.C. §§ 1331, 1441(b) and 29 U.S.C. § 1132).  The plaintiff then filed an amended complaint on June 11, 2014, in which he appears to have repeated the underlying factual allegations from the original complaint, but added an alternative cause of action under ERISA to the preexisting state-law causes of action.  Amended Compl., Doc. No. 3.

---

[1] The plaintiff originally named Liberty Mutual Insurance Company ("Liberty Mutual") as the defendant.  *See* Complaint at 1.  Per a stipulation by the parties which the court entered as an order on May 13, 2015, the parties agreed to amend the caption to substitute Liberty Life Assurance Company of Boston for Liberty Mutual and replace all references in the complaint to Liberty Mutual with Liberty Life.  *See* Doc. Nos. 15, 16.

[2] The plaintiff alleges that he paid all premiums required under the insurance agreement with Liberty Life.  Complaint at ¶ 4.

Liberty Life filed a motion to dismiss the state-law causes of action in the complaint on June 18, 2014.  Doc. No. 5.  In the motion, Liberty Life argued that the court should dismiss the state-law claims for breach of contract and statutory bad faith because ERISA preempted those claims.  *See* Memorandum of Def. Liberty Mutual Ins. Co. in Supp. of Mot. to Dismiss Counts I and II of Pl.'s Am. Compl. at 2-6, Doc. No. 5.  The plaintiff filed a response to the motion on June 26, 2014.  Doc. No. 6.  In the response, the plaintiff asserted that the court should deny the motion because the disability insurance plan at issue falls within the "safe harbor" provision, 29 C.F.R. § 2510.3-1(j) and is exempt from ERISA coverage.  Memorandum of Law in Supp. of Pl.'s Reply to Def.'s Mot. to Dismiss Counts I & II of the Am. Compl. at 6-7, Doc. No. 6.

The court resolved the motion to dismiss via a memorandum opinion and order filed on September 5, 2014.  Doc. Nos. 9, 10.  The court (1) denied the motion to dismiss the state-law claims in counts I and II of the amended complaint because the parties' contentions raised issues of fact that the court could not resolve through a motion to dismiss, and (2) provided the parties with a period of time to conduct limited discovery on the potential applicability of the safe harbor provision and then file motions for summary judgment on this issue.  Memorandum Op. at 4-6, Doc. No. 9; Order, Doc. No. 10.  With respect to this discovery period, the parties sought and received two extensions of time to finish conducting discovery on the safe harbor issue.  Doc. Nos. 11-14.

On May 13, 2015, the parties filed cross-motions for summary judgment on the applicability of the safe harbor provision and the viability of the state-law claims in the amended complaint.  Doc. Nos. 17-21.  Liberty Life then filed an answer to the amended complaint with affirmative defenses on May 28, 2015.  Doc. No. 22.  On the same date, Liberty Life filed a response to the plaintiff's statement of facts in support of his motion for summary judgment and

a brief in opposition to the plaintiff's motion for summary judgment.[3]  Doc. Nos. 23, 24.  The court heard oral argument on the cross-motions for summary judgment on July 8, 2015.  The cross-motions are ripe for disposition.

## II.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

[3] As discussed later in this opinion, the plaintiff did not file any document in opposition to Liberty Life's motion for summary judgment.

(1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252.  Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment.  *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict

5

for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial[]'" and the court should grant summary judgment in favor of the moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment.  *Erbe v. Connecticut Gen. Life Ins. Co.*, No. CIV.A. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)).  "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (citing *Transguard*, 464 F. Supp. 2d at 430).

### B.      Applicable Factual Record

Prior to January 1, 2008, United Omaha Life Insurance Company ("Omaha Life") insured group life and disability benefit plans for Pratt Industries, U.S.A., Inc. ("Pratt").[4]  Appendix of Evidentiary Materials in Supp. of Def.'s Mot. for Summ. J. on Counts I and II of Pl.'s Compl. ("Def.'s App.") at Ex. 1, Declaration of Laurie Kruse ("Kruse Decl.") at ¶ 6, Doc. No. 18-1; Def.'s App. at Ex. 2, Declaration of Lisa K. Fryar ("Fryar Decl.") at ¶ 8, Doc. No. 18-2.  In spring 2007 and in anticipation of the expiration of Pratt's policies with Omaha Life, Laurie Kruse ("Kruse"), an employee of Liberty Life, engaged in preliminary discussions with Lisa K.

---

[4] Pratt Industries, U.S.A., Inc. was the former name for Pratt Industries, Inc.  Plaintiff's Mot. for Summ. J. Pursuant to Fed. R. Civ. Pro. 56(a) ("Pl.'s MSJ") at 3, ¶ 5 & Ex. B, Telephonic Dep. of Victor Columbus ("Columbus Dep.") at 15, Doc. Nos. 19, 19-3; Defendant's Response to Pl.'s Statement of Facts ("Def.'s Response") at 2, ¶ 5, Doc. No. 23.

Fryar ("Fryar") about Liberty Life submitting a proposal for Pratt's policies.[5]  Kruse Decl. at ¶ 6;

Fryar Decl. at ¶ 8; Kruse 30(b)(6) Dep. at 6, 7, Pl.'s MSJ at 8; Def.'s Response at 6, ¶ 18.

At the time of these discussions, Fryar was working for D.I.A. Benefits Solutions LLC

("DIA"), which was representing Pratt's interests and negotiating on its behalf as its broker.[6]

---

[5] Liberty Life is an affiliate of Liberty Mutual.  Kruse Decl. at ¶ 1.  Although the plaintiff's counsel and Kruse consistently referred to "Liberty Mutual" throughout Kruse's Rule 30(b)(6) deposition, the plaintiff's counsel meant to refer to "Liberty Life" and Kruse understood counsel's references to "Liberty Mutual" to actually mean "Liberty Life." Pl.'s MSJ at Ex. A, 30(b)(6) Dep. of Laurie Kruse ("Kruse 30(b)(6) Dep.") at 39-40, Doc. No. 19-2.

Kruse is (as of May 2015) a senior group benefit sales consultant for Liberty Life.  Kruse Decl. at ¶ 1.  She has worked as a sales consultant for Liberty Life and Liberty Mutual for approximately ten years, and she has been employed in the insurance industry as a sales consultant for approximately 21 years.  *Id.*  In her role as a sales consultant for Liberty Life, Kruse is responsible for acquiring new business for group life and disability insurance products offered by Liberty Life.  *Id.*; Kruse 30(b)(6) Dep. at 7-8.  She sells life and disability policies only to companies and only through brokers or consultants.  Kruse 30(b)(6) Dep. at 8; Pl.'s MSJ at 8; Def.'s Response at 6, ¶ 18.

[6] As discussed later in this opinion, there is a disputed issue of fact as to whether Fryar was a Pratt employee and the precise organizational relationship between DIA and Pratt (although the parties agree that DIA and Fryar acted as Pratt's broker).  In particular, Fryar states that Pratt employed her as a salaried employee from December 2005 until December 20, 2013.  Fryar Decl. at ¶ 1.  As part of this employment, Fryar (1) received IRS W-2 forms showing her compensation from Pratt, (2) participated in Pratt's employee benefit plans, including group health, dental, STD, and LTD plans, (3) participated in Pratt's 401k plan while receiving matching contributions from Pratt, and (4) had a Pratt e-mail address (lfryar@prattindustries.com).  *Id* at ¶¶ 1, 2.  Fryar also stated her "official job title was Director of Benefits, and [her] market title was Vice-President of Benefits."  *Id.* at ¶ 1.

In her role as Director of Benefits, Fryar supervised Hali Smith ("Smith"), who was the Benefits Administrator and, according to Fryar, a salaried Pratt employee.  *Id.* at ¶ 3.  Smith and Fryar comprised Pratt's benefits department, and their duties included:

> [I]nteracting with third-party providers and insurers concerning various employee benefit plans and benefits provided to Pratt employees; representing Pratt in discussions and negotiations with such providers and/or insurers concerning the terms and premiums associated with such benefit plans; providing information to current Pratt employees for their use in completing the annual (or any special) enrollment forms concerning their elections for participation in those benefit plans, as well as providing such information to new hires; assisting with claims under such plans by providing requested information to the providers or insurers; and answering questions from employees regarding employee benefits with Pratt.

*Id.* at ¶ 4.

Regarding DIA, Fryar indicates that Pratt formed DIA some time after Pratt hired her in December 2005.  *Id.* at ¶ 5.  According to Fryar, Pratt was the "sole and controlling shareholder of DIA."  *Id.*  Throughout Fryar's employment with Pratt, DIA practically operated as a division of Pratt.  *Id.*  At no time during or after her employment with Pratt did Fryar receive compensation from DIA.  *Id.*  All of her compensation and bonuses came from Pratt.  *Id.*

In addition to Fryar's statements in her declaration, the record contains redacted W-2 forms for Fryar and Smith for 2012 and 2013.  Pl.'s MSJ at Ex. D, Stipulation at Ex. A, Doc. No. 19-5.  The W-2 forms for Fryar and Smith list their employer as "PRATT INDUSTRIES USA INC."  *Id.*; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 15.

Although Fryar indicated that (1) Pratt created DIA and was its "sole and controlling shareholder," and (2) she and Smith were Pratt employees (seemingly corroborated by the above-referenced W-2 forms), Victor Columbus ("Columbus"), executive vice president of Pratt Industries, Inc. provided contradictory information.  Columbus testified at a deposition as the Rule 30(b)(6) designee of Pratt Industries, U.S.A.  Columbus Dep. at 4.  Columbus has been an executive vice president at Pratt since 1992, and he is in charge of safety, "environmental," and human resources (including benefits).  *Id.* at 8.

Kruse 30(b)(6) Dep. at 20; Fryar Decl. at ¶ 5; Pl.'s MSJ at 7; Columbus Dep. at 24, 27, 28, 44;

Def.'s Response at 4, ¶ 12.   Fryar and Smith, whom Fryar supervised, were DIA's principal

employees.   Fryar Decl. at ¶¶ 3, 4; Columbus Dep. at 30-31.   All of the direct negotiations for

Pratt's disability policy occurred between Kruse, Fryar, and Smith.   Kruse 30(b)(6) Dep. at 16,

25; Columbus Dep. at 36, 61.   Fryar and Kruse negotiated the prices and the benefits for the Pratt

policies.   Kruse 30(b)(6) Dep. at 15; Kruse Decl. at ¶¶ 4, 7; Columbus Dep. at 54.   During the

negotiations, Fryar was obliged by Pratt to obtain the highest coverage levels at the lowest

premiums because the costs were paid 100% by the employees.   Columbus Dep. at 54-56, 59;

Pl.'s MSJ at 4; Def.'s Response at 2, ¶ 2.   Columbus had the ultimate authority to approve the

---

Columbus stated that DIA was formed in 2005 and was a subsidiary of Pratt Holdings, which is also the parent company of Pratt.   Columbus Dep. at 29, 40.   The parties appear to agree with this particular testimony.   Pl.'s MSJ at 5; Def.'s Response at 2, ¶ 5.   Columbus also testified that Pratt did not have a financial interest in DIA.   Columbus Dep. at 25-26.   The parties dispute this fact.   *See* Pl.'s MSJ at 5; Def.'s Response at 3, ¶ 6.

Columbus stated that DIA was created to replace Pratt's former insurance broker.   *Id.* at 29-30, 43, 48.   In addition, DIA would act as a benefits help desk to answer employees' questions about benefits issues, which Columbus indicated is a service typically provided by a broker and one provided by Pratt's past and post-DIA brokers.   *Id.* at 48-49.   According to Columbus, Fryar and Smith were the only employees of DIA and they never held a position with Pratt or had office space at Pratt's corporate offices.   *Id.* at 30-31, 33, 34, 42; Pl.'s MSJ at 6; Def.'s Response at 3, ¶¶ 7, 9.   Columbus did not know if Fryar or Smith held positions with Pratt Holdings or the company that apparently actually employed the plaintiff, Pratt Impress.   *Id.* at 31, 33.   With regard to Fryar having an e-mail address for Pratt, Columbus explained that "it is not uncommon for Pratt to give e-mail addresses . . . for ease of employees to contact a benefit representative."   *Id.* at 32.

The parties agree that, *inter alia*, (1) in June 2008, the Internal Revenue Service assigned an employer identification number to DIA, (2) Liberty Mutual provided DIA with a list of requirements to become a broker and receive commissions, (3) DIA had errors and omissions coverage and a license to act as an insurance broker, (4) DIA filed an application to become an independent agent authorized to sell insurance policies for one (or more) of the Liberty Mutual Group Companies, and (5) DIA and Liberty Life entered into an "Employee Benefit Producer Agreement" in August 2007, by which DIA would "submit for Liberty Life's underwriting consideration applications from employers for group policies or products," and for which DIA would receive a commission from Liberty Life.   Pl.'s MSJ at 6-7 & Ex. C; Def.'s Response at 3-4 & ¶¶ 10, 11.   DIA and its representatives were independent contractors under the "Employee Benefit Producer Agreement."   Pl.'s MSJ at 6 & Ex. C; Def.'s Response at 4, ¶ 11.   Fryar signed the "Employee Benefit Producer Agreement" on behalf of DIA.   Pl.'s MSJ at 6 & Ex. C; Def.'s Response at 4, ¶ 11.   This agreement does not reference Pratt Industries, Inc. or Pratt Industries, U.S.A.   Pl.'s MSJ at 6-7 & Ex. C; Def.'s Response at 4, ¶ 11.

With regard to Fryar's assertion that the W-2 forms illustrate her employment with Pratt, Pratt's attorney, in response to document requests submitted to Pratt, provided an e-mail (containing Fryar and Smith's W-2 forms) in which he sought to "clarify an issue that might result from the recently circulated W-5 [sic] for the named DIA employees."   Pl.'s MSJ at Ex. D, Stipulation at Ex. B.   In this regard, Pratt's attorney indicated that "Pratt Industries has acted, in the past, as a common payroll provider for certain cost reasons and to simplify matters.   In doing so, it has acted as a payroll provider for individuals who are not exactly employed by Pratt.   In doing so, Pratt is merely providing a service."   *Id.*   While Liberty Life acknowledges the text of the attorney's e-mail, it denies that Pratt issued the W-2 forms for the reasons stated in the e-mail.   Def.'s Response at 5, ¶ 16.

8

amount of the premiums and coverage levels for the STD and LTD plans negotiated between Fryar and Liberty Life.[7]  *Id.* at 53-55.

To assist with the discussions between DIA and Liberty Life, Fryar provided Kruse with (1) copies of summary booklets describing the disability benefits provided under Omaha Life's disability policy, (2) data concerning Pratt employee participation levels, and (3) data concerning claim experience under the Omaha Life policy.  Fryar Decl. at ¶ 8; Kruse Decl. at ¶ 6.  After the discussions between Kruse and Fryar, Liberty Life agreed to submit a proposal for Pratt's group life and disability insurance.  Fryar Decl. at ¶ 8.  In addition, Pratt submitted an application for group insurance, including a group disability income insurance policy, with Liberty Life on August 1, 2007.  Kruse Decl. at ¶ 5 & Ex. B, Application for Group Insurance.  Fryar signed this application on Pratt's behalf and identified herself as "VP Benefits."[8]  *Id.*

Liberty Life issued a disability policy for Pratt that was effective January 1, 2008 (the "Pratt Disability Policy").[9]  Kruse Decl. at ¶¶ 2, 7 & Ex. A; Fryar Decl. at ¶¶ 7, 9.  Pratt insisted that certain terms were included this policy.  Kruse Decl. at ¶ 7; Fryar Decl. at ¶ 10.  Some of those Pratt-insisted terms included:  (1) voluntary participation for Pratt employees; (2) the employees paid 100% of the premiums through post-tax payroll deductions; (3) hourly employees could not obtain coverage for LTD benefits; (4) salaried employees electing STD coverage had to also elect LTD coverage; (5) for hourly employees, (a) STD benefits were payable for up to 24 months, with a 14-day waiting period, and (b) the amount of STD weekly benefits was 60% of "Basic Weekly Earnings," as defined in the Policy, with a maximum weekly

---

[7] As discussed later in this opinion, Pratt chose different coverage levels for hourly and salaried employees.  DIA did not have the authority to expand the coverage for hourly employees without Columbus's approval.  Columbus Dep. at 53-54.

[8] Columbus did not know why Fryar identified herself as the "VP Benefits."  Columbus Dep. at 33.

[9] The Pratt Disability Policy was issued number GD/GF3-850-288264-01.  Kruse Decl. at Ex. A.  It lists "Pratt Industries, U.S.A." as the sponsor of the plan.  *Id.*  It also states that "[t]his policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments."  *Id.*  It stayed in effect until July 1, 2014.  Kruse Decl. at ¶ 2.

benefit of $750; (6) for salaried employees, (a) STD benefits were payable for up to 13 weeks with a 14-day waiting period, and (b) the amount of weekly STD benefits was 66.67% of "Basic Weekly Earnings," as defined in the policy, with a maximum weekly benefit of $750; and (7) the amount of monthly LTD benefits payable for salaried employees was 66.67% of "Basic Monthly Earnings," as defined in the policy, less other income benefits or earnings as defined in the policy, there was a 90-day elimination period, and the maximum monthly benefit was $20,000. Kruse Decl. at ¶ 7; Fryar Decl. at ¶ 10; Columbus Dep. at 38, 52-54; Kruse 30(b)(6) Dep. at 11-12, 30-31, 34.   Pratt also elected the definition of the term "disability" for STD and LTD benefits.   Kruse Decl. at ¶ 7(g); Fryar Decl. at ¶ 10(f).

Regarding the LTD benefit coverage in particular, Pratt also elected the following provisions:  (1) a 24-month maximum period of benefits for employees with disabilities caused by mental illness or substance abuse; (2) a standard integration provision for offsetting LTD benefits by a person's receipt of other income, which included, among other things, dependent social security benefits; (3) a partial disability benefit provision providing eligibility if the employee worked in the employee's own or another occupation and was earning between 20% and 80% of the employee's pre-disability earnings; (4) a rehabilitation incentive benefit under which an employee's monthly benefit would increase from 66.67% to 76.67% if the employee participated in a rehabilitation program approved by Liberty Life; and (5) a maximum duration period under which benefits payable to persons age 60 or less at the time of disability who continued to meet the policy's definition of disability would be subject to a maximum duration period constituting the greater of age 65 or the person's social security normal retirement age. *Id.* at ¶ 8.  Conversely, Pratt chose not to elect the following:  (1) a 24-month maximum period for employees with disabilities caused by non-verifiable symptoms; and (2) offsetting LTD

benefits by an employee's receipt of social security benefits or limiting the offset to only the employee's receipt of primary social security benefits.  *Id.* at ¶¶ 8(a), (b).

Although Liberty Life's initial proposal for Pratt's group life and disability policies provided for a two-year rate guarantee, Liberty Life agreed to Pratt's request (relayed through Fryar) to extend the time to two-and-a-half years so that it was compatible with Pratt's other employee benefit plans.  Kruse Decl. at ¶ 15.  Liberty Life also agreed to Pratt's request to reduce the monthly premium rate of $.59 per $100 of coverage in the initial proposal to a rate of $.53 per $100 of coverage.  *Id.* at ¶ 16.

All Pratt employees previously covered by Omaha Life were automatically enrolled in Liberty Life's group life and disability policies without having to provide evidence of insurability.  Kruse Decl. at ¶ 10.  Pratt also requested that Liberty Life provide an "open enrollment" period so that Pratt employees not previously covered by the Omaha Life policy could enroll for coverage under the Pratt Disability Policy without providing evidence of insurability.  *Id.*  Liberty Life agreed to the request and there was an enrollment period for the January 1, 2008 effective date of the policy.[10]  *Id.* & Ex. D.

Pratt and DIA were solely responsible for overseeing the enrollment process for the Pratt Disability Policy and Liberty Life did not participate in the process of providing information to Pratt employees.  Kruse Decl. at ¶¶ 12, 13; Fryar Decl. at ¶ 12; Columbus Dep. at 49-50.  New employees had a certain number of days after commencing employment to enroll and existing employees could enroll or change their enrollment elections during the annual enrollment period or during a special enrollment period.  Kruse Decl. at ¶¶ 11, 12.  Regarding special enrollments,

---

[10] Kruse did not know how Pratt or DIA communicated the availability of LTD coverage from Liberty Mutual to Pratt employees.  Kruse 30(b)(6) Dep. at 33.

Pratt requested and Liberty Life agreed to a special enrollment period in 2009. *Id.* at ¶ 11; Fryar Decl. at ¶ 11 & Ex. 2.

Regarding information about employee benefits in connection with enrollment periods, either Fryar or Pratt's human resources personnel would conduct meetings with employees to provide information about the process and the available plans.[11]   Columbus Dep. at 49-51.   In addition, Fryar and Smith supervised vendors preparing booklets describing the benefits and those booklets were provided to the employees annually as part of the enrollment process.   Fryar Decl. at ¶ 6.   The booklets were also available at other times to assist with enrollment.   *Id.*

As an example of one of the booklets, Pratt employees were provided with a "Benefits Enrollment Guide" effective July 1, 2012 (the "Guide"), which described the STD and LTD policies and summarized Pratt's other benefit plans offered to employees, including health insurance, dental insurance, life insurance, vision benefits, wellness programs, and prepaid legal services.[12]   Fryar Decl. at ¶ 6 & Ex. 1, Benefits Enrollment Guide; Pl.'s MSJ at 10; Def.'s Response at 9, ¶ 28.   The Guide included a disclaimer, which stated: "[T]he information contained herein is provided for information purposes only.   FOR SPECIFIC COVERAGE QUESTIONS SEE YOUR CERTIFICATE OF COVERAGE, SUMMARY PLAN DESCRIPTION OR CONTACT THE CARRIER – ONLY THOSE SOURCES ARE BINDING." *Id.* at 5.

---

[11] Columbus stated that in smaller office locations, regional human resource managers that had received training regarding the benefits and open enrollment would lead the benefit presentations to Pratt employees.   Columbus Dep. at 49.   At larger facilities, DIA (or representatives of the broker) would assist with the presentations.   *Id.* at 50.
[12] Liberty Life was not involved in preparing the Guide.   Kruse 30(b)(6) Dep. at 47-48 & Ex. 4.   Columbus stated that DIA drafted the language describing the disability coverage in the Guide.   Columbus Dep. at 36, 37; Pl.'s MSJ at 10; Def.'s Response at 9, ¶ 28.

The cover page of the Guide indicates that it is "[b]rought to you by Pratt Industries (USA)" and contains a Pratt company logo.[13]  Benefits Enrollment Guide at 1.  Inside the Guide, there is a section informing employees that there is a Pratt Industries Benefits Center, which has a website—https://pratt.employee.com to guide employees through the enrollment process.[14]  *Id.* at 4.  This section also informs employees that if they "do not have internet access, [they] may call D.I.A. Benefits Solutions at (800) 933-2618."  *Id.*  In the section for "Useful Resources & Key Benefits Contact Information," the Guide informs employees that DIA is "YOUR TOTAL BENEFIT[S] RESOURCE."  *Id.* at 3.  The Guide provides telephone, facsimile, and e-mail contact information for DIA and the direct phone numbers for Fryar and Smith.  *Id.*  The Guide also identifies the issuers of the various benefit policies, such as Blue Cross/Blue Shield of Georgia as administering health and dental benefits and Liberty Mutual for disability and life insurance coverage.  *Id.* at 6, 12; Pl.'s MSJ at 10; Def.'s Response at 9, ¶ 28.

The Guide provides numerous references to Pratt, including the following:

- "Your health and the health of your family are important to Pratt Industries – this is the reason we offer comprehensive health care coverage with many ancillary benefit options to eligible employees and their families."

- "This guide describes Pratt Industries' comprehensive health care programs."

- "If you elect health insurance with Pratt Industries you will be part of the BlueCard PPO."

- "Pratt offers two voluntary vision benefits you may purchase with pre-tax dollars for yourself and any eligible dependents."

- "Pratt Industries provides every employee Basic Life & AD&D (Accidental Death & Dismemberment) insurance."

- "In order for your health plan sponsor (Pratt Industries) or our benefits division, D.I.A. Benefit Solutions[,] to assist you with all information concerning claims

---

[13] The Pratt company logo is also found on a number of other pages in the Guide.  *See* Benefits Enrollment Guide at 2, 4, 6, 8, 10, 12, 14, 16.

[14] The footer on each page of the Guide also contains a link to the Pratt Industries Benefits Center's website.

payment, denial of coverage, the status of pending claims, billing status or any other information relating to disclosure of your [protected health information]."

Benefits Enrollment Guide at 5, 6, 9, 10.

Pratt maintained all data about its employees' benefits elections. Kruse Decl. at ¶ 14. After the enrollment periods, Liberty Life would seek and receive a census from Pratt to show the covered employees and, consequently, the employees who should be paying the premiums. *Id.* at ¶ 14; Kruse 30(b)(6) Dep. at 31-32. Fryar provided Liberty Life with a census as to which Pratt employees elected coverage. Kruse 30(b)(6) Dep. at 32-33. Also, if an employee elected coverage, Liberty Life claims personnel would contact either Fryar or Smith to confirm coverage. Kruse Decl. at ¶ 14.

Fryar was the only person that provided Kruse (and Liberty Life) with all documentation relating to the purchase of LTD coverage by Pratt employees. Kruse 30(b)(6) Dep. at 33. DIA also handled all aspects of the LTD contracts and any renewals, including enrollment, premiums, elections, [and] questions. *Id.* at 37. Pratt did not receive any separate consideration for activities in connection with the LTD contracts. *Id.*

The Pratt Disability Policy provides that participants must submit notice and proof of a claim for benefits to Liberty Life. Kruse Decl. at Ex. A, Policy at LL-0047.[15] The Pratt Disability Policy also vests Liberty Life with discretionary authority to construe the terms of the policy and to determine eligibility for benefits. *Id.* at LL-0046; Pl.'s MSJ at 9; Def.'s Response at 8, ¶ 24. Also, Liberty Life's "decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." Kruse Decl. at Ex. A, Policy at LL-0046; Pl.'s MSJ at 11; Def.'s Response at 10, 11, ¶ 31. Liberty Life is the sole company identified as

---

[15] A copy of the policy was introduced as an exhibit during Columbus's Rule 30(b)(6) deposition and is attached to the deposition transcript. *See* Columbus Dep. at Ex. A.

being obligated to pay benefits pursuant to the Pratt Disability Policy.  Kruse Decl. at Ex. A, Policy at LL-0001; Pl.'s MSJ at 10; Def.'s Response at 10, ¶ 29.

The Pratt Disability Policy states that the sponsor, *i.e.* Pratt, "will furnish at regular intervals" to Liberty Life:  (1) "[I]nformation relative to Employees [(a)] who qualify to become insured; [(b)] whose amounts of insurance change; and/or [(c)] whose insurance terminates[; and (2)] any other information about this policy that may be reasonably required."  Kruse Decl. at Ex. A, Policy at LL-0046.  In addition, Liberty Life had the ability to inspect Pratt's records, which in Liberty Life's opinion had a bearing on insurance, at any reasonable time.  *Id.*

During the time that the Pratt Disability Policy was in effect, Liberty Life agreed that, to the extent necessary, it would (1) withhold and remit employee FICA from benefit checks using Liberty Life's tax identification number, (2) remit employer FICA match using Liberty Life's tax number, and (3) report employee and employer FICA wages using Liberty Life's tax identification number.[16]  Kruse Decl. at ¶ 17 & Exs. F, G.  Pratt agreed that it would reimburse Liberty Life for employer FICA match, if applicable.  *Id.*

DIA received commissions from Liberty Life.  Kruse 30(b)(6) Dep. at 34-35, 37; Columbus Dep. at 35; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 13.  Liberty Life provided the commissions directly to DIA based upon percentages for each line of coverage.  Kruse 30(b)(6) Dep. at 35, 37; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 13.  Liberty Life would annually report the commissions paid to DIA as part of its tax filings.  Kruse 30(b)(6) Dep. at 35; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 13.

---

[16] On December 20, 2011, Fryar signed a Liberty Life "FULL TAX SERVICE WITH W-2 PRODUCTION" form. Kruse Decl. at Ex. G; Kruse 30(b)(6) Dep. at 20-22 & Pl.'s Ex. 3; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 14.  Fryar signed the location for the "Employer Signature," and the document identified the "employer" as "Pratt Industries." Kruse Decl. at Ex. G (underline omitted); Kruse 30(b)(6) Dep. at 20-22 & Pl.'s Ex. 3 (underline omitted); Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 14.  Fryar indicated that her title was "VP Benefits." Kruse Decl. at Ex. G; Kruse 30(b)(6) Dep. at 20-22 & Pl.'s Ex. 3; Pl.'s MSJ at 7; Def.'s Response at 5, ¶ 14.

Because Pratt had a group disability policy for its employees, the premiums for LTD coverage were significantly lower than premiums that an individual employee would pay if he or she purchased similar disability coverage because the insurer spreads the risk over a group as opposed to insuring an individual risk.  Kruse Decl. at ¶ 19; Columbus Dep. at 59-60; Pl.'s MSJ at 4; Def.'s Response at 2, ¶ 3.  Neither Liberty Life nor Liberty Mutual sells private disability insurance to individuals; as such, Pratt employees would not have been able to purchase private disability insurance coverage from them.  Kruse Decl. at ¶ 18; Kruse 30(b)(6) Dep. at 8.

The plaintiff was covered under the Pratt Disability Policy because of his position as a controller with Pratt.  Amended Compl. at ¶ 3; Answer at ¶ 3; Kruse Decl. at ¶ 10.  As with the other Pratt employees, the plaintiff paid all premiums under the policy.  Kruse 30(b)(6) Dep. at 12; Columbus Dep. at 37; Pl.'s MSJ at 4; Def.'s Response at 1-2, ¶ 1.  After Pratt received or accounted for the premiums it would send a single check with the owed premiums to Liberty Life.  Kruse 30(b)(6) Dep. at 34.

## C.    Analysis

In the plaintiff's motion for summary judgment, he asserts that the court should permit him to proceed with his state-law claims for breach of contract and bad faith because the Pratt Disability Policy falls within the safe harbor provision of 29 C.F.R. § 2510.3-1(j).  Memorandum of Law in Supp. of Pl.'s Mot. for Summ. J. Pursuant to Fed. R. Civ. Pro. 56(a) ("Pl.'s Mem.") at 1, 3, 8-9, Doc. No. 19-1.  In the Liberty Life's motion for summary judgment, it contends that (1) the Pratt Disability Policy is an "employee welfare benefit plan" under ERISA, (2) the Pratt Disability Policy does not fall within the safe harbor provision because Pratt contributed to the

policy and endorsed or controlled the policy.[17]   Memorandum of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Summ. J. on Counts I and II of Pl.'s Am. Compl. ("Def.'s Mem.") at 5-20, Doc. No. 20.  As such, Liberty Life argues the court should enter judgment in its favor as to the plaintiff's state-law claims because ERISA preempts those claims.  *Id.* at 20-23. For the reasons discussed below, the court (1) finds that the Pratt Disability Policy is "employee welfare benefit plan" under ERISA, and (2) the Pratt Disability Policy does not fall within the safe harbor provision because Pratt endorsed the policy.  Consequently, the defendant is entitled to summary judgment on the plaintiff's state-law claims for breach of contract and bad faith in Counts I and II of the complaint because ERISA preempts those claims.[18]

### 1.    Burden of Proof

Although the question of which party bears the burden of proof with respect to ERISA preemption is seemingly uniform in the law, *i.e.* the burden rests with the party asserting preemption, when the safe harbor provision is at issue as well, courts have reached conflicting decisions on the parties' burdens:  Some courts have kept the burden with the party asserting preemption and others place it on the party asserting the applicability of the safe harbor provision.  *Compare McCann v. Unum Provident*, 921 F. Supp. 2d 353, 358 (D.N.J. 2013) (indicating that the defendant insurance company "bears the burden of proving that the Policy is part of an ERISA-governed employer welfare benefit plan, subject to ERISA governance," and the plaintiff "bears the burden of proving that the Safe Harbor Provision removes the Policy from

---

[17] Liberty Life focuses on (1) Fryar's relationship with Pratt, and (2) the safe harbor provision issues, in its brief opposing the plaintiff's motion for summary judgment.  *See* Defendant's Br. in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Opp. Br.") at 2-20, Doc. No. 24.

[18] Although the plaintiff filed his own motion for summary judgment, he did not file a response to the Liberty Life's motion for summary judgment.  The court has interpreted this lack of response as evidencing a lack of opposition to the portions of the Liberty Life's motion claiming that (1) the Pratt Disability Policy is an "employee welfare benefit plan" under ERISA, or (2) if the court finds that the Pratt Disability Policy is not within the safe harbor provision, ERISA preemption warrants judgment in the Liberty Life's favor on both of the plaintiff's state-law causes of action in the complaint.  Nonetheless, the court will address them on their merits as there are some arguments in the plaintiff's motion for summary judgment that at least partially overlap the arguments in the defendant's motion.

the sphere of ERISA's coverage"), *and Peterson v. Principal Fin. Grp.*, 628 F. Supp. 2d 1272, 1275 (D. Colo. 2007) ("The burden is on Plaintiff to allege facts that bring her benefits plan within the scope of the safe harbor provision."), *with Roehrs v. Minnesota Life Ins. Co.*, 390 F. Supp. 2d 886, 894, 896 (D. Ariz. 2005) (stating that "[b]ecause Defendants' claim of ERISA preemption is a federal defense, the burden is on the defendant to prove the facts necessary to establish it" and concluding that "Defendants sustained ***their burden of proof***" as to three of the four prongs of the safe harbor provision (emphasis added)), *and Ehrenspeck v. Spear, Leeds & Kellogg*, 389 F. Supp. 2d 485, 489-90 (S.D.N.Y. 2005) ("In this case, [the insurer] bears the burden of showing that the Plan meets the definition of an 'employee welfare benefit plan' under 29 U.S.C. § 1002(1), as well as the burden of showing that the safe harbor provision . . . is not applicable."), *and Delong v. Teacher's Ins. and Annuity Ass'n*, No. 99-cv-1384, 2000 WL 426193, at *3 (E.D. Pa. Mar. 29, 2000) ("[B]ecause the claim of ERISA preemption is a defense, the burden is on defendant to establish that the safe harbor regulation is inapplicable."). Fortunately, the allocation of the burden of proof in this case is not determinative; nonetheless, this court believes that the more persuasive rationale lies with those cases holding that the burden of proof remains with the party asserting preemption under ERISA to also establish that the safe harbor provision is inapplicable.  Therefore, Liberty Life bears the burden of showing that (1) the Pratt Disability Plan is a covered plan under ERISA, and (2) the safe harbor provision is inapplicable.[19]

## 2.    Whether ERISA Covers the Pratt Disability Policy

ERISA is a comprehensive statute that regulates private employee benefit plans.  *See* 29 U.S.C. § 1001(b) (indicating Congress enacted ERISA to "protect . . . participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and

---

[19] During oral argument, Liberty Life agreed that it had the burden of proof on this issue.

obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts"); *see also Shaw v. Delta Air Lines*, 463 U.S. 85, 90 (1983) (explaining that ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans). In enacting ERISA, Congress attempted to "provide a uniform regulatory regime over employee benefits." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004). "To this end, ERISA includes expansive pre-emption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Id.* (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). Because of these broad preemption provisions, ERISA preempts "any state-law cause of action that duplicates, supplements, or supplants [an] ERISA civil enforcement remedy." *Id.* at 209.

The initial issue presented by Liberty Life's motion for summary judgment is whether ERISA covers the Pratt Disability Policy. ERISA governs two types of "employee benefit plans," namely "employee welfare benefit plans" and "employee pension benefit plans." 29 U.S.C. § 1002(3). The applicable type of plan here is the "employee welfare benefit plan[]," which ERISA defines as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1). Based on this definition, "a disability insurance policy is covered under ERISA [as an 'employee welfare benefit plan'] if it is obtained through: (1) a plan, fund, or program; (2) that is established or maintained; (3) by an employer; (4) for the purpose of

providing benefits; (5) to its participants or beneficiaries." *Spillane v. AXA Fin., Inc.*, 648 F. Supp. 2d 690, 695 (E.D. Pa. 2009) (citations omitted). "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances and from the point of view of a reasonable person.'" *Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir. 1990)).

The court will now address whether the Pratt Disability Policy constitutes an employee welfare benefit plan by going through each of the above-referenced elements.[20]

### a.   Plan, Fund, or Program

In analyzing whether the Pratt Disability Policy is a "plan, fund, or program," the court must determine "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* (citations and internal quotation marks omitted). After reviewing the Pratt Disability Policy from the point of a view of a reasonable person, the court finds that it qualifies as an "plan, fund, or program" for the following reasons:  First, a reasonable person can understand the intended benefits under the policy because it expressly sets forth the benefits that are potentially payable to participants in the plan with those benefits being noted as certain percentages of pre-disability earnings of the participating employees. *See* Kruse Decl. at Ex. A,

---

[20] The Pratt Disability Policy states that "[t]his policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments."  Kruse Decl. at Ex. A, Policy at LL-0001.  Multiple courts of appeals have determined that the employer's intent that ERISA cover a plan is not determinative.  *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263-64 (11th Cir. 2004) ("[O]ur determination of whether ERISA governs the UNUM Plan does not turn on whether [the employer] intended the plan to be governed by ERISA."); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir. 1993) ("We are not here concerned with whether the entity that established and maintained the [benefits plan] intended ERISA to govern [the benefits plan; instead] ERISA protection and coverage turns on whether the plan satisfies the statutory definition."); *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1049 n.11 (10th Cir. 1992) (stating that if a plan satisfies the definition of a covered plan under ERISA, it is "governed by ERISA whether or not the parties wish to be subject to ERISA").

Policy at LL-0004-LL-0005.   Second, a reasonable person can understand the class of beneficiaries because the policy expressly sets forth the class of beneficiaries for STD and LTD benefits.  *See id.* at LL-0003.  Third, a reasonable person can understand the source of financing as the policy sets forth that the participating employees contribute to the plan and the parties do not dispute that the participating employees paid 100% of the premiums.[21]  *Id.* at LL-0003; Kruse Decl. at ¶ 7; Fryar Decl. at ¶ 10; Pl's MSJ at 4; Def.'s Response at 1-2, ¶ 1.  Finally, a reasonable person can understand the procedures for receiving benefits as those procedures are also explicitly set forth in the policy.  *See* Kruse Decl. at Ex. A at LL-0046-LL-0047.

b.   Established or Maintained/Application of Safe Harbor

As for whether Pratt "established or maintained" the Pratt Disability Policy, "[t]he disjunctive nature of the [']established or maintained['] language appearing in the statute suggests that a showing of either one is sufficient to give rise to ERISA's application.  Courts should focus on the employer and its involvement with the administration of the plan."  *Spillane*, 648 F. Supp. 2d at 696 (citations and internal quotation marks omitted).  The court's resolution of this issue overlaps at least in part with the parties' dispute over the application of the safe harbor provision.  *See McCann v. Unum Provident*, 921 F. Supp. 2d 353, 364 (D.N.J. 2013) ("The Safe Harbor Provision addresses the second element; it describes when and to what extent an employer may be involved with an employee welfare benefit program without being deemed to have established or maintained it.").

With regard to the safe harbor provision, despite ERISA's broad preemption provisions, it does not regulate all employee benefit plans.  In this regard, the Department of Labor has promulgated some "safe harbor" regulations, which exempt certain benefit plans from federal

---

[21] "The source of funding may be the employer, the employee, or a combination of both."  *Tannenbaum v. Unum Life Ins. Co. of Am.*, No. 03-cv-1410, 2006 WL 2671405, at *8 (E.D. Pa. Sept. 15, 2006) (citations omitted).

regulation.  *See* 29 C.F.R. § 2510.3-1(j) (stating that an "employee welfare plan . . . shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization" meeting certain criteria); *see also McCann*, 921 F. Supp. 2d at 364 (stating that the safe harbor provision "describes the extent to which an employer may be involved with a group insurance program offered to its employees [and] removes such group insurance programs from the sphere of ERISA coverage" if the program satisfies the four elements of section 2510.3-1(j)).  To qualify for the safe harbor provision, an employee welfare benefit plan must satisfy each of the following criteria:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation in the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j)(1)-(4).  "'All four factors must be met for a plan to fall within the regulation's safe harbor.'"  *Spillane*, 648 F. Supp. 2d at 695 (quoting *Weinstein v. Paul Revere Ins. Co.*, 15 F. Supp. 2d 552, 557 (D.N.J. 1998)).

Here, if the court concludes that all of the safe harbor criteria are satisfied, the court could "necessarily conclude" that Pratt did not "establish or maintain" the Pratt Disability Policy.  *See McCann*, 921 F. Supp. 2d at 364 ("If the Court determined that each of the Safe Harbor criteria are satisfied here, then the Court would necessarily conclude that . . . the [employer] did not establish or maintain the [disability policy at issue.]").  As to the safe harbor criteria, the parties

agree that the Pratt Disability Policy satisfies the second and fourth safe-harbor criteria insofar as (1) participation in the Pratt Disability Policy is completely voluntary for Pratt employees, and (2) Pratt received no consideration or reimbursements in connection with the Pratt Disability Policy or benefits program.  Pl.'s MSJ at 5, 11; Def.'s Response at ¶¶ 4, 32; Pl.'s Mem. at 3 ("There is no dispute that participation of all eligible employees of Pratt who chose long-term disability coverage was voluntary and Pratt received no consideration in the form of 'cash or otherwise' in connection with the long-term disability program.").  Thus, the parties only discuss whether (1) Pratt endorsed or controlled the group disability program, and (2) whether Pratt contributed to the group disability program.  *See* Pl.'s Mem. at 3-8; Def.'s Mem. at 9-20; Def.'s Opp. Br. at 10-20.

The court will first address the third prong of the safe harbor provision, namely whether Pratt endorsed the Pratt Disability Policy.  The plaintiff argues that Pratt did not endorse the policy because Pratt played a minimal role in the nature of performing only ministerial tasks with respect to the policy.  Pl.'s Mem. at 5-8.  In particular, the plaintiff points out that other than being listed on the policy as the sponsor, Pratt's name does not appear anywhere else on the policy.  *Id.* at 8.  The plaintiff further notes that Pratt played no role in administering the policy, paying benefits under the policy, or interpreting the policy's provisions; instead, Liberty was responsible for those duties.  *Id.*  Also, the plaintiff asserts that Pratt "disclaimed any endorsement of the available coverage" by directing employees to other sources for binding answers to coverage questions and this further shows that it did not endorse the group disability program.  *Id.*

The plaintiff also notes that DIA and Fryar, and not Pratt, negotiated the terms of the policy.  *Id.* at 7-8.  The plaintiff argues that the court should not attribute any acts by DIA and

Fryar as acts by Pratt because Fryar was not a Pratt employee and, despite having a common parent company, DIA and Pratt were separate entities as a matter of law. Pl.'s Mem. at 5-8. The plaintiff states that DIA and Fryar acted as Pratt's broker and performed acts such as any other broker would perform. *Id.* at 6.

In support of a finding that the safe harbor provision is inapplicable, Liberty Life argues that the evidence in the record demonstrates that Pratt controlled and endorsed the Pratt Disability Policy. Def.'s Opp. Br. at 13-20, Doc. No. 24. Concerning the relationship between Fryar, DIA and Pratt, Liberty Life asserts that there are disputed issues of fact regarding whether DIA, Pratt, or both were Fryar's employers. *Id.* at 2-10. Nonetheless, Liberty Life contends that this disputed issue does not preclude summary judgment because even if the court were to consider Fryar as a DIA employee and DIA and Pratt as separate entities despite their status as subsidiaries of Pratt Holdings, Fryar and DIA always acted as agents of Pratt with respect to the Pratt Disability Policy and the court should attribute their actions to Pratt. *Id.* at 10.

As for Pratt's control and endorsement of the policy, Liberty Life points out that the pertinent facts of record unequivocally demonstrate that Pratt exercised control over the terms and conditions of the policy. *Id.* at 14-18. This level of control is evidenced by, *inter* alia, (1) Pratt determining which groups of its employees were eligible to participate in STD and LTD coverage; (2) Pratt determining that if salaried employees elected coverage, they had to elect STD and LTD coverage; (3) the inability of DIA and Fryar to deviate from the participation and eligibility requirements without Pratt's approval; and (4) Pratt choosing the benefit coverage levels for hourly and salaried employees. *Id.* at 14-17. Pratt also had Fryar negotiate for lower premiums and a longer rate guarantee than those originally proposed by Liberty Life. *Id.* at 17.

Pratt further had Liberty Life agree to provide open enrollment periods for Pratt employees outside of the normal enrollment process. *Id.*

Liberty Life also claims that the record shows that Pratt endorsed the Pratt Disability Policy. *Id.* at 18. In this regard, the Guide (1) contained the Pratt company logo and indicated that the benefits were "[b]rought to you by Pratt Industries," and (2) included statements confirming that the benefits were part of Pratt's overall employee benefits package. *Id.* at 18-19. In addition, although Fryar and DIA oversaw the enrollment process, they worked in conjunction with Pratt human resources personnel to conduct meetings with Pratt employees as part of the process. *Id.* at 19.

After reviewing the evidence of record, the court agrees with Liberty Life that Pratt endorsed or controlled the Pratt Disability Policy and, as such, it does not satisfy the third prong of the safe harbor provision. The court also agrees with Liberty Life that although there are disputed issues of fact regarding whether Fryar was a Pratt employee, the undisputed evidence of record shows that Fryar and DIA always acted as Pratt's broker or agent with regard to the Pratt Disability Policy and many of their actions were taken on Pratt's behalf and are equally attributable to Pratt. Even without those attributable actions, the court would still find that Pratt endorsed the Pratt Disability Policy through its own involvement with the policy.

Unfortunately, the Third Circuit Court of Appeals has yet to pronounce standards for the evidence necessary to satisfy the endorsement prong of the safe harbor provision. Nonetheless, both parties cite to the standard set forth by the First Circuit Court of Appeals in *Johnson v. Watts Regulator Co.*, 63 F.3d 1129 (1995) as establishing the relevant standard.[22] *See* Pl.'s

---

[22] Numerous district courts in the Third Circuit have applied the *Johnson* standard to the endorsement prong of the safe harbor provision. *See, e.g.*, *McCann*, 921 F. Supp. 2d at 366-67 ("The Third Circuit Court of Appeals has not yet addressed 'endorsement', *i.e.* the extent to which an employer may involve itself in an employee welfare benefit plan without removing that plan from the ambit of the Safe Harbor Provision. Other courts in this circuit have

Mem. at 7-8; Def.'s Mem. at 12; Def.'s Opp. Br. at 14.  In *Johnson*, the court explained the safe

harbor provision as follows:

> The safe harbor dredged by the regulation operates on the premise that the
> absence of employer involvement vitiates the necessity for ERISA safeguards. In
> theory, an employer can assist its work force by arranging for the provision of
> desirable coverage at attractive rates, but, by complying with the regulation,
> assure itself that, if it acts only as an honest broker and remains neutral vis-a-vis
> the plan's operation, it will not be put to the trouble and expense that meeting
> ERISA's requirements entails. Failure to fulfill any one of the four criteria listed
> in the regulation, however, closes the safe harbor and exposes a group insurance
> program, if it otherwise qualifies as an ERISA program, to the strictures of the
> Act.

63 F.3d at 1133 (citations omitted).

The court then indicated that it had to only address the third facet of the provision, which

was "a fitting focus, as the Department of Labor has called the employer neutrality that the third

facet evokes 'the key to the rationale for not treating such a program as an employee benefit

plan....'"  *Id.* at 1134 (quoting 40 Fed. Reg. 34,526).  The court then discussed the endorsement

prong as follows:

> In dealing with the regulation, courts have echoed the agency's view of the
> importance of employer neutrality. But as the regulation itself indicates,
> remaining neutral does not require an employer to build a moat around a program
> or to separate itself from all aspects of program administration. Thus, as long as
> the employer merely advises employees of the availability of group insurance,
> accepts payroll deductions, passes them on to the insurer, and performs other
> ministerial tasks that assist the insurer in publicizing the program, it will not be
> deemed to have endorsed the program under section 2510.3–1(j)(3). It is only
> when an employer purposes to do more, and takes substantial steps in that
> direction, that it offends the ideal of employer neutrality and brings ERISA into
> the picture.

*Id.* (internal citations omitted).  As the circumstances of the case at issue "f[e]ll[] between these

extremes," the court had to "clarify the standard for endorsement under section 2510.3-1(j)(3)."

*Id.*  The court then defined the relevant inquiry as:

---

looked to the First Circuit's decision in *Johnson* . . . for guidance.") *Schneider v. Unum Life Ins. Co. of Am.*, 149 F.
Supp. 2d 169, 177 (E.D. Pa. 2001) (applying *Johnson*).

> [A]n employer will be said to have endorsed a program within the purview of the Secretary's safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Id.* at 1135.

After reviewing the record here in light of the *Johnson* standard, the court finds that an objectively reasonable employee would have concluded that, based on Pratt's actions, it did not merely facilitate the Pratt Disability Policy's availability but had control over it or made it appear part and parcel of its own benefit package.   In this regard, albeit mostly in the context of attempting to differentiate Fryar and DIA's actions from being attributable to Pratt, the plaintiff has ignored some of the probative evidence in the record in his attempt to minimize Pratt's involvement in the Pratt Disability Policy.   For instance, although Fryar and Smith prepared the Guide, they did so while acting on behalf of Pratt (even if it was simply as Pratt's broker). Nonetheless, the Guide contains numerous representations that would direct an objectively reasonable employee to conclude that Pratt endorsed the plan and that the Pratt Disability Policy was part and parcel of Pratt's own comprehensive benefits package being offered to its employees.

As already described above, the cover page of the Guide contains the Pratt company logo and expressly states that it is "[b]rought to you by Pratt Industries."   Fryar Decl. at Ex. 1, Benefits Enrollment Guide at 1.   Other than the cover page, every page of the Guide contains a footer with a reference to the Pratt Industries Benefits Center and its website.   *Id.* at 2-17.   There are also numerous uses of the Pratt company logo throughout the document.   *Id.* at 2, 4, 6, 8, 10, 12, 14, 16.   The Guide indicates to Pratt's employees that "[y]our health and the health of your family are important to Pratt Industries – this is the reason we offer comprehensive health care

coverage with many ancillary benefit options to eligible employees and their families." *Id.* at 5. The Guide also informs the employees that it "describes Pratt Industries' comprehensive health care programs." *Id.*

Also, with respect to the life and disability insurance policy section of the Guide, as with other sections, it identifies Liberty Mutual as the provider of Basic Life, Accidental Death & Dismemberment, Supplemental Life, STD, and LTD insurance. *Id.* at 12. The Guide specifically states that "Pratt Industries provides every employee Basic Life & [Accidental Death & Dismemberment] insurance." *Id.* Although the Guide does not specifically state the same regarding STD and LTD insurance, it is included in the same section of the Guide that again, has a logo at the top of the first page of the section and contains the benefits center footer at the bottom of both pages of the section. *Id.* at 12-13.

This inclusion of the information on the STD and LTD disability policies in a benefits guide containing the Pratt logo, with an introduction that it was "[b]rought to you by Pratt Industries," and explanation that the Guide was describing Pratt Industries' comprehensive health care programs would be sufficient in itself to show Pratt's endorsement and take the policy out of the safe harbor provision.[23] *See Hansen v. Continental Ins. Co.*, 940 F.3d 971, 976-77 (5th Cir. 1991) (determining employer endorsed plan where corporate logo was embossed on the benefits booklet containing a summary of a voluntary insurance plan, and the booklet described the policy as "our plan"); *Schneider v. Unum Life Ins. Co. of Am.*, 149 F. Supp. 2d 169,

---

[23] As indicated above, the plaintiff also argues that through the disclaimer on page 5 of the Guide, Pratt "*disclaimed any endorsement* of the available coverage." Pl.'s Mem. at 8 (emphasis in original). The court finds that the disclaimer would not alter a finding of endorsement here because an objectively reasonable employee would not view that language as a lack of endorsement of the plans in the Guide, including the Pratt Disability Policy. In this regard, it would not detract from the totality of the other evidence in the Guide indicating that Pratt Disability Policy was part of Pratt's comprehensive benefits plan that it was providing to its employees. In addition, the language is not disclaiming endorsement; instead, it directs Pratt employees to the locations for information should there be discrepancies about coverage or an allegation that the terms of the Guide somehow alter the terms of the benefit plans.

181 (E.D. Pa. 2001) ("We find that the availability of [the employer's] logo and its reference to the [long-term care insurance] policy as part of [the employer's] long-term employee benefits package would lead a reasonable employee to conclude that [the employer] endorsed [the insurer's] plan within the meaning of ERISA's Safe Harbor Provision."); *Shiffler v. Equitable Life Assur. Soc. of U.S.,* 663 F. Supp. 155, 161 (E.D. Pa. 1986) (finding that a "personal accident insurance plan" did not qualify for the safe harbor exemption because, *inter alia*, the employer endorsed the policy as it presented the plan as belonging to its benefits package)*, aff'd,* 838 F.2d 78 (3d Cir. 1988); *see also Johnson*, 63 F.3d at 1138 ("When an objectively reasonable employee reads a brochure describing a program as belonging to his employer, he is likely to conclude that, if he participates, he will be dealing with the employer and that he will therefore enjoy the prophylaxis that ERISA ensures in such matters.").  Nonetheless, this evidence when combined with other evidence in the record supports an even stronger case for a finding that Pratt endorsed the Pratt Disability Policy.

Additional evidence supporting endorsement relates to the terms of the Pratt Disability Policy.  Although the plaintiff attempts to minimize Pratt's involvement in the process of negotiating the Pratt Disability Policy with Liberty Life because the direct negotiations occurred between Fryar and Kruse, the plaintiff ignores Columbus's testimony and Kruse's and Fryar's declarations that Pratt ultimately chose numerous terms of the policy.  In particular, Pratt defined the employees that were eligible to participate in the policy and the forms of coverage they were allowed to obtain.  In this regard, as part of its plan, Pratt provided that (1) non-union hourly employees were eligible to participate only in STD coverage, and (2) salaried employees could elect coverage for STD and LTD benefits, but if they elected coverage they had to elect both coverages.  Kruse Decl. at ¶ 7; Fryar Decl. at ¶ 10; Columbus Dep. at 38, 52-54; Kruse 30(b)(6)

Dep. at 11-12, 30-31, 34.  Even though DIA negotiated the plan with Liberty Life, Columbus stated the different treatment of hourly and salaried employees was part of Pratt's plan design and that he (and not DIA or Fryar) was the only one that had authority to alter the coverage to allow hourly employees to be eligible to receive LTD coverage.  Columbus Dep. at 53-57. Pratt's designation of the employees eligible to participate in the Pratt Disability Policy would also show endorsement and place the policy outside of the safe harbor.  *See Post v. Hartford Ins. Co.*, No. 04-cv-3230, 2005 WL 424945, at *3 (E.D. Pa. Feb. 23, 2005) ("[T]he employer designated the types of employees who could be covered under the Plan by allowing only full-time exempt employees to participate. . . . [A]n employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor." (citation and internal quotation marks omitted)); *see also Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 11 (1st Cir. 2013) (concluding that LTD policy did not satisfy third criteria of the safe harbor provision because the policy "was not only tied to employment at [the employer], but [the employer] also determined which employees had access to th[e LTD] benefit"); *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 436 (6th Cir. 1996) ("[W]here the employer plays an active role in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or the benefits provided thereunder, the extent of employer involvement is inconsistent with 'employer neutrality' and a finding of endorsement may be appropriate.").

In addition to the eligibility for STD and LTD coverage, Pratt was responsible for additional aspects of the Pratt Disability Policy, including, *inter alia*:  (1) selecting the STD benefit coverage levels for its hourly and salaried employees and the LTD coverage level for its salaried employees; (2) not electing a 24-month maximum duration for disabilities caused by

non-verifiable symptoms; (3) electing a partial disability benefit provision; (4) electing a maximum duration period provision under which benefits payable to persons age 60 or less at the time of their disability would be subject to a maximum duration period of the greater of age 65 or the person's social security normal retirement age if they continued to meet the policy's definition of disability; and (5) electing the definition of the term "disability" for STD and LTD benefits.  Kruse Decl. at ¶¶ 7, 8; Fryar Decl. at ¶ 10(f).  Pratt also had Fryar and DIA negotiate for a lower premium for LTD coverage and a longer rate guarantee than initially proposed by Liberty Life.  Kruse Decl. at ¶¶ 15, 16.  Pratt further had Liberty Life agree to additional open enrollment periods outside of the normal enrollment process, so that Pratt employees could elect coverage without providing evidence of insurability.  *Id.* at ¶ 10 & Ex. D.  Pratt also had its human resources employees, along with Fryar and Smith acting on its behalf, conduct meetings to provide Pratt employees with information about the enrollment process and the available plans.  Columbus Dep. at 49-51.

After considering all of the above in light of all the surrounding facts and circumstances, the court finds that an objectively reasonable employee would conclude on the basis of Pratt's actions that it had not merely facilitated the Pratt Disability Policy's availability but had exercised control over it or made it appear to be part and parcel of Pratt's own benefit package. Therefore, Pratt endorsed the policy and it falls outside of the safe harbor provision.[24]

---

[24] As indicated above, the parties also argued about whether the first safe harbor criteria is satisfied because Pratt contributed to the Pratt Disability Policy by virtue of it obtaining a lower premium than the employees could receive as individuals and that the employees received a discount from the originally proposed premium of $0.59 per $100 of coverage to $0.53 per $100 of coverage.  Pl.'s Br. at 3-5; Def.'s Mem. at 10-12; Def.'s Opp. Br. at 11-13.  Liberty Life also claimed that a contribution occurred when at Pratt's request it extended the two-year rate guarantee to a two-and-a-half year rate guarantee for its group life and disability policies so that they were compatible with Pratt's other employee benefit plans.  Def.'s Opp. Br. at 13.

Regarding the safe harbor's first requirement that "no contributions are to be made by an employer," [t]he Third Circuit Court of Appeals has not yet interpreted the Safe Harbor Provision's requirement that "no contributions are to be made by an employer". But several courts within this circuit have considered the issue and concluded that "contribution" should be given its clear

As the court has concluded that Pratt Disability Policy does not fall under the safe harbor provision, the court will still analyze whether Pratt established the policy.  *See McCann*, 921 F. Supp. 2d at 368 ("Because the Court has determined that the Safe Harbor Provision does not apply to the instant dispute, the Court must continue its analysis 'under the conventional tests.'" (quoting *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 463 (10th Cir. 1997)).  With regard to this establishment inquiry, "[a]n employer may easily establish an employee welfare benefit plan."  *Id.* (citations omitted).   "Although no single act necessarily constitutes the establishment of a plan, if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan."  *Spillane v. AXA Fin., Inc.*, 648 F. Supp. 2d 690, 696 (E.D. Pa. 2009) (citation and internal quotation marks omitted).

Here, the named sponsor of the Pratt Disability Policy is Pratt.  Fryar, acting on Pratt's behalf, applied for the policy with Liberty Life.  Through Fryar and DIA, Pratt negotiated the

---

meaning. *See, e.g., Morris,* 986 F.Supp. at 880. These courts have concluded that group discounts applied to employee insurance policies, issued pursuant to an employee welfare benefit plan, constitute employer contributions. *See Harding v. Provident Life & Accident Ins. Co.,* 809 F.Supp.2d 403, 417–18 (W.D.Pa.2011); *Tannenbaum,* 2006 WL 2671405, at *6; *Stone v. Disability Mgmt. Servs., Inc.,* 288 F.Supp.2d 684, 691–92 (E.D.Pa.2003). These courts, and others sitting outside the Third Circuit, have reasoned that employees who receive such group discounts receive a benefit that they could not otherwise receive as individuals, and would not have received but for the employer's role in creating the employee welfare benefit plan. *See Harding,* 809 F.Supp.2d at 417 ("when discounted premiums are offered to a group of employees, the Safe Harbor regulations are not applicable"); *Brown v. Paul Revere Life Ins. Co.,* No. 01–1931, 2002 WL 1019021, at *7 (E.D.Pa. May 20, 2002) ("Where an employer provides its employees benefits that they can not [sic] receive as individuals, it has contributed to an ERISA plan."); *see also Healy v. Minn. Life Ins. Co.,* No. 11–659, 2012 WL 566759, at *4–5 (W.D.Mo. Feb. 21, 2012); *Moore v. Life Ins. Co. of N. Am.,* 708 F.Supp.2d 597, 607 (N.D.W.V. Mar.25, 2010) (referring to group discount as "constructive contribution"), *aff'd,* 439 Fed.Appx. 245 (4th Cir.2011).
*McCann v. Unum Provident,* 921 F. Supp. 2d 353, 366 (D.N.J. 2013).
   Because the court has determined that the Pratt Disability Policy falls outside of the safe harbor insofar as Pratt endorsed the policy, the court need not address whether Pratt contributed to the plan and will not address it here.  The court notes, however, that while it appears that Liberty Life was able to point to an ascertainable benefit received by Pratt employees as part of the group disability policy, other district courts outside of the Third Circuit have not interpreted "contribution" as broadly as the cases referenced above.  *See, e.g., Rosen v. Provident Life & Acc. Ins. Co.,* No. 2:14-cv-0922-WMA, 2015 WL 260839, at *12 (N.D. Ala. Jan. 21, 2015) ("Some courts have determined that that a premium discount constitutes a contribution because it is a benefit an employee cannot receive as an individual. However, this construction is contrary to the text of the regulation and would swallow the third and fourth safe harbor requirements.").

terms of the policy with Liberty Life and oversaw and administered the enrollment process for the policy.  On behalf of Pratt, DIA, Fryar, and Smith also provided services to Pratt employees to assist them with the policy and serve as their benefits resource.  *See Weinstein v. Paul Revere Ins. Co.*, 15 F. Supp. 2d 552, 558 (D.N.J. 1998) (discussing employer's use of insurance broker to assist with enrollment and serve as an intermediary between the employees and the employer for benefits purposes indicated that the employer, "by providing the insurance broker, assumed a role in the ongoing administration of the Policy").  Pratt maintained records of employees that elected coverage and would provide that information to Liberty Life.  Further, Pratt would remit the premiums (after withholding the amounts from its employees) to Liberty Life.  Pratt also agreed to allow Liberty Life to inspect its records if Liberty Life opined that they had a bearing on insurance, and Pratt was obligated to provide Liberty Life with information at regular intervals relative to its employees that qualify to become insured, whose amounts of insurance change, or whose insurance terminates.  All of this evidence supports a conclusion as a matter of law that Pratt established or maintained the policy and intended to provide its employees with a welfare benefit program.  *See id.* ("In order to establish or maintain a plan, there must be some meaningful degree of participation by the employer in the creation or administration of the plan, and an intent to provide its employees with a welfare benefit program." (citation and internal quotation marks omitted)).

### 3.    Whether ERISA Preempts the Plaintiff's State-Law Claims

Since the court has determined that ERISA applies to the plaintiff's clams with respect to the alleged wrongful denial of LTD benefits under the Pratt Disability Policy, the court must address whether ERISA preempts his state-law causes of action.  Section 1144 of ERISA states that it "supersedes any and all State laws insofar as they may now or hereafter relate to any

employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."  29 U.S.C. § 1144(a).  Courts give the phrase "relate to" in section 1144 its "broad, common sense meaning."  *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985).

Neither party here has expressly indicated the particular state law applicable to the plaintiff's causes of action for breach of contract and bad faith.  The Pratt Disability Policy states that the "Governing Jurisdiction is Georgia and subject to the laws of that State."  Kruse Decl. at Ex. A, Policy at LL-0001.  The plaintiff appears to be proceeding as if Pennsylvania law applies and he references Pennsylvania's bad faith statute, 42 Pa. C.S. § 8371 in the amended complaint. *See* Amended Compl. at 8.  Nonetheless, regardless of whether Georgia or Pennsylvania law applies to this case, ERISA preempts his state-law claims.  *See Barber v. Unum Life Ins. Co. of Am.*, 383 F.3d 134, 140-41 (3d Cir. 2004) (concluding that ERISA preempts Pennsylvania's bad faith statute, 42 Pa. C.S. § 8371); *Burden v. Reliastar Life Ins. Co.*, No. 1:12-cv-4392-WSD, 2014 WL 26090, at *9 (N.D. Ga. Jan. 2, 2014) (concluding that ERISA preempted plaintiff's Georgia state-law claims for "breach of contract and bad faith refusal to pay an insurance claim under O.C.G.A. § 33-4-6 of the Georgia Code"); *Miller v. Aetna Healthcare*, No. 01-cv-2443, 2001 WL 1609681, at *1 (E.D. Pa. Dec. 12, 2001) (determining that ERISA preempted Pennsylvania state-law claims, including a claim for breach of contract because the plaintiff asserted that he was entitled to benefits under an ERISA plan).

Both the breach of contract and bad faith claim in the amended complaint "relate to" the alleged denial of benefits under the Pratt Disability Policy, an ERISA plan.  Therefore, ERISA preempts those causes of action and the defendant is entitled to judgment in its favor on those claims.

### III.    CONCLUSION

After reviewing the evidence of record in light of all the surrounding facts and circumstances and from the point of view of a reasonable person, the Pratt Disability Policy qualifies as an employee welfare benefit plan under ERISA because it is (1) a plan, fund, or program; (2) that is established or maintained; (3) by Pratt; (4) for the purpose of providing benefits; (5) to its participants or beneficiaries.  In addition, the Pratt Disability Policy does not fall under the safe harbor provision because an objectively reasonable employee would conclude on the basis of Pratt's actions that Pratt had not merely facilitated the policy's availability but had exercised control over it or made it appear to be part and parcel of its own benefit package. Since the Pratt Disability Policy is an ERISA plan and the plaintiff's state-law claims for breach of contract and bad faith under 42 Pa. C.S. § 8371 are related to his claim under the policy, ERISA preempts those claims.  Accordingly, the court will deny the plaintiff's motion for summary judgment, grant the defendant's motion for summary judgment, and enter partial judgment in the defendant's favor on counts I (breach of contract) and II (statutory bad faith) of the amended complaint.  The case shall proceed solely under the plaintiff's theory that Liberty Life violated ERISA by wrongfully denying him LTD benefits.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

35