IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG VAN ARSDEL, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-2579 |
| | : | |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE | : | |
| COMPANY OF BOSTON, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                March 30, 2017

This action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. §§ 1001-1191c stems from the defendant's alleged wrongful denial of the plaintiff's claim for long-term disability benefits.  The plaintiff worked as a plant controller for a corrugated packaging industry and sought short-term disability benefits due, among other things, his morbid obesity, difficulty ambulating, and osteoarthritis in his right hip.  Although the defendant initially denied the request for short-term disability benefits, it reversed its decision after concluding that the plaintiff's impairments prevented him from performing his own job.

The plaintiff then sought long-term disability benefits.  Under the disability policy the plaintiff needed to show that he could not perform the material and substantial duties of his own occupation.  The disability policy provides that the defendant would consider the requirements of the plaintiff's occupation as the occupation is performed in the national economy.

After reviewing the plaintiff's documentation, the defendant determined that the plaintiff's occupation was properly designated as a controller and it was performed as a sedentary or light duty occupation in the national economy.  The defendant then determined that

the plaintiff was capable of sedentary work and, as such, concluded that the plaintiff was not disabled and entitled to longer-term disability payments because he could perform the material and essential duties of a controller.  The plaintiff contested the denial by filing the instant action, which was eventually removed from state court to this court.

The parties have filed cross-motions for summary judgment on the propriety of the defendant's denial of benefits.  They agree that the court should review the defendant's denial of benefits under the arbitrary and capricious standard of review.  As explained below, the court finds that there are no genuine issues of fact that prevent the court from disposing of this case at the summary judgment stage.  In addition, although the court recognizes the highly deferential standard applicable to this case, the record compels the court to conclude that the defendant abused its discretion in denying long-term disability benefits in this case.  Accordingly, the court will grant the plaintiff's motion for summary judgment, deny the defendant's motion for summary judgment, and remand the case to the defendant.

## I.    PROCEDURAL HISTORY

The plaintiff, Craig Van Arsdel, filed a complaint against Liberty Life Assurance Company of Boston ("Liberty Life") in the Court of Common Pleas of Philadelphia County on April 3, 2014.  Notice of Removal ("Notice"), at Ex. 1, Compl., Doc. No. 1.[1]  In the complaint, the plaintiff alleges that he developed severe arthritis in his right hip along with a multitude of other ailments while working as a plant controller for Pratt Industries.  Compl. at ¶¶ 3, 8.  By January 4, 2013, the plaintiff could not continue working at his job, and he applied for short-term disability ("STD") benefits under a group disability insurance policy that he purchased from

---

[1] The plaintiff originally named Liberty Mutual Insurance Company ("Liberty Mutual") as the defendant.  *See* Compl. at 1.  Per a stipulation by the parties which the court entered as an order on May 13, 2015, the parties agreed to amend the caption to substitute Liberty Life Assurance Company of Boston for Liberty Mutual and replace all references in the complaint to Liberty Mutual with Liberty Life.  *See* Doc. Nos. 15, 16.

Liberty Life in 2011.[2]  *Id.* at ¶¶ 4, 9.  Although Liberty Life initially denied the claim, it provided him with STD benefits from February 1, 2013, until April 7, 2013, after he successfully appealed from the denial.  *Id.* at ¶¶ 9, 10.  On March 28, 2013, the plaintiff applied for long-term disability ("LTD") benefits.  *Id.* at ¶ 11.  Liberty Life denied the LTD benefits claim on or about May 2, 2013, and although the plaintiff appealed from the denial, Liberty Life affirmed its prior denial on August 23, 2013.  *Id.* at ¶¶ 19-20.

Based upon Liberty Life's denial of his claim for LTD benefits, the plaintiff asserted state-law causes of action for breach of contract and statutory bad faith in the original complaint. *Id.* at 8-9.  On May 2, 2014, Liberty Life filed a notice of removal claiming that removal to federal court was proper because the plaintiff was actually asserting an ERISA claim.  *See* Notice at ¶ 10 (referencing 28 U.S.C. §§ 1331, 1441(b) and 29 U.S.C. § 1132).  The plaintiff then filed an amended complaint on June 11, 2014, in which he appears to have repeated the underlying factual allegations from the original complaint, but added an alternative cause of action under ERISA to the preexisting state-law causes of action.  Amended Compl., Doc. No. 3.

Liberty Life filed a motion to dismiss the state-law causes of action in the complaint on June 18, 2014.  Doc. No. 5.  In the motion, Liberty Life argued that the court should dismiss the state-law claims for breach of contract and statutory bad faith because ERISA preempted those claims.  *See* Memorandum of Def. Liberty Mutual Ins. Co. in Supp. of Mot. to Dismiss Counts I and II of Pl.'s Am. Compl. at 2-6, Doc. No. 5.  The plaintiff filed a response to the motion on June 26, 2014.  Doc. No. 6.  In the response, the plaintiff asserted that the court should deny the motion because the disability insurance plan at issue fell within the "safe harbor" provision, 29

---

[2] The plaintiff alleges that he paid all premiums required under the insurance agreement with Liberty Life.  Compl. at ¶ 4.

C.F.R. § 2510.3-1(j), and was exempt from ERISA coverage.  Memorandum of Law in Supp. of Pl.'s Reply to Def.'s Mot. to Dismiss Counts I & II of the Am. Compl. at 6-7, Doc. No. 6.

The court resolved the motion to dismiss via a memorandum opinion and order filed on September 5, 2014.  Doc. Nos. 9, 10.  In the memorandum opinion and order, the court (1) denied the motion to dismiss the state-law claims in counts I and II of the amended complaint because the parties' contentions raised issues of fact that the court could not resolve through a motion to dismiss, and (2) provided the parties with a period of time to conduct limited discovery on the potential applicability of the safe harbor provision and then file motions for summary judgment on this issue.  Memorandum Op. at 4-6, Doc. No. 9; Order, Doc. No. 10.  With respect to this discovery period, the parties sought and received two extensions of time to finish conducting discovery on the safe harbor issue.  Doc. Nos. 11-14.

On May 13, 2015, the parties filed cross-motions for summary judgment on the applicability of the safe harbor provision and the viability of the state-law claims in the amended complaint.  Doc. Nos. 17-21.  Liberty Life then filed an answer to the amended complaint with affirmative defenses on May 28, 2015.  Doc. No. 22.  On the same date, Liberty Life filed a response to the plaintiff's statement of facts in support of his motion for summary judgment and a brief in opposition to the plaintiff's motion for summary judgment.[3]  Doc. Nos. 23, 24.  The court heard oral argument on the cross-motions for summary judgment on July 8, 2015.  On March 29, 2016, the court entered a memorandum opinion and order in which the court (1) granted Liberty Life's motion for summary judgment and entered judgment in its favor and

---

[3] As discussed later in this opinion, the plaintiff did not file any document in direct opposition to Liberty Life's statement of material facts.

against the plaintiff as to counts I (breach of contract) and II (statutory bad faith) of the amended complaint, and (2) denied the plaintiff's motion for summary judgment.[4]  Doc. Nos. 29, 30.

On April 27, 2016, the parties filed a stipulation, attaching thereto the documents they agreed comprised the administrative record in this case.  Doc. No. 32.  Liberty Life filed a motion for summary judgment, statement of undisputed material facts, and supporting memorandum of law, with respect to the remaining ERISA cause of action, on April 28, 2016. Doc. Nos. 33-35.  The plaintiff filed a motion for summary judgment, statement of undisputed material facts, and supporting memorandum of law as to his ERISA claim on April 29, 2016. Doc. No. 36.  After a couple of extensions, Liberty Life filed a response to the plaintiff's motion for summary judgment and statement of undisputed material facts on May 26, 2016.  Doc. Nos. 42, 43.  The plaintiff then filed a response in opposition to Liberty Life's motion for summary judgment on May 27, 2016.  Doc. No. 44.  The motions are ripe for disposition.

## II.    DISCUSSION

### A.    Standards of Review

#### 1.    Summary Judgment Standard

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is

---

[4] In reaching these determinations, the court found that ERISA preempted the state-law causes of action and the relevant disability policy did not fall into the safe harbor provision.

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and

provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

The court "may not weigh the evidence or make credibility determinations."  *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets., Inc. v. Darling–Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).  Instead, "[w]hen considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party.  *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment.  *Erbe v. Connecticut Gen. Life Ins. Co.*, No. CIV.A. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)).  "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate

basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (citing *Transguard*, 464 F. Supp. 2d at 430).

## 2.    Standard of Review for Benefit Denials Under ERISA

The plaintiff has brought this action under section 502(a)(1)(B) of ERISA, which permits a participant or beneficiary of a covered policy to bring a civil action to recover the benefits due under the terms of the policy.  29 U.S.C. § 1132(a)(1)(B).  Generally, the court must review the denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations," the court must review its decision "under an abuse-of-discretion (or arbitrary and capricious) standard." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citations omitted).[5]

Here, the parties agreed in their submissions that the court should apply the abuse of discretion (or arbitrary and capricious) standard of review in this case.  *See* Memorandum of Law in Supp. of Pl.'s Mot. for Summ. J. Pursuant to Fed. R. Civ. Pro. 56(a) ("Pl.'s Mem.") at 3 (stating that "the parties agreed in their submissions that the Pratt plan gives the administrator the required discretion" to make eligibility determinations and, as such, the arbitrary and capricious standard applies), Doc. No. 36-1; Memorandum of Def. Liberty Life Assurance Co. of Boston in Supp. of Mot. for Summ. J. on Count III of Pl.'s Am. Compl. ("Def.'s Mem.") at 15 ("The Deferential 'Arbitrary and Capricious' Standard of Review is Applicable to this Dispute." (emphasis omitted)), Doc. No. 34.   Under this standard, "[a]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous

---

[5] The abuse-of-discretion standard and the arbitrary and capricious standard are used "interchangeably" in ERISA cases.  *Viera*, 642 F.3d at 413.

as a matter of law." *Fleisher v. Standard Ins. Co.,* 679 F.3d 116, 121 (3d Cir. 2012) (internal quotations omitted). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

The arbitrary and capricious standard of review "is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted). Although "the arbitrary and capricious standard is extremely deferential, [i]t is not ... without some teeth. Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.*, No. CIV. A. 10-877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013) (citations and internal quotation marks omitted); *see Connelly v. Reliance Standard Life Ins. Co.*, No. CIV. A. 13-5934, 2014 WL 2452217, at *4 (E.D. Pa. June 2, 2014) ("Although the arbitrary and capricious standard is highly deferential, the court must still consider the quality and quantity of the medical evidence and the opinions on both sides of the issues, so as to avoid rendering courts 'nothing more than rubber stamps for any plan administrator's decision.'" (quoting *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

In addition,

> [o]n a motion for summary judgment in an ERISA case where the plaintiff claims that benefits were improperly denied, a reviewing court is generally limited to the facts known to the plan administrator at the time the decision was made. *Post v. Hartford Ins. Co.,* 501 F.3d 154, 168 (3d Cir. 2007), *overruled on other grounds, Doroshow,* 574 F.3d 230. "Consequently, when, as here, a plaintiff alleges that a plan administrator . . . abused its discretion in deciding to terminate benefits, [the Court] generally limit[s][its] review to the administrative record, that is, to the 'evidence that was before the administrator when [it] made the decision being reviewed.'" *Sivalingam v. Unum Provident Corp.,* 735 F.Supp.2d 189, 194 (E.D. Pa. 2010) (quoting *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.

1997)); *see also Johnson v. UMWA Health & Ret. Funds,* 125 F. App'x 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation.").

*Plank v. Devereux Found.*, No. CIV. A. 13-7337, 2015 WL 451096, at *6 (E.D. Pa. Feb. 2, 2015)

(alterations in original).

As an additional point, the plaintiff argues that there are "procedural" conflicts of interest insofar as there were several deficiencies in Liberty Life's decision-making process. *See, e.g.*, Pl.'s Mem. at 4, 24-29. With regard to purported conflicts of interest,

> courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

*Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citations omitted). As such, the court must "review various procedural factors underlying the administrator's decision, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious." *Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). In this regard, "'the procedural inquiry focuses on how the administrator treated the particular claimant.'" *Id.* (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007), *abrogated on other grounds by Estate of Schwing*, 562 F.3d 522 (3d Cir. 2009)). When reviewing "the process that the administrator used in denying benefits," courts consider "numerous 'irregularities' to determine 'whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.'" *Id.* (quoting *Post*, 501 F.3d at 165).[6] "Ultimately, [the court] 'determine[s] lawfulness by taking account of several,

---

[6] In *Post*, the Third Circuit identified the following "illustrative, not exhaustive, list of [identified irregularities]: (1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical

often case-specific, factors, reaching a result by weighing all together."  *Id.* (quoting *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

## B.     The Applicable Record

### 1.     The Disability Plan

Liberty Life provided short- and long-term disability insurance to employees of Pratt Industries pursuant to a group disability income policy (the "Disability Policy").  Defendant's Statement of Material Facts in Supp. of Mot. for Summ. J. ("Def.'s Facts") at ¶ 1;[7] Administrative Record ("Admin. R.") at 0001-0051, Doc. No. 32-1.[8]  The Disability Policy covered the plaintiff because he was a plant controller with Pratt Industries.  Amended Compl. at ¶¶ 3, 4; Defendant's Answer and Affirmative Defenses at ¶¶ 3, 4.

With regard to the provision of short-term disability ("STD") benefits, the Disability Policy states that "[w]hen Liberty [Life] receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty [Life] will pay the Covered Person a Weekly Benefit after the end of the Elimination Period, subject to other provisions of this policy."[9]  Admin. R. at 0018.  To provide further guidance on eligibility for STD benefits, a covered employee must refer to the definition section of the Disability Policy as it contains the definitions of numerous terms and phrases applicable to claims for STD benefits.

---

examination when all of the evidence indicates disability[.]"  501 F.3d at 165 (internal citations omitted).  Some other examples of

> [p]rocedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason; failing to follow a plan's notification provisions; . . . relying on favorable parts while discarding unfavorable parts in a medical report; [and] denying benefits based on inadequate information and lax investigatory procedures.

*Morgan v. The Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 643 (E.D. Pa. 2010) (internal citations omitted).
[7] The plaintiff did not file a response to Liberty Life's statement of material facts.
[8] For ease of reference, although the documents contained in the administrative record each have a reference to "LL," the court has removed this reference from any citations to the administrative record.
[9] The elimination period for STD benefits is 14 calendar days from "Injury" or "Sickness."  Admin. R. at 0004; Pl.'s Facts at ¶ 3; Def.'s Resp. at ¶ 3.

In this regard, the Disability Policy defines the term "Disabled" to mean "as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of his Own Job." Plaintiff's Proposed Stipulation of Facts ("Pl.'s Facts") at ¶ 2; Defendant's Resp. to Pl.'s Proposed Stipulation of Facts ("Def.'s Resp.") at ¶ 2; Admin. R. at 0008. The Disability Policy defines the terms "Injury" and "Sickness" to mean:

> **"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy:
>
> 1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and
>
> 2. any Injury which occurs before the Covered Person is covered under this policy, but which accounts for a medical condition that arises while the Covered Person is covered under this policy will be treated as a Sickness.
>
> . . .
>
> **"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

Admin. R. at 0010, 0012. The Disability Policy also defines the phrase "Material and Substantial Duties" as "responsibilities that are normally required to perform the Covered Person's Own Job and cannot be reasonably eliminated or modified." *Id.* at 0010. Finally, the Disability Policy defines the phrase "Own Job" as "the Covered Person's job that he was performing when his Disability or Partial Disability began." *Id.*; Def.'s Facts at ¶ 3; Def.'s Resp. at ¶ 2.

As for long-term disability ("LTD") benefits, the Disability Policy includes an initial provision identical to the one providing for STD benefits.[10] Admin. R. at 0027. Some of the applicable definitions to the terms and phrases, however, are different. In particular, the Disability Policy defines "Disabled" or "Disability" with respect to LTD benefits as meaning

---

[10] The Disability Policy provides that the Elimination Period for LTD benefits is 90 days. Admin. R. at 0005; Pl.'s Facts at ¶ 3; Def.'s Resp. at ¶ 3.

"during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." *Id.* at 0008; Pl.'s Facts at ¶ 2; Def.'s Resp. at ¶ 2; Def.'s Facts at ¶ 15.

Unlike the definition of "Disabled" applicable to STD benefits, the LTD benefits' definition references the phrase "Own Occupation." Admin. R. at 0008. The Disability Policy defines "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is normally performed in the national economy." Admin. R. at 0010; Pl.'s Facts at ¶ 2; Def.'s Resp. at ¶ 2; Pl.'s Facts at ¶ 15. Also, after receiving benefits for 24 months, LTD benefits will continue if the claimant's condition prevents him or her from performing the duties of any occupation. Admin. R. at 0008; Def.'s Facts at ¶ 15.

Along with the above-referenced provisions applicable to claims for STD and LTD benefits, the Disability Policy provides that "Liberty [Life], at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty [Life]. This right may be used as often as reasonably required." Admin. R. at 0045; Pl.'s Facts at ¶ 4; Def.'s Resp. at ¶ 4. With regard to interpreting its provisions, the Disability Policy provides that "Liberty [Life] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty[ Life's] decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." Admin. R. at 0046; Pl.'s Facts at ¶ 5; Def.'s Resp. at ¶ 5. In addition to having responsibility for deciding questions concerning benefit eligibility, Liberty Life is "responsible for paying benefits to covered persons

13

determined to be eligible for such benefits."  Stipulation at ¶ 3, Doc. No. 32; Pl's Facts at ¶ 6; Def.'s Resp. at ¶ 6.

## 2.      The Plaintiff's Application for STD Benefits

In January 2013, the plaintiff submitted a disability claim for STD benefits with Liberty Life.  Admin. R. at 0071, 0370.[11]  On the claim form, the plaintiff indicated that his injury or illness began on January 4, 2013, and his last day of work was on that date.  Admin. R. at 0370. When asked to describe "how and where the injury occurred" or the "onset and nature of your illness," the plaintiff stated: "Impaired mobility and inability to walk unassisted.  Right leg unable to sustain weight.  Extended periods of obesity may have caused deterioration in function of joints and tendons.  Despite significant weight loss, impairment has increased."  Admin. R. at 0370.

As part of Liberty Life's investigation into the plaintiff's claim for STD benefits, it requested medical records and information from an internal medicine/primary care physician, Dr. Ryan Minnich, who the plaintiff had identified as his treating physician.  Def.'s Facts at ¶ 4; Pl.'s Facts at ¶ 13; Def.'s Resp. at ¶ 13; Admin. R. at 0071, 0370.  In response to this request, Liberty Life received various documents from Dr. Minnich reflecting treatment records and medical reports during 2012.  Def.'s Facts at ¶ 5; Admin. R. at 0373-0395.

Included among those medical records was a March 15, 2012 carotid ultrasound report showing that the plaintiff had "Bilateral 16-49% stenosis of internal carotid arteries."  Pl.'s Facts

---

[11] In the plaintiff's proposed stipulation of undisputed facts, he indicates that he submitted a disability claim form on January 4, 2013.  *See* Pl.'s Facts at ¶ 1.  This appears to be incorrect because the plaintiff signed and dated the disability form on January 11, 2013.  *See* Admin. R. at 0370.  This January 11, 2013 date also appears to be inaccurate, at least in terms of when the plaintiff would have presented it to his employer or Liberty Life because the form also indicates that the date of his last visit was "01-15-13," which would have occurred after the date he signed the form.  *Id.*  In addition, the plaintiff appears to have attached a form completed by Ryan Minnich, D.O., which is dated on January 18, 2013.  Admin. R. at 0374.  All of this gives more credence to Liberty Life's assertion that the plaintiff did not provide it with notice of his claim form until January 22, 2013.  *See* Def.'s Facts at ¶ 1 (citing Admin. R. at 0071).  Despite the potential discrepancy as to when the plaintiff first submitted a disability claim, the actual date of the claim has no bearing on the court's analysis here.

at ¶ 10; Def.'s Resp. at ¶ 10; Admin. R. at 0384.  The records also contained an April 24, 2012

report from cardiologist Roger B. Rehr, M.D., F.A.C.C.  Pl.'s Facts at ¶ 11; Def.'s Resp. at ¶ 11;

Admin. R. at 0386-0389.  This report indicated that the plaintiff "is a delightful, morbidly obese,

58-year-old man currently weighing 417 pounds."  Admin. R. at 0386.

> The plaintiff had informed Dr. Rehr that
>
> [o]ver the past 6-9 months [he] has noticed a decreased exercise tolerance.  If he
> walks even 25 feet he will become diaphoretic and short of breath.  He has had no
> chest discomfort.  He has had no orthopnea or PND but he does sleep in a recliner
> due to back pain.

Id.; Pl.'s Facts at ¶ 11; Def.'s Resp. at ¶ 11.  Dr. Rehr also reported about an exercise stress test

that the plaintiff performed in September 1999, during which "[h]is functional capacity was 30%

impaired."  Admin. R. at 0386.

> During his review of systems, Dr. Rehr noted that
>
> [p]ertinent positives reported by the patient include episodic weight gain or
> weight loss, right knee discomfort with walking, dyspnea with exertion, or
> diaphoresis.  The patient does report that his wife has indicated that he stops
> breathing sometimes when he is sleeping.  He was set up to have a sleep study in
> 2004 . . . but refused to complete the study because of the smell of the EEG
> electrode paste on his scalp.   Otherwise, on questioning the patient,
> comprehensive review of all other systems is negative.

Id. at 0388.

For the physical examination, Dr. Rehr noted that the plaintiff "is morbidly obese.  He

has difficulty lying down on the examination table and then again sitting up because of his size.

He appears to be in no acute distress and is not short of breath at rest."  Id.  Dr. Rehr's

impressions of the plaintiff were:  "Increased dyspnea with exertion and diaphoresis with

exertion over the past 6-9 months[;] . . . Morbid obesity[;] . . . Likely obstructive sleep apnea[;] .

. . Dyslipidemia[;] . . . Diabetes[;] . . . [and] Medical noncompliance."  Id.

In his "Discussion/Plan," Dr. Rehr indicated in pertinent part as follows:

[The plaintiff] presents a problem in terms of his morbid obesity and his medical noncompliance. He previously refused to complete a sleep apnea study because of the electrode paste. He has not taken any of his medications for the past two days because he "forgot". He did manage to lose substantial weight and dropped down to 340 pounds in February of 2010 but then gained it all back.

At this time he has shortness of breath with relatively small amounts of exertion, which have been present and without significant change for the past 6-9 months. Because of his risk factor status I was concerned about the possibility that this might represent coronary artery disease and I wanted to obtain a dobutamine echocardiographic stress test with him. I discussed the procedure of that study, the risks of it, etc[.], and he refused at this time to have the study because "he has to walk too far when he goes to The Reading Hospital for studies". As he describes it, with his morbid obesity he is unable to walk as far as he needs to. I indicated to him that The Reading Hospital has Valet parking and we could arrange for a wheelchair to meet him at his car and take him to the stress test area, but he declined that at this time. He said he will "let that one alone for now" or something with that meaning, indicating that he did not want to pursue testing at this time in spite of the reasons for it, which I explained fully to him.

I indicated to [him] the importance of taking medications as prescribed and pointed out that stopping the metoprolol could, in fact, precipitate a myocardial infarction. He agreed to start on his medications again tonight and to take them faithfully. He is going to monitor his blood pressure twice daily, while at rest, over the next month and he will see me back in the office in a month and we will make further adjustments in his therapy.

Otherwise, I discussed with him the real need to get him set up for sleep apnea testing again and, as you will see from the enclosed note, I have sent a letter to Respiratory Specialists trying to do everything possible to get him to proceed with the sleep apnea test. I am hopeful, if necessary, they will modify their procedure slightly in order to be able to get some useful information on a perhaps less than optimal study as opposed to no information obtained because a perfectly performed test cannot be done.

*Id.* at 0388-0389.

Also included in the medical records was a May 4, 2012 report from Karen Delong, MSN, CRNP, from Respiratory Specialists, which indicated that the plaintiff suffered from obstructive sleep apnea. *Id.* at 0391-0395; Pl.'s Facts at ¶ 12; Def.'s Resp. at ¶ 12. Although Nurse Delong discussed with the plaintiff about the possibility of a sleep study and

16

recommended that he get one, the plaintiff did not choose to schedule any studies at that time. Admin. R. at 0394.

Dr. Minnich also provided Liberty Life with an Attending Physician's Statement dated January 18, 2013. *Id.* at 0373-0374; Pl.'s Facts at ¶ 14; Def.'s Resp. at ¶ 14. In this statement, Dr. Minnich stated that he had treated the plaintiff since January 13, 2012, and the plaintiff's last visit with him occurred on January 15, 2013. Admin. R. at 0373. Dr. Minnich also stated that the plaintiff was advised to cease work "by [his] employer due to his abnormal gait." *Id.* Dr. Minnich identified the following diagnoses: Abnormality of gait, morbid obesity, obstructive sleep apnea, Legg-Calve Perthes Disease, hypertension, "NIDDM," and hyperlipidemia. *Id.* His prognosis for the plaintiff was "fair." *Id.* Dr. Minnich's proposed treatment plan was "His maintain [sic] of treatment is weight loss related to morbid obesity. He is not a surgical candidate." *Id.* at 0374. In completing the remainder of the form, Dr. Minnich indicated that the plaintiff had (1) a Class 4 physical impairment, defined as a "[m]oderate limitation of functional capacity; capable of clerical/administration activity;" (2) a Class 3 mental/nervous impairment, defined as "[p]atient is able to engage in only limited stressful situations and engage only in limited interpersonal relations (moderate limitations);" and (3) a Class 3 cardiac impairment, defined as a "[m]arked [l]imitation."[12] *Id.*; Pl.'s Facts at ¶¶ 14-18; Def.'s Resp. at ¶¶ 14-18.

As part of its assessment of the plaintiff's claim for STD benefits, Liberty Life also received an Employer's Statement form completed by Erin Cutler ("Cutler"), a regional human

---

[12] For physical impairments, the classes ranged from Class 1, defined as "[n]o limitations of functional capacity; capable of heavy work," to Class 5, defined as "[s]evere limitation of functional capacity; incapable of minimum activity." Admin. R. at 0373. For mental/nervous impairments, the classes ranged from Class 1, defined as "[p]atient is able to function under stress and engage in interpersonal relations (no limitations)," to Class 5, defined as "[p]atient has significant loss of psychological, physiological, personal, and social adjustment (severe limitations)." *Id.* Finally, for cardiac impairments, the classes ranged from Class 1, defined as "[n]o limitation," to Class 4, defined as "[c]omplete limitation." *Id.*

resources manager of Pratt Industries.[13]  *Id.* at 0404.  The form indicates that the plaintiff's occupation was a controller, and this position was "[a]ccountable for all accounting operations at the company, accounts payable, accounts receivable, invoicing, billings, and other financial duties."  *Id.*  The form also listed the physical requirements of the job as involving sitting for 80% of the day, standing for 10% of the day, and walking for 10% of the day.  *Id.*  The form also identified the lifting requirements as five pounds.  *Id.*

During the review process, nurse Karen Hughes reviewed the plaintiff's file and prepared a January 31, 2013 file note summarizing the results of her review.  *Id.* at 0070; Def.'s Facts at ¶ 7.  In the notes of Ms. Hughes' file summary, she noted, *inter alia*, the following:  (1) the plaintiff contemplated medical leave after Pratt Industries recommended it due to his mobility issues; (2) the plaintiff was ambulating with a cane and reporting discomfort of his right knee; (3) the plaintiff had comorbid conditions of diabetes and morbid obesity, but the diabetes was well controlled per recent lab work; and (4) the plaintiff's physical examination was "ESSENTIALLY NORMAL" and there were no documented musculoskeletal examinations.  *Id.*  Based on her observations that there were no physical exam findings to support a gait abnormality; thus, she concluded that "WHILE THE [PLAINTIFF] MAY NEED TO UTILIZE A CANE AS NEEDED FOR COMFORT, THERE IS NO EVIDENCE OF FUNCTIONAL DEFECTS TO NECESSITATE AN ASSISTIVE DEVICE."  Admin. R. at 0070; Def.'s Facts at ¶ 7.

Via a letter dated February 5, 2013, Liberty Life denied the plaintiff's claim for STD benefits.  Def.'s Facts at ¶ 8; Pl.'s Facts at ¶ 31; Def.'s Resp. at ¶ 31; Admin. R. at 0362-0364.  In denying the claim, Liberty Life stated that it had reviewed the records from Dr. Minnich and had consulted with a disability nurse case manager.  Def.'s Facts at ¶ 8; Pl.'s Facts at ¶ 31; Def.'s

---

[13] The form was dated January 22, 2013.  Admin. R. at 0404.

Resp. at ¶ 31; Admin. R. at 0362-0363.  Liberty Life noted that his medical condition was not of

such severity to "prevent [him] from performing [his] sedentary job duties, which require[d him]

to sit 60% [sic], with occasional walking 10% of the time."  Pl.'s Facts at ¶ 31; Def.'s Resp. at ¶

31; Admin. R. at 0363.  In addition, Liberty Life stated that

> [a]lthough you were diagnosed with gait abnormality and it was documented you
> reported symptoms of pain in your right knee and in the right side of your pelvis,
> there were no abnormal physical exam findings to support restrictions and
> limitations.  While it is noted you ambulate with a cane as needed for comfort,
> there is no evidence of functional deficits to necessitate an assistive device.
>
> We understand that you may have symptoms associated with your condition;
> however, the above information does not support a condition of such severity to
> preclude you from performing your job as a Controller for Pratt Industries, U.S.A.

*Id.*; *see* Def.'s Facts at ¶ 8.

On February 7, 2013, shortly after the decision to deny the plaintiff's STD benefits claim,

Liberty Life received a physical job evaluation form completed by Cutler on behalf of Pratt

Industries USA.  Def.'s Facts at ¶ 9; Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45; Admin. R. at 0360.

In describing the physical requirements of the plaintiff's controller job, unlike the earlier form

she completed on behalf of Pratt Industries, Cutler indicated that the job required him to sit 3

hours a day, stand 2 hours a day, and walk 2 hours a day.  Def.'s Facts at ¶ 9; Pl.'s Facts at ¶ 45;

Def.'s Resp. at ¶ 45; Admin. R. at 0360.  Cutler also stated that the plaintiff was required to bend

frequently, reach above shoulder level frequently, reach shoulder level frequently, and reach

below shoulder level frequently.  Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45; Admin. R. at 0360.

The plaintiff also had to lift up to 20 pounds daily.  Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45;

Admin. R. at 0360.  In the comments section, Cutler stated that "[a] great deal of the Controller

job requires significant walking and getting around the plant for physical inventory and taking

stock of product."  Pl.'s Facts at ¶ 45; Def.'s Resp. at ¶ 45; Def.'s Facts at ¶ 9; Admin. R. at 0360.

The plaintiff appealed from Liberty Life's decision to deny STD benefits via a letter dated February 20, 2013, and attached medical documentation.  Admin. R. at 0345-0359.  In his letter, the plaintiff stated, *inter alia*, that (1) he experienced pain and fatigue while using his cane, but it was "bearable as long as I am going a short distance," (2) he experienced "excruciating" pain when he takes his weight or load off of his leg, (3) he has "unbearable" pain in his lower back if he stands for too long, even while using his cane, (4) this lower back pain causes him to avoid going into the plants and warehouses because there are very few places to sit and rest, (5) he could not use a wheelchair or scooter to move about in the plants and warehouses due to the irregular surfaces and levels, (6) "[t]he stairs and irregular surfaces became a significant issue at both plants [he] was responsible for, as there are offices and conference rooms on two different floors of both, with no elevators," (7) when traversing the stairs, he would use both hands to grab the railing while tying his cane to his belt and dragging it behind him, (8) he frequently experienced "stumbling and missteps" on the stairs (which caused other employees to "express worry and concern"), (9) he requested and received permission not to attend the October 2012 Pratt controller meeting due to his worsening mobility factors, (10) he missed some doctors' visits over the past year due to work emergencies and not because of "negligence or low concern," (11) although he was able to delegate some of his responsibilities to minimize the amount of walking he has to do at work, he was not able to count on the delegation to other employees to get consistent results and, thus, "while computer work and desk work is indeed the biggest slice of the day, time-wise, every plant controller in the corrugated packaging manufacturing industry needs to be capable of observing product and production

within the typical 150,000 sf plant and/or warehouse," and (12) "everyone that knows or deals with [him] . . . have no question . . . that [he has] become disabled, and that [he] needs rehabilitation now.  This was not [his] idea or decision or request, and if not for the intervention, [he] would still be trying to hobble around pain or not."  Pl.'s Facts at ¶ 42; Def.'s Resp. at ¶ 42; Admin. R. at 0345-0348.

Among the documents attached to the plaintiff's February 20, 2013 letter were office visit notes from Sana Hanafi, M.D., an internist.  Admin. R. at 0352-0359; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.  The notes reflect that the plaintiff visited Dr. Hanafi for hypertension, Hyperlipidemia, and obesity.  Admin. R. at 0353, 0355.  Dr. Hanafi indicated that the plaintiff told her that "[h]e works at plants in a company that manufactures boxes where more than 60% of the time he has a desk job however has to go on site and be on his feet, at times he has had [f]alls."  Admin. R. at 0353.  The plaintiff described to Dr. Hanafi "right leg pain which is excruciating burning and tingling pain from his right hip down to his right knee, not associated with back pain however gets worse about a scale of 10/10 when [w]eight-bearing."  Admin. R. at 0353; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.  In addition, the plaintiff "uses a cane to compensate his weight and of course has gait dysfunction which has been leading to multiple falls in the past."  Admin. R. at 0353; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.

During Dr. Hanafi's physical examination of the plaintiff, she noted that the plaintiff had "[l]imited range of motion of the right hip joint and knee joint because of excruciating pain.  Patient moaning and seems to be in extreme pain while trying to extend his right leg.  Straight leg raising test in sitting position is positive for sciatica at approximately 45 degrees."  Admin. R. at 0354; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.  In Dr. Hanafi's review of symptoms, she noted that the plaintiff had a "[n]ormal [m]ood" and was "[c]ooperative."  Admin. R. at 0354.

Dr. Hanafi's assessment and diagnosis indicated that the plaintiff had (1) obesity, (2) ambulatory dysfunction, (3) pain of right leg, (4) juvenile osteochondrosis of hip and pelvis, (5) essential hypertension, (6) sciatica of right side, and (7) repeated falls.   Admin. R. at 0355-0356; Pl.'s Facts at ¶ 21; Def.'s Facts at ¶ 21.   Dr. Hanafi also noted past diagnoses of non-insulin dependent diabetes mellitus, valvular heart disease, hypertension, hyperlipidemia, ambulatory dysfunction: legg perthes disease, and obesity.   Admin. R. at 0354.

Dr. Hanafi had the plaintiff submit to an x-ray of his right hip and right knee along with the examination.   Admin. R. at 0355, 0358-0359.   The x-ray of the plaintiff's right hip revealed osteoarthritis with possible osteonecrosis of the femoral head.   Admin. R. at 0358; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.   The x-ray of the plaintiff's right knee revealed "[n]ew dystrophic calcification adjacent to the medial femoral condyle."[14]   Admin. R. at 0359; Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.

In addition to Dr. Hanafi's office visit notes and the x-ray reports, the plaintiff also provided Liberty Life with progress notes from a visit with Tracy D. Frombach, D.O., of Commonwealth Orthopaedic Associates on February 13, 2013.   Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Facts at ¶ 22.   Dr. Frombach's notes from her examination of the plaintiff revealed impressions of (1) morbid obesity, (2) weakness in the quadriceps, hamstring, and hip flexor, (3) severe osteoarthritis of the right hip, and (4) mild osteoarthritis changes of the right knee.   Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.   Her physical examination notes showed that (1) the plaintiff had "crepitus about the knee with flexion and extension[,]" (2) a McMurray's sign gave him general discomfort, (3) he had "minimal range of motion and internal and external rotation of the hip," giving him discomfort through his quadriceps, and (4) he had

---

[14] In the parties' submissions, they characterized this finding as "mild degenerative changes."   Pl.'s Facts at ¶ 21; Def.'s Resp. at ¶ 21.

"weakness through the hip flexor and lifting the leg off the table with approximately 4-/5 strength."  Admin. R. at 0350; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.

Dr. Frombach also reviewed the plaintiff's February 8, 2013 x-rays of his knee and hip. Admin. R. at 0350; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.  The x-ray of the knee showed mild degenerative changes of the medial femoral condyle, and the x-ray of the hip showed "severe degenerative changes."  Admin. R. at 0350; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.

Regarding her plan for the plaintiff, Dr. Frombach indicated that the plaintiff would be sent to another doctor "for further evaluation of his right hip severe degenerative changes and prior history of Legg Calve Perthes disease for evaluation of total hip replacement."  Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.  Dr. Frombach did not feel that the plaintiff "needs full disability" because he "can perform sedentary work duties."  Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.   In addition, Dr. Frombach noted that the plaintiff had a handicap placard, which she felt was appropriate for him, and he could continue to walk with his four-prong cane.  Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.  Nonetheless, she indicated that "due to [the plaintiff's] . . . osteoarthritis and obesity, [he] should not walk for any long periods of time or any long distances."  Admin. R. at 0351; Pl.'s Facts at ¶ 22; Def.'s Resp. at ¶ 22.

Following the receipt of this additional information from the plaintiff and after receiving the February 7, 2013 job description from Cutler, Liberty Life referred the plaintiff's file to another of its nurse case managers for a file review.  Def.'s Facts at ¶ 11; Admin. R. at 0068-0069.  On February 26, 2013, Nurse Janet Green prepared notes to summarize her review.  Def.'s Facts at ¶ 12; Admin. R. at 0068-0069.  In the note, Nurse Green summarized the records she reviewed and concluded that the plaintiff's mobility and hip problems prevented him from

walking and standing on more than an occasional basis.  Def.'s Facts at ¶ 12; Admin. R. at 0068-0069.  Soon thereafter, Liberty Life reversed its initial decision denying the plaintiff's STD benefits claim, and he ultimately received STD benefits for the period of January 21, 2013, through April 7, 2013, which was the maximum duration applicable for such benefits under the Disability Policy.[15]  Def.'s Facts at ¶ 13; Pl.'s Facts at ¶ 8; Def.'s Resp. at ¶ 8; Admin. R. at 0067, 0068, 0074, 0148.  The plaintiff's gross STD benefit was $750.00 weekly.  Pl.'s Facts at ¶ 8; Def.'s Resp. at ¶ 8; Admin. R. at 0148.

### 3.        The Plaintiff's Application for LTD Benefits

Shortly before the expiration of the plaintiff's STD benefits, Liberty Life began evaluating him to determine his eligibility for LTD benefits under the Disability Policy.  Def.'s Facts at ¶ 14; Admin. R. at 0320-0321.  As part of this investigation, Liberty Life sent requests for records to the plaintiff's treating physicians.  Def.'s Facts at ¶ 16; Admin. R. at 0300-0301, 0306.

In response to Liberty Life's requests, it received records from Dr. John Stelmach, an orthopedic surgeon who examined the plaintiff in March 2013.  Def.'s Facts at ¶ 16; Pl.'s Facts at ¶ 23; Def.'s Resp. at ¶ 23; Admin. R. at 0303-0304.  Dr. Stelmach's March 20, 2013 office visit notes indicate that his impressions were that the plaintiff had (1) severe osteoarthritis of the right hip, and (2) "severe degenerative changes [due to] flattening of the femoral head and increased femoral neck angle questionable due to the prior Legg-Calve-Perthes disease."  Pl.'s

---

[15] Liberty Life claims that it reversed its decision based on Nurse Green's notes.  Def.'s Facts at ¶ 13.  Unfortunately, while this appears to be possible chronologically, without a further explanation to assist the court with interpreting the claim notes, the record does not set forth the precise basis for Liberty Life changing its decision.  While Liberty Life reversing its decision is relevant to the background of this case, the rationale for the decision is irrelevant to the ultimate disposition of this case because of the different definitions of "Disability" for STD and LTD benefit claims in the Disability Policy.

Facts at ¶ 23; Def.'s Resp. at ¶ 23; Admin. R. at 0303-0304.  Dr. Stelmach's treatment plan was

as follows:

> At this point due to his weight and not being a surgical candidate, he will need to lose another 50-100 lbs to get closer to a more appropriate BMI.  He definitely is in need of a total hip replacement.  When he gets closer to a more appropriate weight and he can be medically cleared we will do the total hip replacement.  At this point the patient is probably not able to perform his work duties due to the risks of falling and ambulatory dysfunction when he walks.  He seems to be pretty unstable on his leg and his four prong [cane] will help him with this, but due to the osteoarthritis and obesity it is appropriate to say that the patient will not be able to walk on a regular basis.

Pl.'s Facts at ¶ 23; Def.'s Resp. at ¶ 23; Admin. R. at 0303-0304.

Liberty Life also forwarded Dr. Stelmach a letter dated March 28, 2013, and a

"restrictions form."[16]   In the letter, Liberty Life asked whether the plaintiff could perform

sedentary or light capacity work and provided definitions and characteristics of both forms of

work.[17]   Def.'s Facts at ¶ 16; Pl.'s Facts at ¶¶ 24, 25; Def.'s Resp. at ¶¶ 24, 25; Admin. R. at

0302.  Dr. Stelmach returned the letter to Liberty Life on March 29, 2013, and he indicated his

opinion that the plaintiff "is unable to work [at] this time."[18]  Def.'s Facts at ¶ 16; Pl.'s Facts at ¶

---

[16] It appears that Liberty Life faxed both documents to Dr. Stelmach on March 28, 2013.  Admin. R. at 0300-0302.

[17] The letter identified "light work" as follows:

> **Light Work** – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree.

Pl.'s Facts at ¶ 24; Def.'s Resp. at ¶ 24; Admin. R. at 0310.  The letter also defined "sedentary work" as follows:

> **Sedentary Work** – Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Pl.'s Facts at ¶ 25; Def.'s Resp. at ¶ 25; Admin. R. at 0310.

[18] The forms also had a footer showing that they were transmitted/received via facsimile on March 29, 2013.  Admin. R. at 0300-0302.

26; Def.'s Resp. at ¶ 26; Admin. R. at 0300.   On the same date, Dr. Stelmach returned the restrictions form to Liberty Life where he also indicated his opinion that the plaintiff was capable of "no work [at] this time."  Pl.'s Facts at ¶ 26; Def.'s Resp. at ¶ 26; Def.'s Facts at ¶ 16; Admin. R. at 0302.

The plaintiff also completed a Liberty Life activities questionnaire in support of his claim for benefits.  Pl.'s Facts at ¶ 43; Def.'s Resp. at ¶ 43; Admin. R. at 0278-0280.   In the questionnaire, the plaintiff indicated that he (1) could sit for 15 consecutive minutes, (2) could stand for 1.5 consecutive minutes with cane support, but was limited by back pain and arm fatigue, (3) could walk for 2 minutes with cane support, but possibly for longer if he leaned his weight onto a shopping cart, (4) did not stand or walk without support, (5) sat, laid, or slept for 22 hours a day, (6) stood (with cane support) approximately 20 minutes a day, and (7) walked (with a cane, bracing, or shopping cart) for approximately 90 minutes a day, (8) cannot sleep in a flat bed, so he uses a recliner to sleep, (9) experiences fatigue when he uses a normal or desk chair, (10) can sit in a car with a reclining seat for about a maximum of one hour, (11) had a handicapped placard, but had to come back to a location if a handicapped spot was unavailable or not within a "couple minutes of a shopping cart" (where he would use his cane to get to the cart), (12) can do approximately 20 minutes of shopping if he has a shopping cart, but could not go into a store that did not have or allow shopping carts, and (13) was unable to travel or take vacations due to mobility issues and the need for a recliner to sleep.  Pl.'s Facts at ¶ 43; Def.'s Resp. at ¶ 43; Admin. R. at 0278-0279.  The plaintiff also stated that his lack of mobility kept him from getting out into the "typical 150,000 [square foot] production plant and warehouses, to attend to job cost duties and inventory duties, and troubleshoot[] production reporting."  Pl.'s Facts at ¶ 44; Def.'s Resp. at ¶ 44; Admin. R. at 0280.  The plaintiff stated that he needed this

type of mobility, which "include[ed] being able to get between loads and units."  Pl.'s Facts at ¶ 44; Def.'s Resp. at ¶ 44; Admin. R. at 0280.

Along with requesting and receiving records from the plaintiff's treating physicians as part of its investigation, Liberty Life sent an email to Pratt Industries requesting clarification of the physical requirements of the plaintiff's job because Cutler had submitted differing physical job evaluation information.  Def.'s Facts at ¶ 17; Admin. R. at 0316.  In the email, Liberty Life indicated that it needed clarification and an accurate description of the plaintiff's job demands as part of its LTD benefits evaluation and so its vocational specialist could evaluate how the plaintiff's occupation is performed in the national economy.  Def.'s Facts at ¶ 17; Admin. R. at 0316.  In response to this email, Pratt Industries sent an email stating that the information provided by Cutler on February 7, 2013, was more accurate and should be used.  Def.'s Facts at ¶ 17; Admin. R. at 0314.

After receiving Dr. Stelmach's medical records and the clarification from Pratt Industries about the plaintiff's job duties, Liberty Life requested its vocational rehabilitation department to complete a vocational report summarizing the principal duties of the plaintiff's controller occupation as it is performed in the national economy.  Def.'s Facts at ¶ 18; Admin. R. at 0294.  On April 8, 2013, Bernadette Cook ("Cook"), a senior vocational case manager, prepared a report in response to Liberty Life's request.  Def.'s Facts at ¶ 18; Admin. R. at 0238-0240.

In Cook's report, she summarized the principal duties associated with the plaintiff's controller position, including the information provided by Pratt Industries.  Def.'s Facts at ¶ 19; Admin. R. at 0238.  She did not speak to the plaintiff.  Pl.'s Facts at ¶ 52; Def.'s Resp. at ¶ 52; Admin. R. at 0239-0240.

Cook indicated that "[a]ccording to the review of file records and after reviewing the job description provided by the employer, [the plaintiff's] job as a Controller is most closely represented by the occupation of Controller" as defined by the Dictionary of Occupational Titles, fourth edition ("DOT") and the Occupational Information Network ("O*NET").  Def.'s Facts at ¶ 19; Pl.'s Facts at ¶ 52; Def.'s Facts at ¶ 52; Admin. R. at 0238-0239.  A controller generally directs the financial activities of an organization and essentially performs accounting functions. Pl.'s Facts at ¶ 52; Def.'s Facts at ¶ 52; Admin. R. at 0239-0240.

Cook noted that a O*NET custom report on controllers indicated that (1) 100% of the respondents reported sitting more than half the time continually or almost continually, (2) 70% reported making repetitive motions, (3) 86% reported walking/running less than half the time with 14% reporting never, and (4) 83% reported standing less than half the time with 17% reporting never.  Pl.'s Facts at ¶ 52; Def.'s Resp. at ¶ 52; Admin. R. at 0239.  Regarding the physical demands of the position of controller, Cook stated as follows:

> The occupation of Controller is considered a sedentary work classification according to the DOT.  According to the DOT sedentary work is defined as: "Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."

> The following physical demands were obtained from the DOT, O*NET, and [Occupational Outlook Handbook, 2012-2013 edition].  The physical demands of climbing, balancing, stooping, kneeling, crouching, bending or twisting of the body and crawling are not typical to this occupation.  The physical demands of reaching, handling and sitting are performed on a frequent basis.  The physical demands of fingering, standing, walking, making repetitive motions and using your hands to handle, control, or feel objects, tools, or controls are performed on an occasional basis.

28

Def.'s Facts at ¶ 19; Admin. R. at 0240.   Based on these observations, Cook concluded that "[w]ith a reasonable degree of vocational certainty, the typical physical demands of [the plaintiff's] occupation of Controller are most often performed in the sedentary physical demand category in the national economy.   Based on standard vocational resources, internet research and my vocational expertise, part-time availability does exist in this occupation." Def.'s Facts at ¶ 19; Pl.'s Facts at ¶ 52; Def.'s Resp. at ¶ 52; Admin. R. at 0240.

Once it received Cook's vocational report, Liberty Life requested completion of a peer review report by one of its consulting physicians.   Def.'s Facts at ¶ 20; Admin. R. at 0237.   In response to the request, Liberty Life received an April 20, 2013 memorandum report from Richard Avioli, M.D., a board-certified orthopedic surgeon.   Def.'s Facts at ¶ 20; Admin. R. at 0223-0227.   Dr. Avioli did not conduct a medical examination of the plaintiff.   Pl.'s Facts at ¶ 33; Def.'s Resp. at ¶ 33.

In Dr. Avioli's report, he listed all of the medical records he had reviewed and noted that he had unsuccessfully tried to contact Dr. Stelmach, the plaintiff's treating orthopedic surgeon. Def.'s Facts at ¶ 20; Pl.'s Facts at ¶ 33; Def.'s Resp. at ¶ 33; Admin. R. at 0223.   Dr. Avioli indicated that "[b]ased on the information in the file his employer told the employee he could no longer do his job duties due to his obesity issues and being a danger to himself – The claimant's job would require him to go into the plant to do inventory thus requiring him to walk and climb stairs."   Pl.'s Facts at ¶ 36; Def.'s Resp. at ¶ 36; Admin. R. at 0233.   Dr. Avioli also stated that Dr. Minnich stated the plaintiff could work at a sedentary occupation, and his orthopedic physician, Dr. Stelmach, stated that the plaintiff could not work and needed a right hip replacement.   Pl.'s Facts at ¶ 36; Def.'s Resp. at ¶ 36; Admin. R. at 0233.   Dr. Avioli listed the current primary diagnosis as "severe degenerative arthritis of the right hip which results in severe

impairment of his ability to walk due to pain and stiffness, as well as instability in his gait with associated fall risk.  His fall risk would put him at risk for possible hip fracture resulting from a fall."  Pl.'s Facts at ¶ 34; Def.'s Resp. at ¶ 34; Admin. R. at 0223.

In response to a specific question asking him to describe any restrictions and limitations that were necessary because of the plaintiff's physical conditions, Dr. Avioli stated as follows:

> The medical record documentation indicates that based on the severity of the claimant's right hip condition with pain, stiffness, and unsteady gait with fall risk that the claimant is capable of instrumental activities of daily living with the need to ambulate with an assistive device.  He is capable of frequent sitting with occasional standing and walking with an assistive device with no squatting, kneeling or climbing and with no push/pull/lift greater than 10 pounds but otherwise unrestricted us of his arms and hands.  These restrictions and limitations would be in effect until the claimant can undergo right total hip replacement, at which time it would be expected that his functional capacity would improve to the point where he could be considered for return to work with appropriate limitations 3-6 months postoperatively.

Def.'s Facts at ¶ 20; Pl.'s Facts at ¶ 37; Def.'s Resp. at ¶ 37; Admin. R. at 0224.  Dr. Avioli also indicated that the plaintiff's obesity is a significant co-morbid condition impacting his condition at this time, since his weight is preventing him [from being] considered for right total hip replacement."  Pl.'s Facts at ¶¶ 35, 37; Def.'s Resp. at ¶¶ 35, 37; Admin. R. at 0224.

In his "analysis," Dr. Avioli stated that

> [a]rthritis of the hip can become an impairing condition with significant impairment and restriction of activities of daily living.  Initially, treatment options include modification of activities, medications, and weight loss if appropriate, since the force across the hip with standing and walking is three times the body weight.  If hip symptoms progress, fluoroscopically guided intra-articular cortisone injection can be considered.  When symptoms warrant it, total hip replacement is the definitive treatment for this condition in the appropriately selected individual.  Obesity is a significant complicating factor for consideration of hip replacement due to the markedly increased stress that the prosthetic joint would experience, as well as the significant increased risk of postoperative wound problems associated with obesity.

Pl.'s Facts at ¶ 38; Def.'s Resp. at ¶ 38; Admin. R. at 0224.  Dr. Avioli noted that x-ray reports of the plaintiff's right hip and right knee dated February 8, 2013, stated that there was "right hip osteoarthritis with probable osteonecrosis of the femoral head with flattening of the femoral head with osteophytes and subchondral cysts."  Pl.'s Facts at ¶ 38; Def.'s Resp. at ¶ 38; Admin. R. at 0225-0226.

On April 24, 2013, Dr. Avioli telephoned Dr. Stelmach again to discuss the plaintiff's condition and work capacity.  Pl.'s Facts at ¶¶ 27, 32; Def.'s Resp. ¶¶ 27, 32; Def.'s Facts at ¶ 22; Admin. R. at 0078-0079, 0212.  Dr. Avioli memorialized this conversation in an addendum to his memorandum report, and indicated that Dr. Stelmach had

> agreed that the [plaintiff] had the capacity for sedentary duty with frequent sitting with only occasional walking and standing with the use of a cane or crutches as needed, with no kneeling, squatting, stooping or bending and no push/pull/lift greater than 10 pounds, but otherwise with unrestricted use of the hands for fine fingering.

Pl.'s Facts at ¶ 27; Def.'s Resp. at ¶ 27; Def.'s Facts at ¶¶ 22, 23; Admin. R. at 0212.  Dr. Avioli also noted that "[t]hese restrictions would be in effect until the [plaintiff] can be considered for total hip replacement surgery and if he proceeds with total hip replacement surgery, it would be expected that these restrictions and limitations could be considered at 3-6 months post-operatively."  Def.'s Facts at ¶ 23; Admin. R. at 0212.

On the same date as the above-referenced conversation, Dr. Avioli sent Dr. Stelmach a letter to confirm that Dr. Stelmach agreed that the plaintiff was capable of performing sedentary duty as Dr. Avioli defined during their conversation.  Pl.'s Facts at ¶ 27; Def.'s Resp. at ¶ 27; Def.'s Facts at ¶ 24; Admin. R. at 0220, 0216.  Dr. Stelmach signed and returned the letter on April 25, 2013.  Pl.'s Facts at ¶ 27; Def.'s Resp. at ¶ 27; Def.'s Facts at ¶ 24; Admin. R. at 0216.

On April 26, 2013, Pratt Industries provided Liberty Life with a typewritten formal job description for the position of controller.  Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 0203-0205.  According to this job description, the purpose of the plaintiff's job "is for financial management.  This person is responsible for general accounting, physical inventories and stock takes, payables, order entry, billing, cost accounting, financial reporting and bills of materials.  This person is responsible to protect all company assets."   Admin. R. at 0203.   The job responsibilities include, *inter alia*, (1) 3 hours per day of corporate reporting of financials, (2) 3 hours per day of "[p]hysical plant inventory, ensure accuracy of physical inventory and report results[,] and [i]nvestiga[te,] explain book to physical adjustments," (3) 1 hour per day of "A/R, A/P, Billing," and (4) 1 hour per day of invoicing.  Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 0203.  The "Physical Requirements" are noted as follows:

> In order to successfully perform the job of Controller, a good portion of the day is spent regularly out of [sic] on the manufacturing floor.  The Controller must be able to stand, walk, balance, bend/stoop, climb, kneel and squat as needed.  This person is empowered to manage and protect company assets and also report any variances.  If a Controller is unable to continuously perform these physical duties, they will not be effective or accurate with financial reporting and the accounting aspects of his or her job.

Pl.'s Facts at ¶ 46; Def.'s Resp. at ¶ 46; Admin. R. at 0203.  Additional physical requirements included (1) frequently (described as 33-66% of the time) sitting, standing, walking, lifting or carrying zero to ten pounds, reaching hands and arms in any direction, and kneeling, crouching, or stooping repeatedly, and (2) occasionally (described as 1-33% of the time) lifting or carrying ten to 20 pounds.  Pl.'s Facts at ¶ 47; Def.'s Resp. at ¶ 47; Admin. R. at 0204.  A controller also had to (1) work near moving or mechanical parts, loud noises, and areas of strong vibration, (2) constantly make decisions that affect other people, financial resources, and the reputation of the company, (3) address constant financial conflicts and variances, (4) deal occasionally with

unpleasant, angry, or discourteous individuals, (5) meet daily strict deadlines, and (6) work in a

team or group (described by Pratt Industries as "critical and mandatory").  Pl.'s Facts at ¶ 47;

Def's Resp. at ¶ 47; Admin. R. at 0204-0205.  A controller also had to be responsible for specific

and detailed tasks set by the company, but also had approximately 30-40% of the daily time to

structure his or her schedule as he or she saw fit.  Pl.'s Facts at ¶ 47; Def.'s Resp. at ¶ 47; Admin.

R. at 0205.

In further reference to the plaintiff's job, Cutler wrote an email to Chenta Kennedy

("Kennedy") of Liberty Life on May 1, 2013.  Pl.'s Facts at ¶ 48; Def.'s Resp. at ¶ 48; Admin. R.

0057, 0193.  In this email, Cutler discussed the plaintiff's job duties as follows:

- [The plaintiff] was unable to perform the physical requirements of his job.
  Due to his mobility issues, he was not able to be physically on the
  manufacturing floor of the plant to take physical inventories, stock levels
  and participate in the month end closing process which requires a great
  deal of time spent on the actual floor.  These job duties are an expectation
  for any Controller at Pratt Industries [and] must be completed on a daily,
  weekly and month[ly] basis.  [The plaintiff] was not able to complete
  these responsibilities.
- On many days, [the plaintiff] was not able to physically be at the plant.
  Due to his mobility issues, he was attempting to do his job from home
  most of the time.  There have been several instances in which he would
  not attempt to come to work due to his mobility issues, weather issues, etc.
  If there was any snow, ice, or messy winter PA "stuff" on the ground, [the
  plaintiff] would not come to work.  There were a few occasions that he
  attempted to come to work, got in his car and drove to the plant and
  refused to get out of his car as there was snow on the ground.  Although
  the snow was less than a half of an inch and was really just on the outside
  corners of the building, he did not feel safe or secure enough to attempt to
  get out of his vehicle with a cane.  [The plaintiff] was working between
  two plants – one in Reading, PA and one in Emmaus, PA.  Both plants
  have between 3 and 5 steps to get into the building and he was not able to
  get himself up the stairs at either facility.  His office in Reading, PA was
  on the 2nd floor of the building and since we do not have an elevator there
  and he would be forced to do the steps, we moved his office down to the
  first floor and this only accommodated his needs for a short period of time
  until he was not able to do the exterior steps to get into the plant.  In
  summation, he was only coming to work 1-2 days per week.

- [The plaintiff] was also unable to travel between the two plants at which he was responsible for due to his mobility issues and joint/knee problems. He had stated several times that the degree of the commute was wearing him out physically and he could not do it anymore. The commute between the two plants is approximately 25 miles. He was virtually unable to walk it appeared. In addition, [the plaintiff] has also not been able to attend Controller conferences which are at our head office in the Atlanta, GA area. The company had purchased two seats on the airplane the first and only year he was able to attend to accommodate his needs. He was also unable to sleep in the bed at the hotel and he requested cots be brought to his room from housekeeping.

The company did do all the extra's [sic] that we could to work around [the plaintiff's] disability. Unfortunately, his mobility issues prohibited him from doing his job.

Pl.'s Facts at ¶¶ 48-50; Def.'s Resp. at ¶¶ 48-50; Admin. R. at 0193-0194.

According to Liberty Life's claim notes, Kennedy forwarded the April 26, 2013 updated job description from Pratt Industries to Liberty Life's vocational consultant. Admin. R. at 0058. Cook reviewed the updated job description and determined that it did not change her conclusions in the April 8, 2013 report. *Id.* In addition, the claim notes showed that Kennedy characterized the plaintiff's position as controller in the "sedentary/light" physical demand category. Pl.'s Facts at ¶ 51; Def.'s Facts at ¶ 51; Admin. R. at 0058. In this same note, Kennedy states that the plaintiff has been in a sedentary position for over six months, and "therefore this will be consider [sic] is [sic] occupation." Pl.'s Facts at ¶ 54; Def.'s Resp. at ¶ 54; Admin. R. at 0058.

The claims notes also reveal that the plaintiff had informed Liberty Life on April 25, 2013, that his occupation was a "plant controller" and not just a controller. Pl.'s Facts at ¶ 53; Def.'s Resp. at ¶ 53; Admin. R. at 0059. The plaintiff further informed Liberty Life that he would not be able to earn the money or even get hired in any other type of controller job because all of his experience was as a plant controller. Pl.'s Facts at ¶ 53; Def.'s Resp. at ¶ 53; Admin. R. at 0059.

34

On May 2, 2013, Liberty Life sent a letter to the plaintiff in which it indicated it was denying his application for LTD benefits under the Disability Policy.  Def.'s Facts at ¶ 25; Pl.'s Facts at ¶ 55; Def.'s Resp. at ¶ 55; Admin. R. at 0195-0201.  In the letter, Liberty Life listed the information it reviewed and summarized the records and information underlying its determination to deny the plaintiff's claim, including, *inter alia*, (1) the February 7, 2013 and April 26, 2013 job descriptions, (2) Cook's vocational analysis in which she determined the plaintiff's occupation title and how the occupation is normally performed in the national economy, (3) medical information from Dr. Hanafi, Dr. Minnich, Dr. Frombach, Dr. Stelmach, and Ann Wellock, R.D., L.D.N., and (4) Dr. Avioli's peer review report, including the addendum which reflects his telephone conversation with Dr. Stelmach and the agreement that the plaintiff could perform "sedentary" work as Dr. Avioli had defined.  Def.'s Facts at ¶ 25; Pl.'s Facts at ¶¶ 57, 60; Def.'s Resp. at ¶¶ 57, 60; Admin. R. at 0197-0200.  The letter stated that Liberty Life considered the diagnoses of "Abnormality of Gait, Morbid Obesity, Right Leg Pain and Osteochondrosis of the Hip and Pelvis."  Pl.'s Facts at ¶ 60; Def.'s Resp. at ¶ 60; Admin. R. at 0197.

Liberty Life indicated that based on its conversation with Pratt Industries, the plaintiff had "been working at an accommodated sedentary position for over six months."  Pl.'s Facts at ¶ 56; Def.'s Resp. at ¶ 56; Admin. R. at 0196.  Liberty Life also stated that the plaintiff's position was most closely consistent with the occupation of controller, a sedentary job as defined in the DOT.  Pl.'s Facts at ¶ 58; Def.'s Resp. at ¶ 58; Admin. R. at 0196.  It further quoted Cook's conclusion that "the typical physical demands of [the plaintiff's] occupation of Controller are most often performed in the sedentary physical demand category in the national economy. Based on standard vocational resources, internet research and my vocational expertise, part-time

availability does exist in this occupation."  Pl.'s Facts at ¶ 59; Def.'s Resp. at ¶ 59; Admin. R. at 0197.

> Liberty Life informed the plaintiff of its conclusion that
>
> [b]ased on our medical and vocational reviews, . . . you can perform, with reasonable continuity the material and substantial duties of your Own Occupation as of April 7, 2013.  Therefore, you do not meet Pratt Industries, U.S.A.'s definition of disability under the Own Occupation definition and no benefits will be paid on this claim.

Pl.'s Facts at ¶ 61; Def.'s Resp. at ¶ 61; Def.'s Facts at ¶ 25; Admin. R. at 0201.  Liberty Life advised the plaintiff of his right to request a review of the denial and the procedure for submitting such a request.  Def.'s Facts at ¶ 25; Admin. R. at 0201.

On June 26, 2013, the plaintiff submitted a letter (through Pratt Industries' human resources) appealing Liberty Life's denial of his claim for LTD benefits.[19]  Def.'s Facts at ¶ 26; Pl.'s Facts at ¶ 62; Def.'s Resp. at ¶ 62; Admin. R. at 0128-0133.  Along with the letter, the plaintiff submitted additional medical documentation including a May 28, 2013 attending physician's statement by Anne Rohrbach, M.D., Dr. Rohrbach's office visit notes from an appointment on May 10, 2013, a psychological evaluation completed by Dr. Rowena Fantasia-Davis, a psychologist, and an additional orthopedic opinion from Gary Zartman, M.D., an orthopedic surgeon who works as part of Lancaster Orthopedic Group.  Pl.'s Facts at ¶ 62; Def.'s Resp. at ¶ 62; Admin. R. at 0128, 0134-0142.

With regard to this medical documentation, Liberty Life received office visit notes from Dr. Rohrbach, an internal medicine specialist who first treated the plaintiff in 2003.  Pl.'s Facts at ¶ 28; Def.'s Resp. at ¶ 28; Admin. R. at 0136-0139.  Dr. Rohrbach reported that the plaintiff was

---

[19] In Liberty Life's June 27, 2013 appeal referral (by Kennedy), she included the claim notes from April 26, 2013 in the "Claim Summary and Denial/Termination" of the referral form.  *See* Admin. R. at 0059, 0125; *see also* Pl.'s Facts at ¶ 67 (referencing information in referral form); Def.'s Resp. at ¶ 67 (agreeing to the plaintiff's recitation of the information contained in the referral form).

suffering from severe arthritis of the hip but could not have a total hip replacement until he got to a more appropriate weight.  Pl.'s Facts at ¶ 28; Def.'s Resp. at ¶ 28; Admin. R. at 0136-0137. Dr. Rohrbach also indicated that the plaintiff (1) was "only able to sit for 15 consecutive minutes and [was] unable to lay in the bed at home," (2) was still limited with standing due to his back pain and arm fatigue, (3) could stand "approximately 1-1/2 minutes with cane support," and (4) was experiencing "a terrible amount of stress related to his inability to get around and his inability to have a hip replacement at the current time."  Pl.'s Facts at ¶ 28; Def.'s Resp. at ¶ 28; Admin. R. at 0136.  Dr. Rohrbach stated that the plaintiff was "disabled due to his severe arthritis of the hip and inability to have surgery."  Pl.'s Facts at ¶ 28; Def.'s Resp. at ¶ 28; Admin. R. at 0137.

On May 29, 2013, Dr. Rohrbach also provided Liberty Life with an attending physician statement in which she indicated that she diagnosed the plaintiff with osteoarthritis, abnormality of gait, morbid obesity, and hypertension.[20]  Admin. R. at 0143-0144; Pl.'s Facts at ¶ 30; Def.'s Resp. at ¶¶ 28, 30.  Dr. Rohrbach indicated that the plaintiff had a Class 5 physical impairment, meaning that he had a "[s]evere limitation of functional capacity; incapable of minimum activity."  Pl.'s Facts at ¶ 30; Def.'s Resp. at ¶ 30; Def.'s Facts at ¶ 26; Admin. R. at 0143.  She also reported that he had a Class 3 "marked limitation" with respect to cardiac impairment and a Class 4 "mental/nervous impairment" meaning that he was "unable to engage in stressful situations or engage in interpersonal relations (marked limitations)."  Pl.'s Facts at ¶ 30; Def.'s Resp. at ¶ 30; Def.'s Facts at ¶ 26; Admin. R. at 0144.  She further indicated that "[d]ue to severe

---

[20] In Liberty Life's response to the plaintiff's statement of material facts, it indicates that Dr. Rohrbach diagnosed the plaintiff with osteoarthritis, abnormality of gait, and morbid obesity in her attending physician statement.  Def.'s Resp. at ¶ 28.  It appears that Dr. Rohrbach ran out of space on the form for secondary diagnoses (as there were only three spaces for diagnoses) and listed hypertension as another diagnosis just to the right of these diagnoses.  Admin. R. at 0143.

osteoarthritis, obesity, instability, and pain, [the plaintiff] cannot work."  Pl.'s Facts at ¶ 30;

Def.'s Resp. at ¶ 30; Admin. R. at 0144.

Concerning the information provided by Dr. Zartman, his office visit notes showed that

he had examined the plaintiff on June 13, 2013, so the plaintiff could get a second opinion about

his right hip.[21]  Def.'s Facts at ¶ 27; Admin. R. at 0134.  Dr. Zartman agreed that the plaintiff "is

in need of a right total hip replacement."  Def.'s Facts at ¶ 27; Admin. R. at 0135.  They also

discussed that

> as long as [the plaintiff] is still making progress with weight loss and is not
> experiencing any further functional decline, then we can hold off on a total hip
> replacement.  If [the plaintiff started] to experience further functional decline,
> the[n] we would like to proceed with a total hip replacement as soon as possible.

Admin. R. at 0135.

The final piece of medical documentation consisted of notes from Dr. Fantasia-Davis, a

licensed psychologist, with whom the plaintiff sought treatment due to severe anxiety and

feelings of depression associated with his physical disabilities.  Pl.'s Facts at ¶ 29; Def.'s Resp.

at ¶ 29; Def.'s Facts at ¶ 28; Admin. R. at 0140-0142.  According to Dr. Fantasia-Davis's notes

from an examination on May 20, 2013, the plaintiff also sought treatment due to stress related to

his separation from his wife in July 2012.  Pl.'s Facts at ¶ 29; Def.'s Resp. at ¶ 29; Admin. R. at

0140-0142.

Dr. Fantasia-Davis noted that the plaintiff's mood "appeared depressed and was

characterized by symptoms of sadness, and anhedonia, social withdrawal, and reported

difficulties with decreased attention and concentration."  Pl.'s Facts at ¶ 29; Def.'s Resp. at ¶ 29;

Admin. R. at 0141.  She diagnosed him with generalized anxiety disorder, anxiety due to a

---

[21] Although the parties indicate in their submissions that Dr. Zartman evaluated the plaintiff, the office visit notes
indicate that "[t]he patient was evaluated by Alexandra J. Grubb, PA-C under the direct supervision of [Dr.
Zartman]."  Admin. R. at 0134.

medical condition, and major depressive disorder, single episode, moderate severity.  Pl.'s Facts at ¶ 29; Def.'s Resp. at ¶ 29; Admin. R. at 0142.  She indicated that the plaintiff "presents moderately severe depression as he has grown increasingly incapacitated" and prior "to the onset of symptoms, he appears to have worked full-time for the past 30 years."  Pl.'s Facts at ¶ 29; Def.'s Resp. at ¶ 29; Admin. R. at 0141.  She further noted that the plaintiff "enjoyed work, and feels a significant loss."  Pl.'s Facts at ¶ 29; Def.'s Resp. at ¶ 29; Admin. R. at 0141.

In addition to submitting the aforementioned additional medical records, the plaintiff included with his appeal statements explaining various aspects of his medical documentation and indicating the disputes he had with Liberty Life's denial determination.  The plaintiff first attempted to explain his visits with Dr. Minnich and Dr. Hanafi and distinguish them from his May 2013 visit with Dr. Rohrbach.  He explained that both Dr. Minnich and Dr. Hanafi use English as a second language and had resigned and left their prior practice.  Pl.'s Facts at ¶ 63; Def.'s Resp. at ¶ 63; Admin. R. at 0129.  The plaintiff believed that Dr. Hanafi had conducted only a cursory review of him, and the quality of her care was compromised due to their inability to effectively communicate.  Pl.'s Facts at ¶ 63; Def.'s Resp. at ¶ 63; Admin. R. at 0129.  He also characterized his evaluation of Dr. Minnich's and Dr. Hanafi's practice "as relatively cursory."  Pl.'s Facts at ¶ 63; Def.'s Resp. at ¶ 63; Admin. R. at 0129.

In contrast to his experiences with Dr. Hanafi and Dr. Minnich, the plaintiff explained that he had only transferred from Dr. Rohrbach to Dr. Minnich for primary care due to parking issues.  Pl.'s Facts at ¶ 63; Def.'s Resp. at ¶ 63; Admin. R. at 0129.  The plaintiff noted that he had been Dr. Rohrbach's patient for "nearly a ten year span," and she had "continuity with [him], has seen [his] physical changes during a period spanning two corrugated packaging employers

and multiple plants, and . . . spent much more time with me on 05/10, than the prior doctors had accumulated put together."  Pl.'s Facts at ¶ 63; Def.'s Resp. at ¶ 63; Admin. R. at 0129.

The plaintiff also disputed Liberty Life's determination that his occupation was sedentary.  Def.'s Facts at ¶ 29; Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 0130.  He stated that Liberty Life reached this determination without factoring in the more than 25 pages of work references he submitted.  Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 0130.  This information established that his "occupation is not sedentary, [that] there is a vast array of responsibilities in job costs, production machine analysis, cost estimating, and inventory which mandates walking and standing throughout an approximately 150,000 [square foot] production facility and additional warehouses."  Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 0130.

The plaintiff indicated that he had "exclusively worked" for more than 30 years as a "plant controller in the corrugated packaging industry," a position which is "singular and specialized."  Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Def.'s Facts at ¶ 29; Admin. R. at 0130.  The plaintiff supported his "singular and specialized" comment by pointing out that nearly all of the companies in the industry use three or four industry-dedicated software systems.  Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 0130.  He also explained that 90% of what he does is "industry-specific and focused on selling, operations, and plant metrics about what happens on the production floor and related inventory and sales."  Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Def.'s Facts at ¶ 29; Admin. R. at 0130.  He further stated that in his position, "[n]o assumption of 'occasional' walking or standing applies . . .[;] mobility throughout a large manufacturing and warehouse complex applies instead, with multiple stories, uneven surfaces and tight clearances with product loads, which precludes wheelchairs or any other satisfactory accessory." Pl.'s Facts at ¶ 64; Def.'s Resp. at ¶ 64; Admin. R. at 0130.

The third point raised by the plaintiff was that he believed he was unqualified for an accounting occupation or as a generic controller.  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0130-0131.  He asserted that he was "weak and unqualified in any potential accounting opportunity which would be outside [his] industry."  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0131.  He explained that he had never done a "bank reconciliation or prepared quarterly payroll tax reports, or done basic transactional billing or payables[;]" instead, he "concentrate[d] on industry operating metrics, control of equipment and inventory, and other elements."  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0131.  The plaintiff claimed that Liberty Life should have reviewed his documentation about his job duties instead of "just looking up the generic description for 'controller.'"  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0131.  Unlike the generic controller, the plaintiff's "occupation requires plant work, and [he] can't climb on inventory loads, or squeeze between loaded pallets, or do the other physical elements required in doing job costs and checking inventory, until my rehabilitation and hip replacement is complete."  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0131.  The plaintiff further noted that the "floor duties were the core of [his] occupation with all three [of his] employers [in the corrugated packaging industry]" and his "expertise in material, labor, and waste costs . . . could not be fulfilled at a desk."  Pl.'s Facts at ¶ 65; Def.'s Resp. at ¶ 65; Admin. R. at 0131.

The fourth issue the plaintiff raised related to Liberty Life's statement that Pratt Industries had changed his job duties to accommodate his occupation to being a sedentary job.  Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 0131-0132.  The plaintiff indicated that "there were no formal or informal adjustments made in [his] duties, to reflect [his] declining mobility."  Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 0131.  He pointed out that the

"only accommodation was insignificant" because it was merely one of the two plants installing a work station for him in the first-floor conference room, to minimize his climbing the stairs.  Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 0131.  He further explained that

> [s]ince there was no change in my duties, or delegation available to others, this resulted in a provable and significant accumulating erosion in my performance right up until my last work day.  Not only was my movement unsafe, which was justifiably the prime employer concern in a manufacturing environment, but my work had slowed in large part, not due to a change in my mental ability and knowledge, or workload increase, but because of my physical deterioration.

Pl.'s Facts at ¶ 66; Def.'s Resp. at ¶ 66; Admin. R. at 0132.

On June 26, 2013, Liberty Life referred the plaintiff's claim to its appeals review unit for disposition of the appeal.[22]  Def.'s Facts at ¶ 30; Admin. R. at 0125.  On July 25, 2013, the assigned appeal review consultant decided to refer the plaintiff's file to another of Liberty Life's nurse case managers for an additional file review.  Def.'s Facts at ¶ 30; Admin. R. at 0055.  On August 1, 2013, in response to the request, Nurse Case Manager Donna Paine, prepared a claim note summarizing the results of her review of the plaintiff's records. Def.'s Facts at ¶ 31; Pl.'s Facts at ¶ 68; Def.'s Resp. at ¶ 68; Admin. R. at 0054-0055.  Other than this claim note, there is no separate report in the claim file that Ms. Paine prepared.  Pl.'s Facts at ¶ 69; Def.'s Resp. at ¶ 69; Admin. R. at 0054-0055.

Nurse Paine's file note contains a description of various medical records in the file, including the most recent records concerning the plaintiff's physical and mental conditions submitted with his appeal.[23]  Def.'s Facts at ¶ 31; Admin. R. at 0054-0055.  With respect to the plaintiff's physical condition, Nurse Paine concluded that the records did not alter the assessment

---

[22] Kennedy informed the plaintiff of this referral via letter dated June 27, 2013.  Admin. R. at 0127.
[23] It appears that her review covers three notes in the claim file.  Admin. R. at 0054-0055.  The first note states that "ENTIRE FILE WAS REVIEWED."  Admin. R. at 0055.

and opinion expressed in Dr. Avioli's earlier peer review report.  Def.'s Facts at ¶ 31; Admin. R.

at 0054-0055.  As to the plaintiff's mental condition, Nurse Paine noted as follows:

> DR. FANTASIA DAVIS NOTED ON 5/20/13 [THE PLAINTIFF] REPORTED ANXIETY AND DEPRESSION.   [THE PLAINTIFF] REPORTED BEING SELF-CONSCIOUS ABOUT HIS WEIGHT AND STRUGGLE TO WALK. [THE PLAINTIFF] WAS NEAT DRESSED & GROOMED.    [THE PLAINTIFF'S] SPEECH WAS CLEAR, COHERENT AND GOAL DIRECTED. . . . [THE PLAINTIFF] HAD IMPAIRED GAIT.  AFFECT WAS CONGRUENT WITH IDEATION & MARKED BY EXCESSIVE WORRY.   MOOD WAS DEPRESSED   CHARACTERIZED   BY   SYMPTOMS   OF   SADNESS, ADHEDONIA, SOCIAL WITHDRAWAL AND REPORTED DIFFICULTIES IN   ATTENTION   &   CONCENTRATION.     INSIGHT   WAS   GOOD   AS EVIDENCED      BY      [THE      PLAINTIFF'S]      AWARENESS      OF SYMPTOMATOLOGY   AND   LIFE   EVENTS   WHICH   [DR.   FANTASIA-DAVIS]  NOTED  MAY  HAVE  CONTRIBUTED  TO  [THE  PLAINTIFF'S] PRESENT   DIFFICULTIES.    [THE   PLAINTIFF]   HAD   NO   SUICIDAL   OR HOMICIDAL   IDEATION.    [DR.   FANTASIA-DAVIS]   NOTED   [THE PLAINTIFF]  HAD  GENERALIZED  ANXIETY  AND  PRESENTED  WITH MODERATELY   SEVERE   DEPRESSION   AS   [THE   PLAINTIFF]   HAD GROWN  INCREASINGLY  INCAPACITATED.    INDIVIDUAL  COGNITIVE BEHAVIORAL  THERAPY  &  BIOFEEDBACK  WAS  RECOMMENDED.   [DR. FANTASIA-DAVIS]   ALSO   RECOMMENDED   [THE   PLAINTIFF]   HAVE PSYCHIATRIC  EVALUATION  TO  EVALUATE  IF  MEDICATIONS  WERE NEEDED.
>
> . . .
>
> [THE PLAINTIFF] ALSO HAS DEPRESSION AND ANXIETY WHICH [THE PLAINTIFF]  IS  SEEKING  COUNSELING.    THE  RECORD  FROM  AP FANTASIA-DAVIS INDICATE[S THE PLAINTIFF] HAS DEPRESSION AND ANXIETY   WITHOUT   SUICIDAL   OR   HOMICIDAL   IDEATION.     THE RECORDS  ALSO  INDICATE  [THE  PLAINTIFF]  WAS  WELL  GROOMED, HAD  GOOD  INSIGHT,  THOUGHT  CONTENT  AND  JUDGMENT  AND  DO NOT SUPPORT MENTAL HEALTH R/LS.

Pl.'s Facts at ¶ 72; Def.'s Resp. at ¶ 72; Def.'s Facts at ¶ 31; Admin. R. at 0054.

On August 2, 2013, Jonathan Bareham of Liberty Life referred the plaintiff's file to have

an occupational analysis completed.  Pl.'s Facts at ¶ 73; Def.'s Resp. at ¶ 73; Admin. R. at 0123.

According to the case manager's recommendations/reasons for referral, the vocational expert

was to "complete an occupational analysis to confirm the material and substantial duties of the

claimant's occupation as it is normally performed in the national economy."  Pl.'s Facts at ¶ 73; Def.'s Resp. at ¶ 73; Def.'s Facts at ¶ 32; Admin. R. at 0123.   In response to this request, on August 5, 2013, Jason Miller ("Miller"), another senior vocational case manager who is a board-certified vocational expert, prepared an occupational analysis and vocational review report.  Def.'s Facts at ¶ 32; Pl.'s Facts at ¶ 74; Def.'s Resp. at ¶ 74; Admin. R. at 0114-0122.

In his report, Miller stated that he reviewed the "electronic claim file, spoke[] with the Appeals Review Consultant and researched standard vocational resources (e.g. Dictionary of Occupational Titles (DOT), Occupational Outlook Handbook (OOH), Occupational Information Network (O*NET) / Standard Occupational Classification (SOC) coding system, etc.) and Internet job boards."  Admin. R. at 0114.  Miller then included an extensive discussion of all the materials which had been submitted by the plaintiff and Pratt Industries concerning the duties of the plaintiff's position at Pratt Industries.  Def.'s Facts at ¶ 33; Admin. R. at 0115-0118.  Based on his review of these materials, Miller agreed with Cook that the plaintiff's job tasks were best represented by the DOT description of a controller.  Def.'s Facts at ¶ 33; Pl.'s Facts at ¶ 74; Def.'s Resp. at ¶ 74; Admin. R. at 0114, 0118-0119.  He also cited with approval the O*NET survey performed in 2012 and cited by Cook.  Pl.'s Facts at ¶ 74; Def.'s Resp. at ¶ 74; Admin. R. at 0119.

In the report, Miller indicated that he obtained the details of the plaintiff's job from the following information contained in the claim file:  (1) Pratt Industries' February 7, 2013 physical job description and email, (2) the plaintiff's February 22, 2013 appeal letter and attachments, (3) the plaintiff's April 5, 2013 letter with attachments, (4) the plaintiff's April 25, 2013 letter, (5) Pratt Industries' April 26, 2013 employer-provided job description, (6) May 1, 2013 information from Pratt Industries about accommodations for the plaintiff, (7) the plaintiff's May 6, 2013

44

appeal documentation, and (8) the plaintiff's June 27, 2013 appeal letter.  Admin. R. at 0115-0118.  Miller also went through the duties of a controller in the DOT's job description and explained that this occupation fell under the O*NET classification of treasurers and controllers, and the OOH description of financial managers.  Admin. R. at 0118-0119.  He stated that "[r]egarding descriptive information and tasks, [the plaintiff's] job description, as well as the DOT, SOC/O*NET and OOH descriptions, can be considered to be accurate representations of typical tasks required of this occupation.  However, it should be noted that physical demands may differ by job within the occupation."  Admin. R. at 0120.

In conducting his analysis, Miller also conducted labor market research using Indeed.com for controllers and plant controllers in the national economy.  Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0120.  He also reviewed cost accountants.  Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0120.  Based on his research, Miller concluded that "the work of a Controller/Plant Controller depends largely on the size of the business, the level of subordinate managers or inventory staff and the type of business (The job of Plant Controller within the occupation of Controller being more geared toward manufacturing)."  Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0120.  He further stated that as performed in the national economy, occupations such as controllers and plant controllers were most often performed at both the sedentary and light physical demand levels.  Def.'s Facts at ¶ 33; Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0120.  More specifically, he stated as follows:

> This occupation is most often performed at the sedentary and light levels of physical demand based on Department of Labor descriptions found in the DOT.  In larger companies where subordinate managers or staff is present in manufacturing firms, or in those industries outside manufacturing like finance, the jobs will gravitate more toward the sedentary physical demand level.  In smaller companies or those that require more direct floor work for inventory counts and onsite work, the jobs rise more toward the light physical demand level due to heavier demands for weight-bearing, particularly during times of end-of-month

counts and book closings.  Sufficient opportunity appears to be [sic] exist at both physical demand levels.

Def.'s Facts at ¶ 33; Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0120.[24]

Miller's vocational report also contained a detailed response to the statements and documents the plaintiff submitted in support of his assertion that (1) his occupation should be considered as a "Plant Controller in the corrugated packaging industry," and (2) "he would not be qualified to perform the work of a Controller as he only performs accounting work 10% of the time." Def.'s Facts at ¶ 34; Pl.'s Facts at ¶ 76; Def.'s Resp. at ¶ 76; Admin. R. at 0121.  Miller rejected both of these arguments and explained as follows:

> [The plaintiff] is insured for his own occupation as it is performed in the national economy.  As part of my research, I reviewed the differences between Accountants, Controllers, Plant Controllers, Cost Accountants, Production Superintendents, Industrial Engineers and Internal Auditors in the DOT and the associated crosswalks to both O*NET and OOH to ensure the correct occupation was identified.  In addition, I reviewed over ten postings for Plant Controllers in the national economy.  All required an accounting background and some preferred an MBA.  I also researched Controllers in the national economy that demonstrated the same requirements.  Indeed, in both cases, some managed Cost Accountants or were a higher level than Accountants and most of the Controllers and Plant Controllers had very similar duties and responsibilities.  Many supervised subordinate staff and, it appears, the physical demands will differ as outlined above (size of company, subordinate staff, type of company, etc.).
>
> It is clear from researching this occupation that [the plaintiff's] qualifications (financial background, accounting degree, MBA, supervision of employees who did accounting even if he did not do this directly at times, analytical reporting, financial reporting, dealing with capital expenditure, etc. – all those pieces of his performance evaluation above) all lead me to believe he would qualify for another job within the occupation of Controller in the national economy and that his job falls under that occupation.  His argument that this needs to be in the corrugate industry seems more of a misunderstanding between job and occupation as the occupation of Plant Controller that do need to be on the floor doing inventories,

---

[24] Miller cited with approval the Department of Labor's definitions of sedentary and light work.  Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0119-0120.  The definition of light work includes positions that require walking or standing to a significant degree, and exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently.  Pl.'s Facts at ¶ 75; Def.'s Resp. at ¶ 75; Admin. R. at 0121.  Also, positional requirements include the ability to engage in frequent standing and walking, and occasionally "bending/stooping, twisting, [and] crouching/squatting."  Pl.'s Facts at ¶ 75; Def.'s Facts at ¶ 75; Admin. R. at 0121.

checking variances, etc. and this is typically done on an occasional basis but, occasionally rises to the level of frequent during end of month book closings, etc. By contrast, there are also others in other industries that do not necessarily have to do this or, if they do, it never rises to the level of being done on a frequent basis and / or can be done from a desk.  Therefore, the occupation would exist at both the sedentary and light levels of physical demand.

Def.'s Facts at ¶ 34; Pl.'s Facts at ¶ 76; Def.'s Resp. at ¶ 76; Admin. R. at 0121-0122.

Miller then provided the following summary and conclusions:

With a reasonable degree of vocational certainty, the typical physical demands of [the plaintiff's] occupation of Controller are most often sedentary and light in physical demand.  . . . I would respectfully disagree with Ms. Cook regarding part-time opportunity in this occupation.  It does not appear to exist.  In fact, to the contrary, it is typically more than a 40-hour per week occupation.

Pl.'s Facts at ¶ 76; Def.'s Resp. at ¶ 76; Admin. R. at 0122.

Following the receipt of the file summary report from Nurse Paine and the August 5, 2013 vocational report from Miller, Liberty Life issued a letter on August 23, 2013, advising the plaintiff that it was upholding its prior administrative determination denying his claim for LTD benefits under the Disability Policy, based on its conclusion that the plaintiff was not suffering from any condition which prevented him from performing the duties of his own controller occupation as performed in the national economy.  Def.'s Facts at ¶ 35; Pl.'s Facts at ¶ 77; Def.'s Resp. at ¶ 77; Admin. R. at 0102-0113.  The appeal denial letter noted the documents that had been in Liberty Life's case file along with the plaintiff's appeal letter and additional medical records, including Dr. Rohrbach's May 10, 2013 office visit notes and May 29, 2013 attending physician statement, Dr. Fantasia-Davis's May 20, 2013 report, and Dr. Zartman's June 13, 2013 office visit notes.  Pl.'s Facts at ¶ 78; Def.'s Resp. at ¶ 78; Admin. R. at 0107.

Among other things, the denial letter referenced Nurse Paine's conclusions, which included the following:

> The medical documentation supports [the plaintiff] has severe right hip degenerative arthritis and requires a total hip replacement. [The plaintiff] is obese and has been losing weight and needs [to] continue to lose additional weight before surgery can be performed. The additional medical information indicates [the plaintiff] reports having difficulty sitting for long periods of time however there is no objective evidence to support this. There is no indication [the plaintiff] has been prescribed any narcotic pain medication. [The plaintiff] only takes non-steroidal anti-inflammatory medication as needed for pain. The additional information does not alter the opinion by [the physician who previously reviewed the claim]. [The plaintiff] also has depression and anxiety [for] which [the plaintiff] is seeking counseling. The record[s] from [attending physician Dr.] Fantasia-Davis indicate [the plaintiff] has depression and anxiety without suicidal or homicidal ideation. The records also indicate [the plaintiff] was well groomed, had good insight, thought content and judgment and do not support mental health . . . [restrictions or limitations].

Pl.'s Facts at ¶ 80; Def.'s Resp. at ¶ 80; Admin. R. at 108 (emphasis omitted) (some alterations in original).

The denial letter also referenced Miller's vocational analysis and his conclusion that the plaintiff's tasks are best represented by the job description of controller in the DOT. Pl.'s Facts at ¶ 81; Def.'s Resp. at ¶ 81; Admin. R. at 0108-0112. In this regard, Liberty Life copied a significant portion of Miller's report, including his descriptions of sedentary and light work, and placed it in the denial letter. Pl.'s Facts at ¶¶ 81, 82; Def.'s Resp. at ¶¶ 81, 82; Admin. R. at 0108-0112.

In response to the plaintiff's concerns about the characterization and description of his job, Liberty Life stated that "[w]hile your appeal letter comments extensively on issues associated with your job at Pratt Industries, we would reiterate that the Policy does not insure an individual's ability to perform the specific duties of a specific job with a specific employer."

Pl.'s Facts at ¶ 79; Def.'s Resp. at ¶ 79; Admin. R. at 0108.  Liberty Life concluded by informing

the plaintiff that

> [i]n summary, we do understand that you may have been experiencing some
> symptoms associated with your long-standing condition as of and following your
> claimed date of disability.  We also understand that your symptoms may result in
> some degree of functional impairment and may preclude you from performing
> some aspects of your job at Pratt Industries.
>
> However, the available information does not contain physical or mental status
> exam findings, diagnostic test results or other forms of objective medical evidence
> substantiating that your symptoms were of such severity that they resulted in
> restrictions or limitations rendering you continually unable to perform the
> material and substantial duties of your occupation as it is normally performed in a
> sedentary environment in the national economy throughout and beyond the
> Policy's elimination period.
>
> Having carefully considered all of the information submitted in support of your
> claim, our position remains that proof of your disability in accordance with the
> Policy provisions has not been provided, and our original determination to deny
> benefits is therefore upheld.

Pl.'s Facts at ¶ 83; Def.'s Resp. at ¶ 83; Admin. R. at 0112.[25]

On January 16, 2015, the Social Security Administration issued an award letter to the

plaintiff.[26]  Pl.'s Facts at ¶ 7; Def.'s Resp. at ¶ 7; Stipulation at ¶ 4 & Ex. C.  Social security

disability benefits were awarded retroactive to July 2013, in the amount of $2,495.20 per month

in July 2013, $2,532.60 per month starting in December 2013, and $2,575.60 per month starting

in December 2014.  Pl.'s Facts at ¶ 7; Def.'s Resp. at ¶ 7; Stipulation at Ex. C.

According to Liberty Life, the plaintiff's pre-disability earnings were $8,146.67 per

month, entitling him to a gross modal benefit of $5,431.38 per month commencing on April 7,

---

[25] It is interesting that Liberty Life would state that the plaintiff's impairments may have precluded him "from performing *some aspects* of your job at Pratt Industries considering it had previously awarded him STD benefits because he was able to show that he could not perform the material and substantial duties of his "Own Job."

[26] Liberty Life stipulated to the authenticity of the award letter without prejudice to its position that it is not part of the administrative record and the court should not consider it in reviewing Liberty Life's administrative decision insofar as it was not part of the evidence Liberty Life considered at the time of its final administrative decision concerning the plaintiff's claim.  Pl.'s Facts at ¶ 7; Def.'s Resp. at ¶ 7; Stipulation at ¶ 4, Doc. No. 32.  The plaintiff did not include an argument in his submissions that the court should consider the award in reviewing the merits of this case.

2013.  Pl.'s Facts at ¶ 9; Def.'s Resp. at ¶ 9; Admin. R. at 0296.  The Disability Policy provides

that the disability benefit to which a covered person is eligible to be reduced by any amounts the

covered person receives or is eligible to receive under the United States Social Security Act.

Pl.'s Facts at ¶ 9; Def.'s Resp. at ¶ 9; Admin. R. at 0027, 0034.

### C.   <u>Analysis</u>

As indicated above, the parties have filed cross-motions for summary judgment.  The

court will first address the plaintiff's motion.

### 1.   Plaintiff's Motion for Summary Judgment

The plaintiff's arguments in support of his motion can be summarized as follows:  First,

the plaintiff argues that Liberty Life improperly "re-defined" the term "own occupation" in the

definition of "disability" under the LTD benefits provision of the Disability Policy.  Pl.'s Mem.

at 13-16.   Second, the plaintiff contends that Liberty Life arbitrarily redefined the term

"sedentary," insofar as Dr. Avioli was able to get Dr. Stelmach to agree to a definition of

sedentary work that was not the DOT definition.  *Id.* at 16-17.   Third, the plaintiff asserts that

Liberty Life improperly redefined his job duties when it asserted that he had a sedentary job after

considering Pratt Industries' statement that it had accommodated him to a sedentary position for

approximately six months.  *Id.* at 17-19.   Fourth, the plaintiff argues that Liberty Life's

vocational experts improperly relied on the DOT definition of controller instead of his actual

occupation as a plant controller.  *Id.* at 19-21.   Fifth, the plaintiff contends that Liberty Life

arbitrarily and capriciously selected medical evidence and created medical opinions that

supported the denial of his claim.  *Id.* at 21-24.  Finally, the plaintiff asserts that Liberty Life had

numerous procedural conflicts of interest, including, *inter alia*, its ignoring and distorting of the

medical evidence (including self-serving use and interpretation of physicians' reports), ignoring

or mischaracterizing his job duties, ignoring his non-orthopedic diagnoses and failing to consider the combined effect of his diagnoses, and the improper use of a nurse to override the opinions of three physicians and a psychologist.  *Id.* at 24-29.  The court addresses each argument in turn.

a. Liberty Life's Occupational Analysis

Under the LTD benefits portion of the Disability Policy, a covered employee such as the plaintiff is "Disabled" if he "is unable to perform the Material and Substantial Duties of his Own Occupation."  Admin. R. at 0008.  The Disability Policy defines "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is normally performed in the national economy."  Admin. R. at 0010.  The Disability Policy also defines "Material and Substantial Duties," in the LTD benefits context, as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, *and cannot be reasonably eliminated or modified*." *Id.* (emphasis added).

The plaintiff essentially asserts three arguments as to why Liberty Mutual abused its discretion when it conducted its occupational analysis and determined that the plaintiff's occupation was properly classified as a controller with physical demands that are sedentary or light duty.[27]

First, the plaintiff claims that Liberty Life redefined the phrase "Own Occupation."  Pl.'s Mem. at 13-17.  He focuses on the use of the term "consider" in the Disability Policy's definition

---

[27] As part of his appeal from Liberty Life's LTD benefits denial, the plaintiff contested that his occupation was a controller and that he could perform the controller job in the national economy.  Admin. R. at 0129-0131.  Liberty Life contends that the plaintiff's statements that he was somehow unqualified to perform the occupation of controller lacks credibility because his educational background and job description illustrate that he could perform the material and substantial duties of a controller.  The court finds that despite the plaintiff's vigorous opposition and concern about how he would perform in a position when he had basically been a plant controller for 30 years, the record contained substantial evidence to justify that the plaintiff had the background and acumen to perform the occupation of controller as it existed in the national economy.

of "Own Occupation," and contends that the "only reasonable interpretation of the definition of own occupation is that greater weight is to be given to the job as it is actually performed by the covered person, though Liberty Life is to take into account ("consider") how the job is performed in the national economy." *Id.* at 13.  In essence, the plaintiff asserts that instead of "considering" (or taking into account) the plaintiff's occupation as it is performed in the national economy as part of its inquiry into whether he was disabled, Liberty Life treated the "Own Occupation" analysis as stating that the plaintiff was not disabled if he could perform his occupation as it is performed in the national economy.  *Id.* at 13.  The plaintiff points out that as part of this misinterpretation, Liberty Life failed to consider his actual job responsibilities as part of this analysis and committed an abuse of discretion by doing so.  *See id.* at 14 (citing cases for proposition that the failure to consider a claimant's actual job responsibilities is an abuse of discretion when determining the claimant's "own occupation").

In response to the plaintiff's arguments, Liberty Life contends that it "correctly and reasonably interpreted the policy as requiring it to examine [the plaintiff's] controller occupation as that occupation [i]s performed in the national economy, not as performed by [the plaintiff] in his specific job with Pratt Industries."  Defendant's Br. in Opp. to Pl.'s Mot. for Summ. J. on Count III ("Def.'s Opp. Br.") at 10, Doc. No. 42.  Liberty Life relies upon the differing definitions of "Disability" in the STD and LTD portions of the Disability Policy in support of its claim. *Id.* at 11.

Liberty Life essentially points out that to get STD benefits, a covered employee such as the plaintiff needs to only show that the covered employee cannot perform his or her job.  *Id.* When addressing a claim for LTD benefits, which obviously require a greater financial commitment from the insurer, the definition of "Disability" in the Disability Policy is not job

specific because it specifically references "Own Occupation" instead of "Own Job." *Id.* at 11-12.  In addition, to qualify for LTD benefits after 24 months, the Disability Policy changes again by requiring the claimant to show that he or she cannot perform the duties of "Any Occupation." *Id.*

Liberty Life points out that that its interpretation of the Disability Policy – examining a claim for LTD benefits by referencing the duties of the claimant's occupation as it exists in the national economy without examining the claimant's particular job duties – gives full effect to all of the provisions of the policy.  *Id.* at 12.  If the court interpreted the policy consistent with the plaintiff's argument, which focuses on his specific job duties with Pratt Industries, it would not give such an effect because it essentially allows the plaintiff to meet both the definition of "Own Job" for STD benefits and "Own Occupation" for LTD benefits by simply showing that he could not perform the precise duties of his own job.  *Id.* at 12-13.

In addition to its policy interpretation argument, Liberty Life disputes the plaintiff's claim that it did not take his position with Pratt Industries into account in applying the policy's definition of "Own Occupation."  *Id.* at 13.  It requested and received multiple descriptions of the plaintiff's job description as part of its review of his claim for LTD benefits (including his claim for STD benefits) and so it could provide those job descriptions to its vocational analysts for their review and consideration.  *Id.*  It points out that its vocational specialists took into account the plaintiff's job responsibilities when figuring out the closest analogous occupation in the national economy.  *Id.*

With respect to the parties' arguments, the court finds that the plaintiff has overstated Liberty Life's interpretation of the "Own Occupation" provision in the Disability Policy.  In this regard, there is nothing about the language in the Disability Policy that could compel the court to

adopt the plaintiff's interpretation that when determining the claimant's "Own Occupation," "greater weight is to be given to the job as it is actually performed by the covered person, though Liberty Life is to take into account ("consider") how the job is performed in the national economy." Pl.'s Mem. at 13.  The Disability Policy does not contain any language to even remotely suggest that the plaintiff's actual job description is entitled to greater weight than the other information Liberty Life would obtain to determine how the job is performed in the national economy.

In addition, the court agrees with Liberty Life that it is apparent from the overall construction of the Disability Policy that there are three distinct categories of "Disability" that a claimant would have to satisfy to be eligible for certain benefits.  The arbitrary and capricious standard of review applies to Liberty Life's interpretation of the terms of the Disability Policy as it does to its factual findings.  *See Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 124-25 (3d Cir. 2012) (explaining that the general principle that courts will construe ambiguous contract terms in favor of the insured does not apply in ERISA cases in which the court is applying the abuse of discretion standard of review).  Liberty Life provides a reasonable explanation of the purposes for the differing definitions of "Disability" set forth in the STD portions and LTD portions of the Disability Policy.  *See* Def.'s Mem. at 22; Def.'s Opp. Br. at 11.  It is reasonable to interpret the policy as providing a more stringent standard for initial LTD benefits than for STD benefits where the claimant needs to only show that he or she cannot perform their "Own Job."  To follow the plaintiff's interpretation would take away from the language in the Disability Policy and its natural meaning when evaluating whether the claimant can perform the material and substantial duties of their "Own Occupation."  *See Ryan by Capria-Ryan v. Federal Express Corp.*, 78 F.3d 123, 126 (3d Cir. 1996) (explaining that in ERISA cases "straight forward

language . . . should be given its natural meaning" (citation and internal quotation marks omitted)).

Nonetheless, the court finds Liberty Life's interpretation of the language of "Own Occupation," unreasonable insofar as Liberty Life appears to claim that the policy language does not require it to consider the plaintiff's actual job description when determining how the claimant's occupation is performed in the national economy. The court recognizes that Liberty Life technically "considered" the plaintiff's job requirements when attempting analogize the plaintiff's occupation with an occupation in the DOT, O*NET, or OOH as it exists in the national economy. It does not appear, however, that Liberty Life (or its vocational specialists) considered the plaintiff's job description when determining how his "occupation" is actually performed in the national economy.

There is nothing in the language of the Disability Policy's definition of "Own Occupation" that suggests Liberty Life is not to consider the claimant's actual job responsibilities when determining the claimant's occupation. In fact, it would have been appropriate for Liberty Life to do so when evaluating the plaintiff's claim. *See Nyman v. Liberty Mut. Assur. Co. of Boston*, No. 4:04CV2651, 2005 WL 2175706, at *12 (E.D. Pa. Sept. 7, 2005) ("[W]e find that because the [employer's] LTD Policy explicitly defined 'own occupation' by referring to how the occupation is performed in the national economy, it was appropriate for Liberty Life to include in its consideration the DOT job description, in addition to the description obtained from [the employer]."). Moreover, courts have found an abuse of discretion where Liberty Life failed to consider the claimant's job requirements as part of the occupational analysis. *See Branca v. Liberty Life Assur. Co. of Boston*, No. CIV. A. 13-740, 2014 WL

1340604, at *14-15 (E.D. Pa. Apr. 3, 2014) (Buckwalter, J.); *Kavanay v. Liberty Life Assurance Co. of Boston*, 914 F. Supp. 2d 832, 835-36 (S.D. Miss. 2012).

In fact, the facts of this case are very similar to those in *Kavanay* and warrant a finding that Liberty Life acted arbitrarily and capriciously in denying the plaintiff's LTD claim.[28]   In *Kavanay*, the plaintiff worked as a "Claim Service Adjuster" for Allstate Insurance Company ("Allstate") and participated in an Allstate-sponsored group LTD plan.  *Id.* at 833.  Liberty administered the plan and funded it through an insurance policy.  *Id.*  Eligibility for benefits under the LTD plan was identical to the plan in the instant case.  *Id.*  This included an identical definition for "Own Occupation."  *See id.* (explaining that "[t]he plan states, 'For the purposes of determining disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is normally performed in the national economy.'" (quoting plan)).

Liberty Life initially paid LTD benefits to the plaintiff in *Kavanay* based on an injury to his knee while climbing a ladder at work.  *Id.*  Liberty Life later terminated the plaintiff's LTD benefits after concluding that he no longer met the policy's definition of disability because the plaintiff's "'own occupation' could be performed within a sedentary capacity, and since the available medical evidence did not support an impairment which would physically preclude [the plaintiff] from performing full-time sedentary work activities, he was no longer disabled under the policy."  *Id.* at 834.

In addressing the plaintiff's claim that Liberty Life acted arbitrarily and capriciously when it terminated his LTD benefits, the district court pointed out that Liberty Life had assigned the plaintiff's claim to a vocational consultant for an "'own occupation' analysis."  *Id.*  The vocational consultant concluded that the closest related DOT description was "Claims Examiner" and indicated that this job

---

[28] Liberty Life does not address *Kavanay* in its submissions.

> is performed in two manners in the national economy.  One, an inside Claims
> Examiner/Adjustor/Investigator, is "sitting at a desk using a computer and
> telephone in a typical office setting," and is sedentary.  The other is an Outside
> Claims Examiner/Adjustor/Investigator, which falls in the light duty category,
> with "[p]hysical demand requirements ... in excess of those for sedentary Work,"
> including frequent standing and walking.

*Id.* at 835.  The vocational consultant also noted that the working environments for examiners

varied, depending on whether they worked inside or outside of an office environment.  *Id.*

The court explained that Liberty had terminated the plaintiff's LTD benefits because it

found that the medical documentation submitted indicated that the plaintiff could perform

sedentary work as an Inside Claims Examiner.  *Id.*  The court found that Liberty had abused its

discretion by using the Inside Claims Examiner rather than the Outside Claims Examiner

because Allstate had employed him as an outside claims manager.  *Id.*

In reaching this decision, the court

> recognize[d] that under the policy, the standard for whether an insured is disabled
> from his "own occupation" is determined by the duties of the position in the
> national economy and not necessarily by the insured's duties for his particular
> employer.  However, the Fifth Circuit has rejected the argument that the specific
> task listed by a claimant's own employer are irrelevant to an "own occupation"
> analysis, noting that "while the correct standard is the occupation in the general
> economy and not the specific job for a specific employer, the specific duties of
> the employee's job, as described by the employer, are relevant.  *See Burtch v.*
> *Hartford Life & Accident Ins. Co.*, 314 Fed.Appx. 750, 755 (5th Cir. 2009) (citing
> *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389 (5th Cir. 2006) ("Though her
> precise duties do not define her regular occupation, in this case they well illustrate
> the duties of a director of nursing at a small health care facility and nothing in the
> record provides any basis for thinking that such a position at a facility comparable
> to hers requires different duties.")).

*Id.* at 835-36.  The court then concluded that

> it is apparent that in selecting the sedentary position of Inside Claims Examiner
> from the D.O.T. as establishing the requirements of [the plaintiff's] "own
> occupation," Liberty arbitrarily disregarded the nature of [the plaintiff's] position
> with Allstate and the specific tasks he was required to perform as an Outside
> Claims Adjuster.  Its consequent determination that [the plaintiff] was not
> disabled because he was not medically precluded from performing the sedentary

occupation of Inside Claims Examiner amounts to an abuse of discretion and cannot stand.

*Id.* at 836.

In addition to *Kavanay*, Judge Buckwalter's decision in *Branca* also supports a finding that Liberty Life abused its discretion in this case by relying on a vocational analysis that did not consider the plaintiff's actual job responsibilities.   In *Branca*, the court analyzed the same definitions of "Disabled" and "Own Occupation" present here while addressing a plaintiff's claim that Liberty Life's occupational analysis ignored her job requirements.   2014 WL 1340604 at *14.   Despite Liberty Life acknowledging that the plaintiff's job as a "Client Services Representative" required "her to 'frequently drive, sit 2-4 hours a day, stand 1-2 hours a day, walk up to 5 miles per day, and carry up to 25 pounds up to 6 hours a day," it classified her job as a "Sales Representative, Advertising," which required sedentary capacity in the national economy.  *Id.*

After citing to *Kavanay* because it was "highly persuasive," the court concluded that Liberty Life abused its discretion in "disregard[ing] Plaintiff's actual job duties when determining whether Plaintiff was able to perform her 'Own Occupation.'"  *Id.* at *15.  The court explained that "Liberty Life conflated Plaintiff's actual job duties requiring her to travel from site to site with a job description that better suited its conclusion that Plaintiff's work was sedentary."  *Id.*  As such, the court "agree[d] with the *Kavanay* court's reasoning and its holding that such an analysis under the 'Own Occupation' language of Liberty Life's policy 'amounts to an abuse of discretion and cannot stand.'"  *Id.* (citing *Kavanay*, 914 F. Supp. 2d at 836).

Based on the language of the Disability Policy's definition of "Own Occupation" and the aforementioned cases, Liberty Life acted arbitrarily and capriciously when it relied upon its vocational analysts' reports that did not consider the plaintiff's actual job requirements when

determining the duties of his occupation in the national economy.  This determination leads the court to next consider the plaintiff's second contention regarding Liberty's Life's occupational analysis, namely, that Liberty Life's vocational experts improperly relied on a DOT definition of an occupation that was different than the one the plaintiff actually performed.  Pl.'s Mem. at 19-21.  The plaintiff contends that despite the "extensive information" he and Pratt Industries provided about his occupation and accompanying responsibilities, Liberty Life's vocational experts still mischaracterized his occupation as a controller and not a plant controller and ascribed responsibilities to the occupation that were much less than those of plant controllers.  *Id.* at 20.

After considering this argument and the applicable record, the court finds that the record does not include substantial evidence to justify identifying the plaintiff's occupation as a "controller" and not as a "plant controller."  In this regard, Miller, who performed the final vocational analysis for Liberty Life, stated that a plant controller was a "job" in the general occupation of controller, *see* Admin. R. at 0122 ("The occupation of Plant Controller is a job that falls under the occupation of Controller."), but he did so only in a conclusory fashion and without any reference to evidence to support the conclusion.  Miller appears to actually attempt to explain why a plant controller is not an occupation through the following sentence: "[T]he ***occupation*** of Plant Controller is a ***job*** that falls under the occupation of Controller."  *Id.*  In this sentence, Miller characterizes a plant controller as an occupation and as a job.

There is another fundamental issue with Miller's analysis because regardless of whether Miller characterized the plaintiff's occupation as a controller or a plant controller, he states that both positions exist at both the sedentary and light levels of physical demand in the national economy.  Admin. R. at 0121, 0122.  Miller explained that "the work of a Controller/Plant

59

Controller depends largely on the size of the business, the level of subordinate managers or inventory staff and the type of business (The job of Plant Controller within the occupation of Controller being more geared toward manufacturing)."[29]   *Id.* at 0120.   With regard to his indication that occupations such as controllers and plant controllers were most often performed at both the sedentary and light physical demand levels in the national economy, Miller stated as follows:

> This occupation is most often performed at the sedentary and light levels of physical demand based on Department of Labor descriptions found in the DOT. In larger companies where subordinate managers or staff is present in manufacturing firms, or in those industries outside manufacturing like finance, the jobs will gravitate more toward the sedentary physical demand level.  In smaller companies or those that require more direct floor work for inventory counts and onsite work, the jobs rise more toward the light physical demand level due to heavier demands for weight-bearing, particularly during times of end-of-month counts and book closings.  Sufficient opportunity appears to be [sic] exist at both physical demand levels.

*Id.*

Similar to the different types of claims adjusters (inside vs. outside) referenced in *Kavanay* and their commensurate different job duties and levels of physical exertion (sedentary vs. light duty), in Miller's analysis, he describes two different types of plant controllers: one, in which the controller works in a position that "gravitates" more toward the sedentary physical demand level; and the other one, which requires more direct floor work for inventory counts and onsite work and "gravitates" more "toward the light physical demand level due to heavier demands for weight-bearing, particularly during times of end-of-month counts and book closings."  *Id.*  As evidenced by Miller's own summary of the plaintiff's actual job description provided by Pratt Industries and the plaintiff, the plaintiff's job description fits into this second referenced category of plant controller because there are numerous references to the plaintiff's

---

[29] Unlike Cook, Miller conducted additional investigation to gather information on plant controllers as an occupation or job.

need to be on the floor for inventory counts and onsite work and the additional requirements for end-of-month counts and book closings.

Neither Miller nor Liberty Mutual explain why it chose the sedentary version of the job of plant controller, or why it chose the sedentary version of the generic "controller" position, considering that Miller acknowledges that controllers can be classified as sedentary or light duty work and his own description of the job of controller or plant controller that would qualify as a light duty job appears to match the plaintiff's job description.  At bottom, while the court agrees with Liberty Life that the inability of the plaintiff to perform the actual duties of his "Own Job" is not determinative for purposes of whether he can perform the material duties of his "Own Occupation," there is no reason why Liberty Life should not have considered the duties when characterizing his actual occupation as it is performed in the national economy.  To characterize the occupation at the less demanding level of sedentary work, despite the information about the plaintiff's actual job requirements and the information Miller obtained which indicates that plant controller positions involving duties similar to the plaintiff's, *i.e.* controllers on the floor conducting inventories, are light duty jobs, appears to be the type of selective interpretation that would constitute an abuse of discretion.

There is no evidence in the record to support a conclusion that the plaintiff can perform any job beyond a sedentary level at this point, and he disputes even being able to perform sedentary work.  In addition, as evidenced by Miller's and Cook's descriptions of the duties of a controller, or even a plant controller, the "material and substantial duties" of the occupation can differ.  As Miller indicated, the controller and plant controller jobs are most often performed at the sedentary and light duty levels.  Liberty Life selected the sedentary level form of this type of occupation even though that occupation does not include (as acknowledged by Miller) the

material and substantial duties of controllers performing work for businesses such as the plaintiff's employer, *i.e.* companies with multiple business locations or companies that require their controllers to conduct more direct floor work for inventory counts. Liberty Life's selection of the least physically demanding version of a generic controller, or plant controller, is not supported by substantial evidence and constitutes an abuse of discretion because it ignores the requirements of type of occupation in which the plaintiff worked.

The other two claims raised by the plaintiff with respect to Liberty Life's occupational analysis do not warrant extensive consideration in light of the above discussion. Nonetheless, for sake of completeness, the plaintiff also argues that Liberty Life abused its discretion when it purportedly changed his job duties prior to its first LTD claim denial on May 2, 2013. Pl.'s Mem. at 17-19. In particular, the plaintiff contests the information that Liberty Life received about Pratt Industries accommodating the plaintiff's mobility issues for a six-month period by modifying his job to eliminate some of the need to engage in physical activities. *Id.* at 17-18. The plaintiff asserts that under the plan, Liberty Life must ascertain his job duties when his disability began and not when his disability became so severe that his employer could no longer accommodate him. *Id.* at 18.

In response to these arguments, Liberty Life notes that it referenced the six-month accommodation because the definition of "Material and Substantial duties" with respect to LTD benefit claims includes those "'responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.'" Def.'s Opp. Br. at 17 (quoting Admin. R. at 0010) (emphasis in original). Liberty Life acknowledges that it referenced and relied upon this accommodation in its initial decision to deny LTD benefits. *Id.* Nonetheless, after receiving later communications from Pratt Industries

explaining that its attempts to accommodate the plaintiff were not working and the plaintiff was unable to do his job even with the accommodations, Liberty Life did not reference this accommodation when discussing his responsibilities and level of physical demand in the appeal denial letter. *Id.*

Liberty Life points out that even if it should not have included the six-month accommodation as part of its initial denial, it did not "change" its basis for denying the claim because it relied upon (1) Cook's vocational determination that the plaintiff's occupation was a controller and the position was most often performed at the sedentary level, and (2) the medical information it received, including the opinions of Dr. Avioli, Dr. Stelmach, and Dr. Minnich, that the plaintiff had a sedentary work capacity. *Id.* at 18. These reasons were consistent with its final determination. *Id.* Moreover, Liberty Life encourages the court to focus on the final review because that review was not tainted by the inconsistent information Pratt provided about the plaintiff's job requirements. *Id.*

Liberty Life correctly notes that, generally, "a plan administrator's final, post-appeal decision should be the focus of review" when analyzing the decision to deny benefits. *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011). Also, "[w]hile a court may consider pre-final decisions as evidence of the decision-making process that yielded the final decision, those decisions ought merely to inform a court's review of the final decision." *Montanile v. Board of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016).

As indicated above, Liberty Life corrected itself and did not consider the six-month accommodation when reaching its final decision. In addition, Liberty Life had Cook's vocational report in the record to support its conclusion at the initial denial stage that the plaintiff's occupation was a controller and most often a sedentary level job. As such, the court

does not find that the reliance and reference to any accommodations during a six month period, in itself, constitutes an abuse of discretion.

      b.    <u>Liberty Life's Purported Alteration of the Definition for Sedentary Work</u>

The plaintiff's second contention relates to Liberty Life's reliance on its peer review doctor, Dr. Avioli, and Dr. Stelmach, the plaintiff's treating orthopedist, in concluding that he could perform sedentary work. Pl.'s Mem. at 16-17. In this regard, in late March 2013, Dr. Stelmach returned a form to Liberty Life in which he indicated that the plaintiff was unable to work at that time. Admin. R. at 0300, 0310. This form contained the DOT definition for sedentary work. *Id.* at 0300, 0310.

When Dr. Avioli conducted his peer review, he contacted Dr. Stelmach and asked him if he agreed that the plaintiff could perform sedentary work "with frequent sitting with only occasional walking and standing ***with the use of a cane or crutches as needed***, with no kneeling, squatting, stooping or bending and no push/pull/lift greater than 10 pounds, but otherwise with unrestricted use of the hands for fine fingering." Admin. R. at 0212, 0216 (emphasis added). Despite Dr. Stelmach having indicated that the plaintiff could not perform sedentary work in his prior statement to Liberty Life, less than a month later he ended up agreeing with Dr. Avioli that the plaintiff could perform sedentary work based on this modified description of sedentary work.

The plaintiff contends that Liberty Life never told its vocational specialists about the differing definitions of sedentary work or even the limitations recognized by Dr. Rohrbach in her May 10, 2013 examination of the plaintiff. Plaintiff's Br. in Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp. Br.") at 5, Doc. No. 44. The plaintiff believes that "Liberty . . . infected the analysis of the vocational expert by failing to reveal to him that it has re-defined the definition of sedentary duty or that there were significant limitations on the length of time during which [the

plaintiff] could sit or stand without discomfort.  *Id.*  He believes that "[f]or this reason alone, Liberty's denial of [his] application was arbitrary and capricious."  *Id.*

Unfortunately, Liberty Life did not respond to this particular argument, so the court does not have the benefit of its insight into the discrepancy in the definition of "sedentary work" used by Dr. Avioli when communicating with Dr. Stelmach.  There is no explanation in the record as to why Dr. Avioli used this particular definition of sedentary work in which he added the reference to the use of a cane or crutches as needed.  While this is of concern to the court insofar as Liberty Life based its determination of the plaintiff's physical demand status in part on these two doctors' conclusions that he could perform sedentary work, the court cannot find how this discrepancy would affect the vocational experts as argued by the plaintiff.  In particular, both vocational experts were asked to provide information about the typical physical demands of the plaintiff's job.  Liberty Life did not ask the vocational experts to analyze what type of work (physical-demand-wise) the plaintiff could perform in the national economy; instead, they were asked to identify the plaintiff's occupation in the national economy and the job demands and requirements of that occupation.  *See, e.g.*, Admin. R. at 114 (explaining that "Vocational Case Management received this referral on 08/02/13 for an occupational analysis to provide information regarding the typical physical demands of [the plaintiff's] own occupation").  Simply put, the court cannot discern how the discrepancy tainted the vocational specialists' analyses.  As such, while the modified definition is of some concern because it is different than the DOT version, and Liberty Life relied on the doctors' decisions determining that the plaintiff could perform sedentary work which ultimately resulted in the denial of benefits, the court cannot ascribe to the impact argued by the plaintiff.  Thus, the court does not find that the

differing definitions of sedentary work, in themselves, warrant a finding that Liberty Life committed an abuse of discretion.

>  c.  Whether Liberty Life Arbitrarily and Capriciously Selected Medical Evidence and Created Medical Opinions that Supported the Denial of the Plaintiff's Claim

The plaintiff contends that Liberty Life arbitrarily and capriciously denied his LTD benefits claim when it failed to consider or selectively referenced certain medical evidence. Pl.'s Mem. at 21-24. In essence, the plaintiff asserts that Liberty Life's initial denial of LTD benefits failed to reference any of the plaintiff's non-orthopedic impairments and its final review "summarily dismissed the opinions of Drs. Rehr, Minnich, Rohrbach, and Fantasia-Davis in favor of a 'nurse case manager' who is not medically qualified to give a medical diagnosis or make assertions concerning mental health restrictions or limitations." *Id.* at 23-24. The plaintiff raises particular concerns with the nurse case manager and her "monumentally ridiculous 'review.'" *Id.* at 24.

Liberty Life argues that it did not act arbitrarily or capriciously in determining that the plaintiff had a sedentary work capacity and in not considering whether the plaintiff's other impairments were disabling when the plaintiff's own doctors had not stated as such themselves. Def.'s Opp. Br. at 2-10. It also claims that "there is no evidentiary support for Plaintiff's assertion that Liberty Life did not take the information from [the plaintiff's] treating physicians into account." *Id.* at 5.

With respect to Dr. Rohrbach's medical documentation, Liberty Life asserts that it neither had to afford special weight to the opinion of the plaintiff's treating physician nor provide a specific explanation why it credited other evidence in the record. *Id.* at 2-3. Thus, whereas Dr. Rohrbach opined that the plaintiff could not work in any capacity and noted various ailments that were also previously diagnosed by other physicians, Liberty Life contends that it could (and did)

rely on its peer review doctor's determination that the plaintiff could return to work in a sedentary capacity. *Id.* at 3-4. It also notes that the plaintiff's treating orthopedist, Dr. Stelmach, agreed with Dr. Avioli that the plaintiff had a sedentary work capacity. *Id.* at 4.

Regarding the plaintiff's claims that Liberty Life failed to properly consider his non-orthopedic, mobility or obesity impairments in its LTD benefits determination, Liberty Life argues that the medical evidence did not demonstrate that the plaintiff was suffering from a cardiac condition that prevented him from working in a sedentary occupation. *Id.* at 6-8. In addition, Liberty Life asserts that the medical documentation does not establish that he was suffering from a mental impairment that prevented him from returning to work. *Id.* at 8-10.

After reviewing the entirety of the record, the court concludes that Liberty Life did not act in an arbitrary or capricious manner by wrongfully electing to credit certain medical evidence or by failing to consider all of the medical documentation. Substantial evidence supported Liberty Life's determination that the plaintiff could function at a sedentary work capacity. Prior to Dr. Rohrbach, Liberty Life had ample medical documentation in the record to support its determination that the plaintiff could work in a sedentary work capacity. Both Dr. Avioli and Dr. Stelmach agreed that the plaintiff had a sedentary work capacity, and Liberty Life referenced these opinions in detail and relied on them in initially denying benefits and affirming that denial after the plaintiff's appeal.[30]

As indicated earlier, the plaintiff contests the different definitions of sedentary work used by Dr. Avioli, with Dr. Stelmach eventually agreeing that the plaintiff could perform sedentary work as defined by Dr. Avioli. Although Dr. Avioli clearly used language not contained in the DOT definition of sedentary work insofar as she mentioned the use of a cane while moving or standing, the plaintiff does not effectively argue how the reference to the cane invalidates the

---

[30] In addition, Dr. Frombach had indicated that the plaintiff could continue working in a sedentary capacity.

doctors' determinations that the plaintiff could perform sedentary work.  Presumably, the plaintiff is asserting that without the cane, the plaintiff could not walk and stand as required by the DOT definition of sedentary work.  There is however, no indication that the doctors could not consider the plaintiff's use of a cane when concluding he could perform sedentary work, nor are there identifiable aspects of the plaintiff's occupation that would prohibit him from using a cane; in fact, he had been using one for a seemingly lengthy period of time before he stopped working.  As such, the court finds that Dr. Avioli's reference to the cane in his definition of sedentary work does not render Liberty Life's sedentary work determination arbitrary and capricious.

In addition to again contesting Dr. Avioli's definition of sedentary work, the plaintiff focuses on Dr. Rohrbach's examination and attending physician statement to support his argument that he could not function even in a sedentary capacity.  Regarding treating physicians such as Dr. Rohrbach, an internal medicine specialist, although "ERISA 'does not require that plan administrators give the opinions of treating physicians special weight, courts must still consider the circumstances that surround an administrator ordering a paper review [from a non-treating physician].'" *Connelly v. Reliance Standard Life Ins. Co.*, No. CIV. A. 13-5934, 2014 WL 2452217, at *5 (E.D. Pa. June 2, 2014) (quoting *Post v. Hartford Ins. Co.,* 501 F.3d 154, 166 (3d Cir. 2007) (citation omitted) and also citing to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003)).  Additionally,

> [p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, which may include a treating physician's opinion, but a court cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

*Id.* (quoting *Nord,* 538 U.S. at 834).

In Dr. Rohrbach's office visit notes, she referenced the plaintiff's disability due to severe arthritis in his right hip and the delay in the ordering of a hip replacement until the plaintiff lost more weight.  Admin. R. at 0136, 0137.  She also indicates other, non-orthopedic diagnoses, such as borderline diabetes mellitus and valvular heart disease, but does not make any reference to how these diagnoses were, either by themselves or in conjunction, disabling.  *Id.* at 0136.  In addition, she identifies four diagnoses in her attending physician statement:  osteoarthritis, abnormality of gait, morbid obesity, and hypertension.  *Id.* at 0143.  She also specifically stated that "[d]ue to severe osteoarthritis, obesity, instability, and pain, [the plaintiff] cannot work."  *Id.* at 0144.

Contrary to the plaintiff's contention, Liberty Life indicated that it reviewed Dr. Rohrbach's medical documentation, but noted that this additional information did not alter the opinion reached by Dr. Avioli.  Admin. R. at 0108.  The court notes that the plaintiff states that "the only physician who assessed the combined effect of [the plaintiff's] medical impairments after all test results were in was Dr. Rohrbach, who had treated [the plaintiff] for nearly a decade when she reported to Liberty that he was totally disabled."  Pl.'s Opp. Br. at 13.  Although the plaintiff states that Dr. Rohrbach assessed the combined effect of all the plaintiff's medical impairments, the court simply cannot reach such a conclusion after reviewing her medical documentation because she does not state as such.

Even if she had considered the combined effect of the plaintiff's ailments, Dr. Rohrbach limited her conclusion insofar as she only identified orthopedic impairments that were disabling to the plaintiff.  She did not identify other impairments as disabling and expressly opine that the combination of those issues were disabling to the plaintiff.  There is simply no way for the court to interpret a "combined effect" analysis from her records, and consequently, Liberty Life surely

could not have abused its discretion in declining to do so as well.  Moreover, Liberty Life was not unreasonable in relying on the opinions of two orthopedists who indicated the plaintiff can do sedentary work despite a potential disabling diagnosis of osteoarthritis and other mobility issue over the opinion of Dr. Rohrbach, an internal medicine practitioner.  *See, e.g.*, *Addis v. The Limited Long-Term Disability Prog.*, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006) (explaining that non-specialist is less qualified than a specialist to opine about the effects of an illness in the specialist's profession on the claimant's functional abilities).  Furthermore, simply because Liberty Life did not chose to follow Dr. Rohrbach's opinion, resulting in an unfavorable decision for the plaintiff, does not mean that Liberty Life acted arbitrarily and capriciously.  *See, e.g.*, *Johnson v. Hartford Life & Acc. Ins. Co.*, No. CIV. A. 03-3336, 2004 WL 1858070, at *28 (E.D. Pa. Aug. 19, 2004) ("That Hartford had to resolve competing medical records and opinions, and did so in a manner unfavorable to [the plaintiff], does not constitute an abuse of discretion.").

The plaintiff's other general claim is that Liberty Life failed to take his other medical conditions into account, particularly his cardiac condition and mental health issues, when determining that he was not Disabled under the LTD provisions in the Disability Policy.  *See* Pl.'s Mem. at 22; Pl.'s Opp. Br. at 6-10.  The court finds that this general issue does not require significant discussion because it appears that, until briefing occurred in this case, neither the plaintiff nor his treating physicians expressed opinions that any of these other issues, either alone or in conjunction with others (without them being tagged along with his orthopedic issues) were disabling.

The plaintiff framed the disability inquiry in this case when he filed his claim for STD benefits.  In that document, the plaintiff identified the onset and nature of his illness as: "Impaired mobility and inability to walk unassisted.  Right leg unable to sustain weight.

Extended periods of obesity may have caused deterioration in function of joints and tendons. Despite significant weight loss, impairment has increased." Admin. R. at 0405. There is nothing in this statement about mental health issues or cardiac issues that the plaintiff identified as disabling.

Liberty Life also received Dr. Minnich's January 2013 attending physician statement which indicated that the plaintiff needed to stop working (at the request of Pratt Industries) due to his abnormal gait. Admin. R. at 0408. Dr. Minnich did not mention a cardiovascular issue.

During the time that the plaintiff was attempting to obtain STD benefits, he submitted medical documentation from Dr. Rehr relating to his obesity and cardiovascular issues. Dr. Rehr undeniably indicated that the plaintiff had cardiovascular issues and respiratory issues (such as sleep apnea) that appeared to affect his functioning, but it does not appear he ever imposed restrictions on the plaintiff or indicated these issues were disabling. Admin. R. at 0388. Liberty Life indicated that it reviewed Dr. Rehr's notes and summarized them in its initial LTD benefits claim denial. *Id.* at 0198.

After Liberty Life initially denied the LTD claim, the plaintiff submitted a letter along with his appeal and other medical documents in which he does not mention a complaint with Liberty Mutual failing to consider his cardiac or respiratory issues. *Id.* at 0128-0133. And again, the medical documentation submitted thereafter, including Dr. Rohrbach's documentation, does not contain a cardiac diagnosis that either the plaintiff or a practitioner claimed to be disabling or otherwise significantly impairing. *See, e.g.*, Dr. Rohrbach's May 10, 2013 Notes, Admin. R. at 0137 (listing notes from physical examination of (1) cardiovascular system in which the doctor states: "Normal rate; regular rhythm and normal heart sounds. Exam reveals no gallop and no friction rub[;]" (2) pulmonary/chest system in which the doctor indicates: "Effort normal and

71

breath sounds normal.   No respiratory distress.   He has no wheezes.   he has no rales."). Accordingly, Liberty Life did not act arbitrarily and capriciously when it did not identify the plaintiff's medical records relating to possible cardiovascular diagnoses, require any additional medical reviews based on these diagnoses, or find that the plaintiff is disabled based on those diagnoses or their combination with other diagnoses when the plaintiff's own physicians had not done so.

The plaintiff also complains of Liberty Life's failure to give proper consideration to his mental health diagnoses.  Pl.'s Br. at 27-29; Pl.'s Opp. Br. at 6-10.  In particular, the plaintiff indicates that Liberty Life should have been aware of a mental health impairment as early as Dr. Minnich's attending physician statement insofar as he informed Liberty Life that the plaintiff had a Class 3 mental impairment.  Pl.'s Br. at 27; Admin. R. at 0374.  Even if this report had not placed Liberty Life on notice, the plaintiff argues that Liberty Life should have been aware in April 2013 when Pratt Industries provided its updated job description in which it discussed the stresses of the occupation.  Pl.'s Br. at 27; Admin. R. at 0203-0205.  This was followed by Dr. Rohrbach's May 2013 note in which she indicated that the plaintiff told her that he was stressed at work due to his inability to ambulate and identified a Class 4 mental health impairment in her attending physician statement.  Thereafter, the plaintiff submitted Dr. Fantasia-Davis's report indicating that he was suffering from anxiety and depression.  Pl.'s Br. at 28.

The plaintiff focuses on Liberty Life having a nurse case manager review Dr. Fantasia-Davis's report and basically determine that Liberty Life need not take any action or find him disabled based on the nurse's review.[31]  Pl.'s Br. at 28-29.  Other than a general assertion that a

---

[31] The plaintiff also criticizes Liberty Life for using the nurse case manager and her summary of the plaintiff's mental health documentation to contradict Dr. Rohrbach's determination that the plaintiff suffered from a Class 4 mental health impairment.  Similar to Dr. Fantasia-Brown, Dr. Rohrbach did not place any limitations on the

nurse should not be reviewing the opinions of a doctor, *see id.* at 28 ("In the real world, nurses defer to physicians, with good reason.  Only in the world of Liberty Life claims handling would a nurse case manager override the opinions of three physicians and a psychologist."), which admittedly has some merit on its face, the plaintiff has not provided the court with a legally-sufficient basis to discount the nurse's assessment or to find that Liberty Life abused its discretion for considering her assessment.  More specifically, while the plaintiff complains that Liberty Life based its decision to not consider a mental health diagnosis on the nurse's purportedly two-sentence assessment of the plaintiff's mental health documentation from Dr. Fantasia-Davis, *see id.* at 23, there is no indication that the nurse provided a diagnosis or reached any conclusions contrary to Dr. Fantasia-Davis.

Instead, the record shows that Dr. Fantasia-Davis did not place any limitations on the plaintiff despite her mental health diagnoses and did not conduct any objective testing to support any such limitations (or even to support diagnoses such as depression).  There are also no records of the plaintiff taking any medication for mental health issues during the course of his LTD benefits claim proceedings.  Therefore, while it would on its face appear unusual to have a nurse summarize and review a doctor's diagnoses, under the circumstances in this case where Liberty Life was not contesting the diagnoses and there were no indications of limitations caused by any mental health impairments, the court cannot conclude that the nurse case manager's summary and conclusions were unreasonable or that Liberty Life acted arbitrarily and capriciously in relying upon them in rendering its final decision to affirm the denial of LTD benefits.[32]

---

plaintiff due to the mental health impairment.  She also did not diagnose the plaintiff with a mental health disorder, although she does recommend that he see Dr. Fantasia-Davis.  Admin. R. at 0139.

[32] Liberty Life also points out that the plaintiff's appeal letter illustrates the higher quality of cognitive functioning that would support its conclusion that the plaintiff was not suffering from a disabling mental health impairment.

d.  Purported Conflicts of Interest

The plaintiff's final set of substantive arguments relate to numerous purported conflicts of interest in the manner in which Liberty Life ultimately decided the plaintiff's LTD claim.[33] Pl.'s Br. at 24-29.  Because the court has already found that Liberty Life abused its discretion, the court will not delve into an examination of Liberty Life's possible conflicts.  The court notes, however, that many of the purported conflicts relate to issues and claims the plaintiff has already raised in this case.

## 2.  Defendant's Motion for Summary Judgment

In its motion for summary judgment, Liberty Life argues that there is no evidentiary basis for disturbing its determination that the plaintiff was capable of returning to work in his own occupation as a controller, insofar as (1) its determination was based on medical reports and information it received during administrative review, and (2) the occupational analysis and vocational reports support its determination.  In addressing all of the arguments raised by the plaintiff in his motion, the court has generally dealt with the issues raised by the defendant in its motion.  To the extent that the court did not address a particular claim, the court's determination that Liberty Life acted in an arbitrary and capricious manner in the occupational analysis warrants denying the instant motion.

## 3.  Remedy

Because the court has determined that it acted in an arbitrary and capricious manner in denying LTD benefits, Liberty Life contends that the court must remand the case to it, rather

---

[33] As indicated above, it appears that the plaintiff asserted procedural conflicts of interest and did not assert a structural conflict of interest despite the possibility that one would exist in the case insofar as the record from the prior summary judgment proceedings here demonstrates that Liberty Life pays benefits and administers the claims. *See* Memorandum Op. at 14, 15, Doc. No. 28.

than award retroactive benefits.  Def.'s Opp. Br. at 20-21.  The plaintiff argues that due to Liberty Life's numerous wrongful and improper actions in this case, the court should

> refuse to give Liberty [Life] another chance to deny [the plaintiff] benefits and fashion an equitable remedy that will grant [the plaintiff] benefits on an ongoing basis while preserving Liberty [Life]'s right to review [the plaintiff's] entitlement to benefits in the future in accordance with the requirements of the plan.

Pl.'s Opp. Br. at 15.

In circumstances where the district court is deciding whether to remand to the plan administrator or reinstate benefits,

> it is important to consider the status quo prior to the unlawful denial or termination.  As such an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded.  In a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled.  To restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion.  In the termination context, however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully.  Accordingly, benefits should be reinstated to restore the status quo.

*Miller v. American Airlines, Inc.*, 632 F. 3d 837, 856-57 (3d Cir. 2011).

Here, all of the cases cited by the plaintiff in support of his assertion that the court craft an equitable remedy for him rather than remanding it back to the plan administrator were decided prior to *Miller*.  While the court acknowledges the plaintiff's position and the frustration with the administrative process for disposition of his claim at Liberty Life, under *Miller*, the appropriate remedy in a case such as this one where benefits were improperly denied at the outset, is to remand the case to the plan administrator to reevaluate whether the plaintiff is entitled to LTD benefits under the plan, with Liberty Life evaluating the claim consistent with this opinion.

### III.    CONCLUSION

For the foregoing reasons, the court will grant the plaintiff's motion for summary judgment insofar as the plaintiff argued that Liberty Life committed an abuse of discretion in its analysis of whether the plaintiff could perform the material and substantial duties of his "Own Occupation."   The court will remand this matter to the defendant for reevaluation in a manner consistent with this opinion.   The court will also deny Liberty Life's motion for summary judgment.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.